UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

      -against-

JOSEPH PERCOCO,
      a/k/a "Herb,"
ALAIN KALOYEROS,
      a/k/a "Dr. K,"
PETER GALBRAITH KELLY, JR.,
      a/k/a "Braith,"
STEVEN AIELLO,
JOSEPH GERARDI,
LOUIS CIMINELLI,
MICHAEL LAIPPLE,
KEVIN SCHULER,

                  Defendants.

16-CR-776 (VEC)

_____

## DECLARATION OF DANIEL C. OLIVERIO IN SUPPORT OF THE BUFFALO DEFENDANTS' JOINT MOTION TO TRANSFER

      DANIEL C. OLIVERIO, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

### Introduction

      1.      I am a member of Hodgson Russ LLP, counsel of record for Defendant Louis P. Ciminelli.  Timothy W. Hoover and I are trial counsel for Mr. Ciminelli.

      2.      This declaration is made upon my personal knowledge and upon information I learned during the course of my investigation of the charges set forth in the Indictment (Docket #49).

3.      My declaration is offered to support the joint motion of Defendants Louis Ciminelli, Michael Laipple, and Kevin Schuler (the "Buffalo Defendants") for an order, pursuant to Federal Rule of Criminal Procedure 21(b), transferring the case (Counts One, Four, and Five) against the Buffalo Defendants to the United States District Court for the Western District of New York at Buffalo, for pretrial proceedings, substantive motion practice, and trial.  The transfer is in the interest of justice, for the convenience of witnesses and the parties, and for judicial economy.

4.      Set forth below are facts relevant to transfer under the United States Supreme Court's decision in *Platt v. Minnesota Mining and Manufacturing Co.*, 376 U.S. 240 (1964), as adopted and applied by the United States Court of Appeals for the Second Circuit, when evaluating motions under Rule 21(b).[1]

5.      The Buffalo Defendants intend to file reply papers in support of their joint motion.

6.      The Buffalo Defendants request oral argument on the joint motion at the earliest available date and time set by the Court.

---

[1]      Counsel for Mr. Laipple and counsel for Mr. Schuler have submitted separate declarations providing additional facts relating to the *Platt* factors as they pertain to their clients.  I have also submitted a separate, sealed declaration for the Court's review. Relevant background on the Indictment, and facts in support of the Buffalo Defendants' motion to dismiss, are set forth in the separate Declaration of Timothy W. Hoover, dated February 6, 2017.  The Buffalo Defendants have also submitted a joint memorandum of law, and Mr. Schuler has submitted a separate memorandum of law, in support of the joint motions.

**Motion for Transfer and the *Platt* Factors**

Factor 1 — Location of Louis Ciminelli

7.      Mr. Ciminelli was born, raised, and has always resided in or near the City of Buffalo, New York, which is in the Western District of New York.  He grew up in Buffalo and the Buffalo area, and went to school in the Buffalo area.

8.      He is 61 years old.

9.      He resides with his wife at their primary home in the City of Buffalo.  He also spends time and works at a second home in Scottsdale, Arizona.

10.     The majority of Mr. Ciminelli's extended family, including his elderly mother, brothers, two of his three adult children, and his grandchildren, also reside in Buffalo, New York.

11.     Mr. Ciminelli intends to maintain his principal residence and domicile in the City of Buffalo, as he has for over 60 years.  It is close to his family, it is close to his business, and it is his home.

12.     Mr. Laipple and Mr. Schuler also live with their families in the Buffalo area, as set forth in their counsel's declarations.

Factor 2 — Location of Witnesses

13.     Because of the nature of the charges against Mr. Ciminelli, there will likely be a substantial defense case which will include testimony from non-party fact witnesses, government agents, and a host of character witnesses.

14.     Because Buffalo is the center of gravity and the nerve-center of the case against the Buffalo Defendants, it is not surprising that the vast majority of witnesses that both Mr. Ciminelli, and the government, will call, reside in or near Buffalo.  It appears that some witnesses may reside and work in the Northern District of New York.  No witnesses, as far as I know, reside or work in the Southern District of New York.

15.     In particular, Mr. Ciminelli intends to call multiple character witnesses, all of whom reside in Western New York.[2]

16.     None of the proposed character witnesses have a residence or domicile in the Southern District of New York, and several of the character witnesses are currently employed in substantial and critical positions in entities having a principal place of business in the Western District of New York.

17.     These character witnesses will testify regarding Mr. Ciminelli's reputation in the Western New York community and his character for truthfulness, integrity, and honesty as part of the defense case.

18.     If required to travel to, and testify in, the Southern District of New York, these witnesses will need to travel to New York City, obtain lodging (at Mr. Ciminelli's expense), and will be away from their jobs and families for a period of time.

---

[2]     The defense will disclose the identity of these character witnesses, *in camera*, if requested by the Court.

19.     Mr. Ciminelli's (and the Buffalo Defendants') defense will also include testimony from a variety of non-party witnesses, all of whom appear to live and work upstate (and some of whom are in Buffalo) and not in the Southern District of New York.  For example, Mr. Ciminelli intends to call employees from the other Buffalo-based firm, McGuire Development, that was chosen as a preferred developer in response to the Buffalo Request for Proposal ("RFP") issued by Fort Schuyler Management Corporation ("Fort Schuyler").  He also will seek testimony from other Buffalo firms that sought and received the Buffalo RFP, as well as from persons involved in the actual construction of the building at the Riverbend site.  All of these witnesses work and/or reside in or near Buffalo.  Mr. Ciminelli also intends to call certain employees of Fort Schuyler and members of its board at the time of the alleged crimes.  Mr. Ciminelli also intends to call representatives of Whiteman, Osterman & Hanna LLP, the law firm affiliated with the government's cooperating witness, Todd Howe, to provide testimony about the legal contractual/retainer arrangement between the law firm and LPCiminelli, Inc. ("LPCiminelli"), a key fact in the government's bribery allegation.  I do not believe that any of the Fort Schuyler or the Whiteman, Osterman & Hanna LLP witnesses live or work in the Southern District of New York.

20.     Mr. Ciminelli will also call a number of Buffalo-based LPCiminelli employees to testify about the facts and circumstances concerning the allegedly rigged Fort Schuyler RFP, including its president, Frank Ciminelli, II, marketing employees, financial executives, and several other employees with knowledge of construction management and the construction industry.  All of these witnesses live and work in the Western District of New York.

21.     These witnesses are expected to testify that the RFP was not "rigged," that the course of dealings between Fort Schuyler and LPCiminelli was regular and well-within the permitted types of interaction, and about qualifications and characteristics that a successful construction management firm should have.  They also will provide evidence that the conduct of the Buffalo Defendants was lawful and within industry norms at all times.

22.     Accordingly, if the Buffalo Defendants are compelled to try the case in the Southern District of New York, virtually all of their witnesses will have to be subpoenaed and travel to the Southern District of New York, at the Buffalo Defendants' expense, and be inconvenienced by being away from their businesses and places of residence for what could be extended periods of time.

23.     Although the needs of the defense case alone compel transfer, this motion presents the unique and singular circumstance where the investigating law enforcement agency, and the agents who supervised and handled the investigation, are located in Buffalo and within the Western District, rather than the district where the case was charged.

24.     Both the government and the Federal Bureau of Investigation have made clear that the investigation leading to the Indictment was, is, and will be a Buffalo-initiated and Buffalo-investigated matter.

25.     Attached as **Exhibit A** is an article from the *Buffalo News*, where the Special Agent in Charge of the Federal Bureau of Investigation's Buffalo Field Office, Adam Cohen, provides a detailed accounting of the Buffalo-based and -led nature of the investigation, work, and government agents who worked on the case (and will be witnesses at trial).  *See* Jerry

Zremski, *FBI agent: Email evidence built the Buffalo Billion Case*, BUFFALO NEWS, Sept. 22, 2016, *http://buffalonews.com/2016/09/22/fbi-agent-email-evidence-built-buffalo-billion-case/* (last visited Feb. 6, 2017).

26.     Special Agent Cohen makes clear that "the Buffalo FBI office led the criminal investigation . . . ." *Id.*  This was not some ancillary email review, or courtesy assistance to their out-of-town law enforcement partners, or some aspects of the investigation. Rather, Special Agent Cohen's personnel led "'all aspects of it,' Cohen said."  *Id.*

27.     The effort was not just the casual or passing assistance of a few Buffalo-based agents.  Rather

> [] Cohen went out of his way to praise his office's public corruption unit.  Investigators Rob Gross and Gary Jensen led the investigation that led to the indictments Bharara announced Thursday.  Both of them, along with several others who worked on the case, are Buffalo-area natives who are especially dogged in the pursuit of public corruption cases, Cohen said.  "We have about five guys who have worked this type of investigation for a number of years," Cohen said. "They're very experienced, and the professional staffers who work with them are just top notch."

*Id.*

28.     In violation of the September 20, 2016 sealing order of Magistrate Judge Gorenstein (Docket #N/A (Sept. 20, 2016)), someone leaked details of the Complaint (Docket #1) while the Complaint was still under seal, resulting in a story published by the Wall Street Journal online on 12:01 a.m. on September 22, 2016, before the Buffalo Defendants were arrested at their homes in the Buffalo area around 6 a.m. that morning.

29.     When the government's lead prosecutor appeared at, and held, a press briefing later that day, he made clear that the work of the special agents from Buffalo was "extraordinary."

30.     The lead prosecutor stated that "[w]e wouldn't be here without the extraordinary work of a lot of folks and I want to thank them.  I want to thank the FBI, represented here today by Adam Cohen, Special Agent in Charge of the Buffalo field office for their tremendous work in this investigation.  In particular I want to thank supervisory special agent Robert Gross and special agents Gary Jensen . . . . They did really exemplary work on this investigation."  Videotape, Sept. 22, 2016 U.S. Dep't of Justice press conference featuring Preet Bharara and Adam Cohen, *http://usatoday30.usatoday.com/video/raw-video-preet-bharara-press-conference-on-corruption/5137263013001* (last visited Feb. 6, 2017) (copy of video on file with the undersigned and available upon request).

<u>Factor 3 — Location of the Events at Issue</u>

31.     Buffalo is the center of gravity and the nerve center of the case against the Buffalo Defendants.  The events at issue against these three Buffalo Defendants overwhelmingly occurred in the Western District of New York.  Any events that did not occur in the Western District of New York occurred outside of the Southern District of New York.

32.     The RFP at issue was drafted in Albany by Fort Schuyler with the assistance of Albany counsel, and was received by LPCiminelli in Buffalo.  The LPCiminelli response was prepared by LPCiminelli employees in Buffalo and sent to Fort Schuyler in Utica. The "graders" and decision-makers at Fort Schuyler who reviewed the responses were located in

Albany.  The project the government alleges to be tied to the proposal is located in the City of Buffalo.[3]

33.     Neither the 70-plus page Complaint nor the Indictment in this case contains specific allegations indicating any act, critical act, event, or series of actions took place in the Southern District of New York with respect to the Buffalo RFP by Mr. Ciminelli or any of his alleged co-conspirators (Mr. Schuler, Mr. Laipple, and Dr. Kaloyeros).

34.     The government's cooperating witness, Todd Howe, has a residence in Washington, District of Columbia and, through WOH Government Solutions LLC, provided consulting services for LPCiminelli (located in Buffalo) and, apparently, for the State University of New York Polytechnic Institute Colleges of Nanoscale Science and Engineering ("SUNY Poly") located in Albany and Utica.

35.     LPCiminelli retained Whiteman, Osterman & Hanna LLP, an Albany law firm, which, in turn, engaged WOH Government Solutions LLC and Howe to perform consulting services for LPCiminelli.  LPCiminelli's contract with Whiteman, Osterman and Hanna was signed and negotiated in Buffalo and Albany by an LPCiminelli representative and Richard Leckerling, Esq., the managing partner of Whiteman, Osterman and Hanna.  None of those events occurred in the Southern District of New York.  The government claims this contract and

---

[3]     While the RFP does not, on its face, award LPCiminelli any particular project and, in fact, clearly contemplates future contracts and negotiations between the winning preferred developer and Fort Schuyler, the first project performed and completed by LPCiminelli was the SolarCity solar panel manufacturing factory located at Riverbend in the City of Buffalo.

the payments thereunder were bribes.  Neither the law firm nor WOH Government Solutions

LLC have been charged.

36.     The government, in the Complaint, has emphasized various electronic

mail messages claimed to support the charges against the Buffalo Defendants.  Those messages

linked to the Buffalo Defendants were sent from Buffalo, New York, and any alleged

conspiratorial electronic mail messages sent to the Buffalo Defendants were apparently

transmitted from the Albany area to Buffalo.

37.     None of the events relating to the drafting of the RFP, its issuance, the

response by LPCiminelli, or the selection process emanated from, or are in any way connected

with, the Southern District of New York.  The government has nowhere claimed otherwise,

except for a passing reference in the Todd Howe plea colloquy to some unspecified contact

between (apparently) SUNY Poly or Fort Schuyler and Empire State Development (now headed

by a person who apparently lives in the Buffalo area, and which has offices in Buffalo, among

other places).

### Factor 4 — Location of Documents and Records

38.     The vast majority of documents relevant to the charges against the Buffalo

Defendants are documents from LPCiminelli that were created and maintained in the Western

District of New York, or are documents from Fort Schuyler or SUNY Poly or were created and

maintained in the Northern District of New York.

39.     We are unaware of any relevant documents relating to the Buffalo

Defendants that were created or maintained in the Southern District of New York.

40.      Most of the relevant documents are in digital or electronic mail form, either because they are electronic mail messages, or have been scanned.

41.      It is in Buffalo where the Buffalo office of the FBI, including agents and analysts working for the FBI in Buffalo, reviewed this data, including tens of thousands of e-mails.  Review of the data – whether Buffalo data, or Albany data, or data from elsewhere – occurred in the Western District of New York.

42.      FBI Special Agent in Charge Cohen declared that the investigation took place in Buffalo, led by a team of Buffalo special agents, reviewing evidence gathered in and emanating from Buffalo.  *See* Ex. A.

43.      The FBI in Buffalo also led the interview of a number of Buffalo-based witnesses, including other companies that responded to and/or were also selected as a preferred developer.

44.      Accordingly, not only is Buffalo the center of gravity of the conduct by the Buffalo Defendants, but it is also the location of relevant documents and the center of gravity of the government's own investigation.

<u>Factor 5 — Disruption of Mr. Ciminelli's (and the Buffalo Defendants') Business and Employment</u>

45.      As explained in more detail below, the investigation and this case has caused tremendous damage to LPCiminelli and has threatened its future.  The coming months and the coming years are critical to its survival and re-growth.  A trial in the Southern District of New York — as opposed to in Buffalo — would significantly disrupt the efforts of the Buffalo

Defendants (who are now employed by a separate company owned by Mr. Ciminelli) and their work in pursuing development opportunities for LPCiminelli.

46.     As a result of media reports in September 2015 that LPCiminelli had received a subpoena from the government, LPCiminelli lost approximately 14 projects immediately thereafter.  This was before any charges were placed in this case or an indictment was returned.  Attached as **Exhibit B** is a summary of the business lost merely upon the press reports that LPCiminelli had received a grand jury subpoena.

47.     After the issuance of the Complaint in September 2016, through the Fall of 2016, LPCiminelli lost approximately an additional $1.737 billion worth of business through the cancellation of contracts and disqualification from bids.  Attached as **Exhibit C** is a summary of business lost in fall 2016 upon the unsealing of the Criminal Complaint.

48.     As a result, LPCiminelli already has laid off approximately ten percent of its workforce.

49.     In all, LPCiminelli has lost approximately $3.88 billion worth of work and inventory.

50.     Mr. Ciminelli is a beneficial owner of LPCiminelli.

51.     LPCiminelli has always been located and headquartered in Buffalo.

52.     During the course of the investigation and during the pendency of the charges, Mr. Ciminelli was the CEO of LPCiminelli.  He was not directly involved in the day-to-day operations of the company.  Rather, he served a key business development role and advisory

capacity to the president of LPCiminelli, and to other executives and project managers.  Mr. Ciminelli was the face of the company in the community, with LPCiminelli's customers, and in its business development efforts across the country.

53.     The disruption described above has already occurred.  Trial in the Southern District of New York will cause further disruption to Mr. Ciminelli's employment, Mr. Laipple's employment, Mr. Schuler's employment, their current employer, and to LPCiminelli.

54.     On January 12, 2017, in order to facilitate the continued viability of LPCiminelli and meet vendor responsibility requirements given the pending charges, Mr. Ciminelli voluntarily stepped down as CEO of LPCiminelli.

55.     Mr. Ciminelli has created a limited liability company, named LPC Infrastructure Development, LLC, whose registration with the New York Secretary of State occurred on January 20, 2017.  Various other initial organizational work to make this new entity operational is presently in progress.  LPC Infrastructure Development, LLC will focus on pursuing development opportunities outside of New York State, and is located in Buffalo.   Mr. Ciminelli will be employed by LPC Infrastructure Development, LLC.  He also is able to perform work from his second home in Scottsdale, Arizona.

56.     Mr. Laipple and Mr. Schuler also voluntarily stepped down from their positions at LPCiminelli on January 12, 2017, for the same reasons, and also will be employed by LPC Infrastructure Development, LLC in Buffalo.  Mr. Ciminelli, Mr. Laipple and Mr. Schuler will constitute, at present, three of the five employees of LPC Infrastructure Development, LLC.

57.     While Mr. Ciminelli will perform much of his work for LPC Infrastructure Development, LLC, in Scottsdale, Arizona for the near term, Mr. Laipple and Mr. Schuler will work in Buffalo, with Mr. Laipple traveling to Scottsdale as necessary to confer and work directly with Mr. Ciminelli.

58.     It is expected that LPCiminelli employees will consult and coordinate with LPC Infrastructure Development, LLC and Mr. Ciminelli, Mr. Laipple, and Mr. Schuler regarding development opportunities outside of New York State.  LPC Infrastructure Development, LLC will leverage LPCiminelli infrastructure and resources in pursuit of development opportunities outside of New York.  Those opportunities, if and when they come to fruition, would result in new projects (and resulting new revenue) that could be undertaken by LPCiminelli and its employees in the years to come, contributing to its continued viability.

59.     As to Mr. Ciminelli's and the Buffalo Defendants' ability to work from Manhattan during trial, while LPCiminelli has a very small Manhattan office, designed to facilitate the pursuit of work in the Downstate/Tri-State region, the Buffalo Defendants do not have access to that office, as they are no longer employed by LPCiminelli.  And, in any event, that office may close in the near future.

60.     The continued presence of the Buffalo Defendants to work on and collaborate with LPCiminelli on non-New York State pursuits is particularly important given that LPCiminelli is a closely-held, family-operated business.

61.     A trial that, according to the government's estimation, could last two months or more in the Southern District of New York will prevent Mr. Ciminelli, Mr. Laipple,

and Mr. Schuler from having any significant day-to-day presence for LPC Infrastructure Development, LLC, or from collaborating with LPCiminelli on out-of-state development opportunities.  It will also preclude them from having any regular and meaningful prospect or customer contact during that time.  A trial in the Western District of New York will, at the very least, allow the Buffalo Defendants to maintain some presence and be able to continue to pursue opportunities *via* LPC Infrastructure Development, LLC in its efforts to develop business opportunities.

62.     As a result of the investigation, plus the media coverage announcing the subpoena, and the charges against the Buffalo Defendants, the future of LPCiminelli, a company having a 60-year history, is unknown.  The company's inability to continue would result in the loss of approximately 200 well-paying jobs in Western New York.

63.     The ability of the Buffalo Defendants to work and to collaborate on new opportunities, including in Buffalo during trial, will help to build a pipeline of new work for LPCiminelli.  It will also enable LPCiminelli to pursue new opportunities, and provide assurances that the company will be viable going forward.

<u>Factor 6 — Expense to the Parties</u>

64.     The Buffalo Defendants will be compelled to incur the extraordinary expense of travel and lodging for themselves, their counsel, and witnesses during the course of a trial that may, according to the government's estimate, extend for two or more months.  All of those witnesses reside outside the Southern District of New York.

65.     The Buffalo Defendants will have to make arrangements for their own personal lodging during the trial in New York City.  While Mr. Ciminelli owns a small apartment in Manhattan, Mr. Laipple and Mr. Schuler do not.  Each would be required to incur extraordinary hotel costs or to rent separate apartments for the duration of trial.

66.     The Buffalo Defendants are represented by Buffalo-based trial counsel.

67.     Mr. Ciminelli has had to incur the real expense of engaging counsel in New York City to assist in his defense.  His Buffalo counsel already has traveled back and forth to the Southern District of New York on a host of occasions for meetings and Court appearances, and will likely be compelled to incur additional travel and lodging expenses for the anticipated appearances prior to trial, as well as the trial itself.

68.     If the case is tried in the Southern District of New York, the Buffalo Defendants will also bear the expense of travel, food, and lodging for their defense teams and required staff.[4]

69.     Trying the case in the Southern District of New York, where there appears to be no significant acts or activity relevant to the Indictment, will result in fees and expenses far beyond the typical expense for attorneys' fees, witnesses, and experts, all to the detriment of the Buffalo Defendants.

---

[4]     While LPCiminelli's Buffalo-based counsel does, in fact, have a New York City office, trial counsel are based, and reside, in Buffalo.

<u>Factor 7 — Location of Defense Counsel</u>

70.     The Buffalo Defendants have retained Buffalo trial counsel who will be primarily responsible for court appearances, strategic decisions, and actual trial of the case.  As a result, counsel, all of their supporting staff, associates, and research and writing resources are in Buffalo as well.

<u>Factor 8 and Factor 9 — Accessibility of the Place of Trial and Docket Conditions of Each District</u>

71.     Measured by a straight line, Buffalo is approximately 293 miles from New York City.  It is much farther by car.  It is approximately one hour from New York City by commercial air carrier.

72.     The Southern and Western Districts of New York are both accessible by air.

73.     Because of the relative size difference, however, travel and lodging within the Western District of New York are simpler and do not involve the extraordinary expenses described in the preceding section.

74.     Here, Buffalo and the Western District of New York are more accessible given the location of the majority of the Buffalo Defendants' expected witnesses, and many of the government's witnesses.  There is no doubt that Buffalo would be more accessible and efficient for the defense case and, at a minimum, equally accessible for the government's case. The Robert H. Jackson United States Courthouse is literally across the street from the FBI and U.S. Attorney's Offices in Buffalo.

75.     The United States District Court for the Southern District of New York has more active and senior judges than the United States District Court for the Western District of New York.  There are more total criminal cases filed and pending in the Southern District.  As a result of having more judges, the pending cases-per-judgeship statistic appears to be lower in the Southern District of New York.  But this factor is still neutral.  Apart from courts putting little-to-no stock in it, there is no doubt that the judges of the United States District Court for the Western District of New York are not too busy to adjudicate the transferred matter through motions and trial.

76.     Moreover, a Western District Judge may be in a better position to set an earlier trial date, given that the motions and trial scheduling will not be impacted by the possible desire of other Defendants (either the Syracuse/COR Defendants, or the Defendants in the "Percoco Bribery Scheme") to, for instance, seek a trial date well into the future.

77.     A careful reading of the Complaint and the resulting Indictment demonstrates that the conspiracy charges against the Buffalo Defendants, as well as the bribery count against them, have virtually no factual overlap with the charges against the remaining Defendants, except Dr. Kaloyeros, as related to the Buffalo RFP.

78.     Accordingly, it is expected that the Buffalo Defendants will be ready for trial far in advance of the other Defendants.  As a result, a transfer of the charges against the Buffalo Defendants will likely result in a trial date that is more fair and appropriate for the charges against them.

Factor 10 – Other Special Elements/Miscellaneous Factors

79.     The indictment is wholly silent with respect to any specific acts, or overt acts, committed in the Southern District of New York in support of the conspiracy charge or any of the substantive charges against the Buffalo Defendants.

80.     It is clear that the over-arching conspiracy charged by the government is at least two separate conspiracies with no overlapping proof between the two.  The "Percoco Bribery Scheme" is separate and alleges no involvement by the Buffalo Defendants.  The Buffalo Defendants have no involvement in the Syracuse RFP process and, as detailed in the Declaration of Timothy W. Hoover, dated February 6, 2017, ¶¶ 32-39, the Syracuse RFP process and subsequent projects were not part of the Buffalo Billion economic development initiative at all.  Finally, the Buffalo Defendants have no involvement in the false statement charges against Mr. Aiello and Mr. Gerardi.

81.     The Court has the authority to grant the motion and transfer the Buffalo Defendants to the Western District of New York for trial, while the charges against the other, non-moving Defendants remain in the Southern District of New York for adjudication.

82.     Transfer will not result in additional trials.  Even if the Buffalo Defendants are to be tried in this Court, they will move for severance from the other Defendants and the unrelated conspiracies, pursuant to Federal Rules of Criminal Procedure 8(b) and/or 14(a).  In other words, granting the transfer motion will not result in two trials; rather, at least two trials will be required based on the misjoinder and/or the prejudicial joinder of the Buffalo Defendants with unrelated Defendants and unrelated alleged conspiracies and criminal conduct.  Transfer of the Buffalo Defendants is wholly consistent with the applicable severance rules and principles.

83.     Additional facts to be considered under Factor 10 are set forth in the Sealed Declaration of Daniel C. Oliverio, dated February 6, 2017.

84.     In the absence of any proof of venue, and in the face of the overwhelming weight of the *Platt* factors described above, the government should, in the interest of fairness, be required to show substantial facts supporting venue in the Southern District of New York for not only the conspiracy charge against the Buffalo Defendants, but also for the bribery and substantive wire fraud counts.

85.     Based upon the allegations in the Indictment and the facts laid out in the government's extraordinarily lengthy Complaint, any basis for venue is likely either non-existent or extraordinarily thin.  The Court can consider this as a special factor in determining the transfer motion as well as under Factor 3:  the generic, non-factual allegations in the Indictment relating to venue are barely, if at all, sufficient to survive a facial attack.  As a result, and in the interest of justice, the Buffalo Defendants should be tried in the district where the overwhelming majority of events occurred and where the crimes alleged were actually committed.

## Conclusion

86.     Even if the Indictment's generic allegations are determined by the Court, at this early stage, to sufficiently allege venue, the Court should grant the motion to transfer.  By any measure, a balancing of the *Platt* factors, together with a careful review of the allegations in the lengthy Complaint and Indictment, supports a transfer of the charges against Mr. Ciminelli, Mr. Laipple, and Mr. Schuler to the Western District of New York for trial.  The government's venue allegations are either non-existent or extraordinarily weak.  Virtually each of the *Platt* factors favors transfer under Rule 21(b).  Where the events occurred, the location of witnesses,

where the investigation occurred, the extraordinary cost to the Buffalo Defendants if tried in the

Southern District of New York, when combined with the lack of any substantive venue

allegations, strongly supports transfer in the interest of fairness and justice, and trial in the

United States District Court for the Western District of New York.

Dated:      Buffalo, New York
            February 6, 2017

                                        **HODGSON RUSS** LLP
                                        *Attorneys for Defendant Louis Ciminelli*

                                        By:  s/Daniel C. Oliverio
                                             Daniel C. Oliverio
                                             Timothy W. Hoover
                                        The Guaranty Building
                                        140 Pearl Street, Suite 100
                                        Buffalo, New York 14202-4040
                                        716.856.4000
                                        *doliverio@hodgsonruss.com*
                                        *thoover@hodgsonruss.com*