## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | : |
| **v.** | : **Case No. 1:16-cr-00776** |
| | : |
| | : |
| **JOSEPH PERCOCO,** | : **ORAL ARGUMENT** |
| a/k/a "Herb," | : **REQUESTED** |
| **ALAIN KALOYEROS,** | : |
| a/k/a "Dr. K," | : |
| **PETER GALBRAITH KELLY, JR.,** | : |
| a/k/a "Braith," | : |
| **STEVEN AIELLO,** | : |
| **JOSEPH GERARDI,** | : |
| **LOUIS CIMINELLI,** | : |
| **MICHAEL LAIPPLE, and** | : |
| **KEVIN SCHULER,** | : |
| | : |
| **Defendants.** | : |
| | : |
| | : |

## JOINT MEMORANDUM OF LAW IN SUPPORT OF THE BUFFALO DEFENDANTS' MOTION TO DISMISS THE INDICTMENT PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 12

**LIPSITZ GREEN SCIME CAMBRIA LLP**
*Attorney for Defendant Michael Laipple*
Herbert L. Greenman
42 Delaware Avenue, Suite 120
Buffalo, New York 14202

**HODGSON RUSS LLP**
*Attorneys for Defendant Louis Ciminelli*
Daniel C. Oliverio
Timothy W. Hoover
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
716.856.4000

**CONNORS LLP**
*Attorneys for Defendant Kevin Schuler*
Terrence M. Connors
1000 Liberty Building
Buffalo, New York 4202
716.852.5533

**DLA PIPER LLP (US)**
*Attorneys for Defendant Louis Ciminelli*
John M. Hillebrecht
Jessica A. Masella
1251 Avenue of the Americas
New York, New York 10020
212.335.4829

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

THE INDICTMENT ............................................................................................... 5

ARGUMENT ......................................................................................................... 10

I.    THE WIRE FRAUD CHARGES SHOULD BE DISMISSED FOR FAILURE TO ALLEGE ESSENTIAL ELEMENTS OF THE CHARGED CRIMES .......................... 11

    A.    The Indictment Fails To Allege The Existence Of A Scheme Or Artifice To Defraud Through Material Misrepresentations Made With Fraudulent Intent ........................................................................................................ 12

        1.    The Indictment Fails To Allege A Scheme To Defraud Fort Schuyler ........................................................................................ 13

        2.    The Indictment Fails To Allege Facts Sufficient To Establish That The Buffalo Defendants Acted With The Requisite Specific Intent ........ 16

        3.    The Indictment Falls Short Because The Alleged Misstatements Are Not Material To The Transaction ....................................... 26

    B.    The Indictment's Allegations Do Not Establish A Valid Property Interest As The Object Of Any Alleged Scheme Or Artifice To Defraud ...................... 28

    C.    The Indictment Fails To Allege Any Specific Wire Transmissions ................... 41

II.    THE BRIBERY CHARGE (COUNT FIVE) SHOULD BE DISMISSED FOR FAILURE TO ALLEGE ESSENTIAL ELEMENTS OF SECTION 666 ...................... 43

    A.    There Was No Corrupt Offer Or Agreement To Give Anything Of Value ......... 47

        1.    The Indictment Fails To Adequately Allege The Buffalo Defendants Paid Bribes Or Illegal Gratuities ........................................... 47

        2.    Any Payments That May Have Been Made To Howe Were Not Made With The Requisite Corrupt Intent And Cannot Establish Criminal Liability Within The Meaning Of Section 666 ........................ 49

    B.    Howe Is Not An Agent Of Any Pertinent Governmental Organization ............. 52

    C.    Fort Schuyler Is Not A Qualifying State Agency ................................................ 55

    D.    The Alleged Corrupt Conduct Was Not In Connection With A Transaction Or Business Of The Agency Involving Anything Of Value Of $5,000 Or More ................................................................................................................. 60

    E.    Mcdonnell's Definition Of "Official Action" Necessitates The Dismissal Of Count Five ..................................................................................................... 61

III.    IN THE ALTERNATIVE, THE COURT SHOULD ORDER THE GOVERNMENT TO FILE A BILL OF PARTICULARS ............................................. 66

    A.    The Wire Fraud Charges (Counts One & Four) .................................................. 68

        1.    The Indictment Fails To Specify The Scheme Or Artifice To Defraud .................................................................................... 68

2.      The Indictment Fails To Specify The Offending Wire
        Transmissions ............................................................................................ 68

B.      The Bribery Charge (Count Five) .................................................................... 68

1.      Howe's Agency ........................................................................................ 69

2.      The Indictment Fails To Specify the Substance And Extent Of The
        "Official Acts" Alleged By The Government ......................................... 69

3.      The Indictment Fails To Specify Critical Aspects Of The Alleged
        Conduct, Including The Nature And Payment Of The Alleged
        Bribes ...................................................................................................... 70

CONCLUSION .................................................................................................................... 71

# TABLE OF AUTHORITIES

CASES

Blueline Commuter, Inc. v. Montgomery Cty.
126 A.D.3d 1161 (3d Dep't 2015) .........................................................................15

Brega Transport Corp. v. Brennan
105 A.D.3d 985 (2d Dep't 2013) ...........................................................................15

Cleveland v. United States
531 U.S. 12 (2000)............................................................................................ passim

Eastway Const. Corp. v. City of N.Y.
762 F.2d 243 (2d Cir. 1985)....................................................................................35

Fischer v. United States
529 U.S. 667 (2000).................................................................................57, 59, 60, 65

Guidice v. United States
No. 03 CV 4983(SJ), 2007 WL 1987746 (E.D.N.Y. July 3, 2007) .........................43

Hunts Point Terminal Produce Co-op. Ass'n, Inc. v. N.Y. City Econ. Dev. Corp.
36 A.D.3d 234 (1st Dep't 2006) ...................................................................... passim

McArdle v. Bd. of Estimate of City of Mt. Vernon
347 N.Y.S.2d 349 (Sup. Ct. Westchester Cnty. 1973),
aff'd, 45 A.D.2d 822 (2d Dep't 1974) ....................................................................15

McDonnell v. United States
136 S. Ct. 2355 (2016)...................................................................................... passim

McNally v. United States
483 U.S. 350 (1987)....................................................................................12, 28, 40

Pasquantino v. United States
544 U.S. 349 (2005)................................................................................................12

Russell v. United States
369 U.S. 749 (1962)................................................................................................11

Sekhar v. United States
133 S. Ct. 2720 (2013)........................................................................................34, 35

Skilling v. United States
561 U.S. 358 (2010)..........................................................................................63, 64

*Stirone v. United States*
    361 U.S. 212 (1960).................................................................................42, 43

*Terminate Control Corp. v. Horowitz*
    28 F.3d 1335 (2d Cir. 1994).................................................................35

*Tri-State Aggregates Corp. v. Metro. Transp. Auth.*
    108 A.D.2d 645 (1st Dep't 1985) ........................................................16

*United States v. Aleynikov*
    676 F.3d 71 (2d Cir. 2012)....................................................................10

*Untied States v. Alkaabi*
    233 F. Supp. 2d 583 (D.N.J. 2002) .....................................................32

*United States v. Alsugair*
    256 F. Supp. 2d 306 (D.N.J. 2003) ................................................31, 33

*United States v. Ashley*
    905 F. Supp. 1146 (E.D.N.Y. 1995) ................................................10, 68

*United States v. Autuori*
    212 F.3d 105 (2d Cir. 2000)..................................................................27

*United States v. Awan*
    459 F. Supp. 2d 167 (E.D.N.Y. 2006), *aff'd,* 384 F. App'x 9 (2d Cir. 2010)...................11, 63

*United States v. Bank of N.Y. Mellon*
    941 F. Supp. 2d 438 (S.D.N.Y. 2013)....................................................20

*United States v. Barnes*
    158 F.3d 662 (2d Cir. 1998)..................................................................67

*United States v. Binday*
    804 F.3d 558 (2d Cir. 2015), *cert. denied,* 136 S. Ct. 2487 (2016) ......................12, 17, 36, 40

*United States v. Bobo*
    344 F.3d 1076 (11th Cir. 2003) ............................................................30

*United States v. Bonito*
    57 F.3d 167 (2d Cir. 1995)....................................................................60

*United States v. Bortnovsky*
    820 F.2d 572 (2d Cir. 1987)..................................................................67

*United States v. Campbell*
    291 F. Supp. 2d 547 (E.D. Mich. 2003).................................................33

*United States v. Coyne*,
    4 F.3d 100 (2d Cir. 1993)......................................................................43

*United States v. D'Amato*
    39 F.3d 1249 (2d Cir. 1994)................................................................39

*United States v. Dinome*
    86 F.3d 277 (2d Cir. 1996)............................................................17, 40

*United States v. Doran*
    No. 16-10927, 2017 WL 1487222 (11th Cir. Apr. 26, 2017)......................58, 59, 60

*United States v. Evans*
    844 F.2d 36 (2d Cir. 1988)..................................................................31

*United States v. Falkowitz*
    214 F. Supp. 2d 365 (S.D.N.Y. 2002)....................................................12

*United States v. Finazzo*
    850 F.3d 94 (2d Cir. 2017)........................................................... passim

*United States v. Finazzo*
    No. 10-CR-457 RRM RML, 2014 WL 184134 (E.D.N.Y. Jan. 14, 2014),
    *aff'd,* 850 F.3d 94 (2d Cir. 2017)......................................................17

*United States v. Floresca*
    38 F.3d 706 (4th Cir. 1994) ...............................................................43

*United States v. Forrester*
    No. 02 CR.302 WHP, 2002 WL 1610940 (S.D.N.Y. July 22, 2002)......................7

*United States v. Ganim*
    510 F.3d 134 (2d Cir. 2007)............................................................44, 47

*United States v. Gardner*
    65 F.3d 82 (8th Cir. 1995) .................................................................41

*United States v. Granberry*
    908 F.2d 278 (8th Cir. 1990) .............................................................33

*United States v. Griffin*
    324 F.3d 330 (5th Cir. 2003) .....................................................33, 34, 39

*United States v. Guadagna*
    183 F.3d 122 (2d Cir. 1999)................................................................17

*United States v. Henry*
    29 F.3d 112 (3d Cir. 1994).......................................................31, 32, 36, 39

*United States v. Jennings*
   160 F.3d 1006 (4th Cir. 1998) ....................................................................47

*United States v. Kahale*
   789 F. Supp. 2d 359, 370 (E.D.N.Y. 2009),
   *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012)...........67

*United States v. Kurtz*
   No. 04-CR-0155A, 2008 WL 1820903 (W.D.N.Y. Apr. 21, 2008) ...............19, 39

*United States v. LeVeque*
   283 F.3d 1098 (9th Cir. 2002) ....................................................................33

*United States v. Lino*
   No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001) ..........44, 67, 68, 70

*United States v. Mariani*
   90 F. Supp. 2d 574 (M.D. Pa. 2000) .......................................................39, 40

*United States v. Martino*
   No. S1 00 CR 389 (RCC), 2000 WL 1843233 (S.D.N.Y. Dec. 14, 2000) ..............7

*United States v. McGinn*
   787 F.3d 116 (2d Cir. 2015)........................................................................12

*United States v. McLean*
   802 F.3d 1228 (11th Cir. 2015) .............................................................59, 65

*United States v. Mittelstaedt*
   31 F.3d 1208 (2d Cir. 1994)................................................................14, 36, 37

*United States v. Novak*
   443 F.3d 150 (2d Cir. 2006)....................................................................24, 32

*United States v. Novod*
   923 F.2d 970 (2d Cir. 1991), *on rehearing*, 927 F.2d 726 (2d Cir. 1991)........32, 35

*United States v. Paccione*
   949 F.2d 1183 (2d Cir. 1991)......................................................................36

*United States v. Pace*
   314 F.3d 344 (9th Cir. 2002) ......................................................................42

*United States v. Pedigo*
   12 F.3d 618 (7th Cir. 1994) .......................................................................43

*United States v. Peter*
   310 F.3d 709 (11th Cir. 2002) ....................................................................33

*United States v. Phillips*
219 F.3d 404 (5th Cir. 2000) ...........................................................................54

*United States v. Pierce*
224 F.3d 158 (2d Cir. 2000)..............................................................................28

*United States v. Pirro*
212 F.3d 86 (2d Cir. 2000)......................................................................... passim

*United States v. Radley*
632 F.3d 177 (5th Cir. 2011) ...........................................................................39

*United States v. Ramirez*
420 F.3d 134 (2d Cir. 2005).......................................................................41, 42

*United States v Regent Office Supply Co.*
421 F.2d 1174 (2d Cir. 1970)...................................................................... passim

*United States v. Rooney*
37 F.3d 847 (2d Cir. 1994)......................................................................47, 50, 51

*United States v. Rosen*
716 F.3d 691 (2d Cir. 2013)........................................................................ passim

*United States v. Roshko*
969 F.2d 1 (2d Cir. 1992)..................................................................................43

*United States v. Rossomando*
144 F.3d 197 (2d Cir. 1998)..............................................................................40

*United States v. Sabbeth*
262 F.3d 207 (2d Cir. 2001)..............................................................................11

*United States v. Sadler*
750 F.3d 585 (6th Cir. 2014) ............................................................................40

*United States v. Savin*
No. 00 CR. 45(RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001)..........................44

*United States v. Schwartz*
924 F.2d 410 (2d Cir. 1991).....................................................................11, 12, 33

*United States v. Serrano*
191 F. Supp. 3d 287 (S.D.N.Y. 2016)..................................................................11

*United States v. Shellef*
507 F.3d 82 (2d Cir. 2007)................................................................................20

*United States v. Shotts*
145 F.3d 1289 (11th Cir. 1998) ...................................................................33

*United States v. Siddiqi*
No. 06 Cr. 377 (SWK), 2007 WL 549420 (S.D.N.Y. Feb. 21, 2007) ......................44

*United States v. Silver*
117 F. Supp. 3d 461, 471 (S.D.N.Y. 2015).................................................42, 68

*United States v. Skelos*
No. 15 CR 317 KMW, 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015).............61, 63

*United States v. Starr*
816 F.2d 94 (2d Cir. 1987)............................................................... passim

*United States v. Sun-Diamond Growers of California*
526 U.S. 398 (1999).........................................................................64

*United States v. Sunia*
643 F. Supp. 2d 51 (D.D.C. 2009) ...........................................................53

*United States v. Torres*
901 F.2d 204 (2d Cir. 1990)................................................................67

*United States v. Turner*
465 F.3d 667 (6th Cir. 2006) ..............................................................32

*United States v. Upton*
856 F. Supp. 727 (E.D.N.Y. 1994) .........................................................10

*United States v. Veliz*
800 F.3d 63 (2d Cir. 2015)................................................................47

*United States v. Viloski*
557 F. App'x 28 (2d Cir. 2014) ............................................................39

*United States v. Walker*
191 F.3d 326 (2d Cir. 1999)............................................................17, 36

*United States v. Wallach*
935 F.2d 445 (2d Cir. 2010)........................................................17, 39, 40

*United States v. Walsh*
194 F.3d 37 (2d Cir. 1997)................................................................67

*United States v. Walters*
997 F.2d 1219 (7th Cir. 1993) .............................................................11

*United States v. Zandstra*
   No. 00 CR 209 RWS, 2000 WL 1368050 (S.D.N.Y. Sept. 20, 2000)....................................68

**STATUTES**

18 U.S.C. § 201............................................................................................................................61

18 U.S.C. § 201(a)(3)...................................................................................................................61

18 U.S.C. § 666............................................................................................................................45

18 U.S.C. § 666(a)(2)..................................................................................................46, 47, 54, 55

18 U.S.C. § 666(b)..................................................................................................................46, 55

18 U.S.C. § 666(c)..................................................................................................................46, 52

18 U.S.C. § 666(d)(1)..................................................................................................................53

18 U.S.C. § 1341...........................................................................................................................11

18 U.S.C. § 1343......................................................................................................................11, 41

FED. R. CRIM. P. 7(c)(1)..............................................................................................................10

**OTHER AUTHORITIES**

1 William Williamson Kerr, *A Treatise on the Law of Fraud and Mistake* 34
   (2d ed. 1883)............................................................................................................................25

## PRELIMINARY STATEMENT

The Indictment is a lengthy 38-page "speaking" Indictment that charges eight defendants in 15 counts with numerous federal crimes, but with respect to the Buffalo Defendants, its silence is deafening. In the Indictment's "two wide-ranging and overlapping criminal schemes" — which, in reality, are at least four separate alleged schemes with virtually no overlap — the few facts alleged with respect to the Buffalo Defendants do not amount to any federal crime. Instead, the Buffalo Defendants' conduct was lawful, proper, and ordinary. As a result, the Indictment against the Buffalo Defendants must be dismissed.

Louis Ciminelli, Michael Laipple, and Kevin Schuler (the "Buffalo Defendants") were all officers and employees of a Buffalo-based design-build and construction management firm (the "Buffalo Developer") during the relevant time period. Each has no prior criminal history. The charges against the Buffalo Defendants relate to a single request for proposals ("RFP") to identify a preferred developer local to the Buffalo area (the "Buffalo RFP") to which their employer, the Buffalo Developer, responded. The Buffalo RFP was issued by a private entity (the Fort Schuyler Management Corporation ("Fort Schuyler")). That private entity's RFP was, as the Indictment makes explicit, not for any specific project. Instead, the goal was to identify a qualified local developer or developers to be "preferred developers" and thereafter considered, with no guarantee, for actual development contracts. There were no timelines, prices, or line items included in the Buffalo RFP. The answer to the question "What did they win by winning the Buffalo RFP?" is "Nothing" — nothing but the chance to enter into negotiations for an as-yet-to-be-determined project at some point down the road.

The only allegations in the Indictment against the Buffalo Defendants focus specifically on this RFP and the "Fort Schuyler selection process" for this RFP as the sole object and focus of

the wire fraud and bribery schemes. The apparent lynchpin of the allegations against the Buffalo Defendants is that Todd Howe (now a cooperating witness) was "retained by" the Buffalo Developer and that Howe worked with Defendant Alain Kaloyeros to "secretly rig" the Buffalo RFP itself — not the evaluation of any responses, but basically the questions asked in the Buffalo RFP document. Indeed, the Buffalo Developer "retained" a law firm that had a government relations firm that employed Howe, and the law firm was paid a flat fee set each year pursuant to an annual engagement letter for work on various projects. Moreover, the Buffalo RFP itself makes clear that it contained generic and vanilla terms, and requested historical information of the applicant-developers, information such as qualifications, skills, and experience. It was akin to a request for an individual to submit a resume for a job, seeking historical information about qualifications, skills, and experiences — not the kind of things one could easily falsify successfully and there is no allegation of any such falsity here. Ultimately, three developers applied, and two (including the Buffalo Developer) were selected. Months later, both the Buffalo Developer and the other "winning" developer successfully negotiated contracts to build different projects in the Buffalo area. Years later, the project built by the Buffalo Developer — which ultimately turned out to be a large-scale and complex solar panel manufacturing plant — has been completed. It was delivered on-time and on-budget, complied with all requirements, and is a high-quality result. It has the capacity to employ hundreds of individuals in skilled jobs in an area otherwise suffering from high unemployment.

Those are the sum total of allegations relating to the Buffalo Developer. By examining the facts that are *not* alleged, glaring deficiencies are revealed. Starting with the wire fraud charges, the omissions are numerous and include: no "bid rigging" (because the RFP did not seek any actual bids for any actual contract), no misrepresentations in the Buffalo Developer's

response to the RFP as to its qualifications, no violation of any specific rule applicable to Fort Schuyler or the RFP, no interference (by Howe or anyone else) with the independent decision-makers at Fort Schuyler who evaluated the RFP responses, no allegation that the resulting selection of the Buffalo Developer as one of the preferred developers (or the later separate agreement to develop a specific project, or the ultimate successful completion of that project) resulted in any harm, and no allegation that any harm was ever intended.

In connection with the bribery charge, the holes are just as gaping. Perhaps most glaring, the only "payments" allegedly made by the Buffalo Developer to Howe were those made to a prominent Albany law firm which had an affiliated government relations firm that employed Howe. Those flat-fee payments to the law firm were made by the Buffalo Developer — not the individual Buffalo Defendants — disclosed in its regular corporate records, and made pursuant to proper invoices generated pursuant to a proper engagement letter. The Indictment's silence on this score is so striking it bears repeating: there were no side agreements and no under-the-table payments. In short, this bribery charge is missing any actual bribe payments.

The Indictment's allegations — or lack thereof — with respect to the Buffalo Defendants result in numerous legal deficiencies that require dismissal. With respect to the wire fraud counts, the Indictment fails to allege the fundamental elements of the crime because:

> (1) there is no sufficient allegation of a scheme to defraud through material misrepresentations made with fraudulent intent where
>
>> (a) the few alleged pre-RFP communications were lawful and proper in this context and there are no allegations that the Buffalo Defendants had any reason to believe otherwise,
>>
>> (b) there is no sufficient allegation that the Buffalo Defendants had any intent to defraud because they did not engage in any misrepresentations, never mind any that went to the "heart" of the bargain, as the law requires, and

(c) the few misrepresentations that are alleged were not in fact false and were not material;

(2) no valid property interest is alleged as the purported object of the fraud, where at most the Indictment alleges that the RFP process was somehow less "fair" than it was supposed to be; and, last but not least;

(3) no specific wire transmissions are alleged.

The bribery count is just as deficient, if not more so. With respect to bribery, the Indictment fails to allege the fundamental elements of the crime because:

(1) there are no allegations that the Buffalo Defendants made any payments corruptly to Howe in exchange for any official acts and, indeed, the only payments made were by the Buffalo Developer entity (not the individuals) to a law firm pursuant to a flat-fee retainer agreement that (we presume) resulted in payments from that law firm to Howe in connection with his work as a consultant;

(2) even if Howe was somehow paid bribes, there are no allegations showing that he was an "agent" of any qualifying government organization and the allegation that he was a private consultant for the State University of New York Polytechnic Institute ("SUNY Poly") seems to establish the contrary;

(3) even if Howe was an "agent" of SUNY Poly, there are no allegations that SUNY Poly is the relevant entity, given the allegations that the Buffalo RFP was issued and evaluated by Fort Schuyler, a distinct private entity;

(4) there are no allegations that Fort Schuyler is a qualifying entity because there are no allegations that it received any federal funds; and

(5) even if the Indictment somehow clears all of these hurdles, there are no allegations showing any requisite "official action" where there are no allegations that the purported bribe payments had any connection to a vote, a decision, or the like, and instead, at most, are alleged to have influenced the drafting of the Buffalo RFP and not the resulting award of "preferred developer" status.

The few allegations against the Buffalo Defendants in this case are markedly different from the allegations against the other defendants and, indeed, different from any other case brought by the Department of Justice in any similar context. At most the Indictment's

allegations demonstrate that the Buffalo Defendants were lawfully pursuing business opportunities, including by submitting truthful and accurate information as to the Buffalo Developer's qualifications and experience, which was borne out by the successful completion of a large and challenging construction project, on budget and on time. Reading the allegations against the requisite legal backdrop, this Court will soon see what is apparent: the Buffalo Defendants are caught in a net cast too widely, and they should be released.

## **THE INDICTMENT**

The Indictment alleges what it calls "two wide-ranging and overlapping criminal schemes." (Indictment ¶ 1). In reality, the allegations depict at least four independent purported schemes sharing only one common factual nexus: the participation of Todd Howe ("Howe"), the government's cooperating witness, who is not himself charged in the Indictment.[1]

The Indictment alleges in the first scheme, the so-called "Buffalo Billion Fraud and Bribery Scheme," that the Buffalo Defendants as well as certain officers of another entity, the "Syracuse Developer," engaged in wire fraud, each with Howe and defendant Dr. Alain Kaloyeros ("Kaloyeros"), to participate in rigged "bidding process[es]" implemented by Fort Schuyler Management Corporation ("Fort Schuyler") that somehow appeared to be more fair than they actually were. (Indictment ¶¶ 22–26). These processes, the manipulation of which constitutes the alleged criminal conduct, were entirely separate from one another. Fort Schuyler issued a request for proposals ("RFP") to identify a local developer for projects in Syracuse, which the Syracuse Developer responded to, and a separate RFP to identify a local developer for projects in Buffalo, to which the Buffalo Developer responded. There was no overlap in these

---

[1] As explained in the Joint Memorandum of Law in Support of the Buffalo Defendants' Motion for Severance Pursuant to Federal Rules of Criminal Procedure 8(b) and 14, these and other factors necessitate a severance of the Buffalo Defendants. The original indictment was returned on November 22, 2016. On May 11, 2017, the grand jury returned superseding indictment S1 16 Cr. 776 (the "Indictment").

separate and distinct RFP processes, nor was there any overlap between the Buffalo Defendants and those defendants then employed by the Syracuse Developer, and none is alleged.  Thus, in reality, the charges stemming from what the Indictment terms the "Buffalo Billion Fraud and Bribery Scheme" relate to two wholly-separate schemes.

The allegations against the Buffalo Defendants relate entirely to the Buffalo RFP issued by Fort Schuyler.  Fort Schuyler is a private 501(c)(3) corporation "that facilitates research and economic development opportunities in support of New York's emerging nanotechnology and semiconductor clusters."  *See About Fort Schuyler Management Corporation*, http://www.ftsmc.org/ (last visited May 18, 2017).  The Indictment recognizes that Fort Schuyler is a "non-profit real estate corporation."  (Indictment ¶ 7).  It also recognizes that it was Fort Schuyler (not SUNY Poly) that "was charged with selecting private companies to partner with Fort Schuyler in SUNY Poly-related development projects," and that Fort Schuyler was created so that it (Fort Schuyler) "could enter into contracts with private companies" for such projects.[2] (Indictment ¶ 7).

The Buffalo RFP that is at the heart of the allegations against the Buffalo Defendants was not a solicitation for bids for any such contracts but, as alleged in the Indictment, an effort by Fort Schuyler to identify local Buffalo developers as "preferred developers" for potential future contracts.  (*See* Indictment ¶ 23).  Given the limited purpose of the Buffalo RFP, there was no "bidding process" as that term of art is typically used in the public procurement context.  The Indictment does not allege that any actual "bids" were solicited or made, the RFP provided no

---

[2]  For just these reasons, the New York Comptroller's Office has no authority to audit private entities like Fort Schuyler.  *See* New York State Office of the State Comptroller, *Municipal Use of Local Development Corporations and Other Private Entities* (April 2011) ("Municipal Use Report") at 1, *available at* https://www.osc.state.ny.us/localgov/pubs/research/ldcreport.pdf (Comptroller "does not have direct authority to audit [Local Development Corporations] or most other private entities, even when these entities are controlled by a local government").

specifications, identified no specific projects, included no price terms, and made explicit that whatever firm (or firms) was named a "preferred developer" (if any) would not necessarily receive any actual contracts. The RFP did provide:

> [Fort Schuyler] will appoint a Selection Committee that will oversee the process of reviewing submissions to this RFP. The Selection Committee will recommend the selection of a PREFERRED DEVELOPER to the [Fort Schuyler] Board of Directors. . . . Upon [Fort Schuyler] Board approval, detailed discussions and negotiations will be conducted with the preferred candidate which *may* lead to designation of the preferred candidate as the PREFERRED DEVELOPER . . . [Fort Schuyler] reserves the right to reject any and all proposals, in whole or in part, during the first stage and/or the second stage/final interview process.[3]

Accordingly, the Buffalo RFP provided general requirements for the "preferred developers" and merely requested that interested developers respond with information setting forth the developers' qualifications. (*See* Masella Dec., Ex. A (Buffalo RFP), at § 1.C (a)). Given the nature of the RFP, the response submitted by the Buffalo Developer was at a similar high level of generality, touting its experience and qualifications in a broad-stroke fashion. (*See* Masella Dec. Ex. B). There is no allegation in the Indictment that anything in that response misstated the qualifications of the Buffalo Developer.

What the Indictment does allege is that Fort Schuyler's RFP process was somehow rigged to favor the Buffalo Developer. (*See* Indictment ¶ 22). Apparently, this secret rigging took two forms: First, Howe and Kaloyeros allegedly worked in unspecified ways to "secretly

---

[3] *Request For Proposal: For A Strategic Research, Technology Outreach, Business Development, Manufacturing, And Education And Training Partnership With A Qualified Local Developer In The Greater Buffalo Area*, FORT SCHUYLER MANAGEMENT CORPORATION, Oct. 15, 2013 ("Buffalo RFP"), § 7.A. (emphasis added), annexed to the May 19, 2017 Declaration of Jessica A. Masella ("Masella Dec.") as Exhibit A. The Buffalo RFP is a specific, identifiable document referenced in the Indictment. As such, the Court should consider its contents in ruling on the Buffalo Defendants' motion to dismiss. The same goes for the responses to the RFP. *See, e.g., United States v. Forrester*, No. 02 CR.302 WHP, 2002 WL 1610940, at *1 (S.D.N.Y. July 22, 2002) ("The Court may consider documents outside of the indictment [on a motion to dismiss], but cannot give any weight to contrary factual assertions made by the defendant."); *United States v. Martino*, No. S1 00 CR 389 (RCC), 2000 WL 1843233, at *1 (S.D.N.Y. Dec. 14, 2000) (same).

tailor the Buffalo RFP to include qualifications that would favor the Buffalo Developer in Fort Schuyler's selection process for the Buffalo RFP"; Second, Howe and Kaloyeros allegedly provided "secret information" to the Buffalo Defendants, purportedly including an advance copy of the RFP and "the location and purpose of the first preferred developer project." (Indictment ¶ 24). These putative facts are implicitly alleged to have rendered the RFP process less "fair, open, and competitive" than it otherwise might have been. (*See* Indictment ¶ 25a). Significantly, there are no allegations that the RFP (or any rule, guideline, or statute applicable to the RFP) set forth any parameters regarding pre-RFP communications — an understandable silence given that such communications are typical in this context.

The Indictment's conspiracy and wire fraud charges (Counts One and Four) do not mention any particular wires employed in the purported scheme. (*See* Indictment ¶¶ 37–39, 44–45). Nor does the Indictment allege a comprehensible scheme to defraud. It sometimes appears to allege that the object of the scheme was "State contracts that were ultimately worth hundreds of millions of dollars" (Indictment ¶¶ 13, 22), but the only conduct alleged concerns the drafting of the Buffalo RFP — to which the Buffalo Developer's response is not alleged to have been misleading or fraudulent in any way and which did not result in any contract for any project. The scheme as alleged cannot constitute wire fraud because Fort Schuyler got exactly what it bargained for through the RFP process — submission of honest and truthful RFP responses which (a) permitted Fort Schuyler to select two preferred developers and (b) did not result directly in the award of any contracts or the expenditure of any funds. That a wire fraud does not make. There are no allegations that the Buffalo Defendants violated any local, state or federal statute, rule, or guideline with respect to the RFP process, never mind any allegation that the purported violation was so significant as to amount to a federal wire fraud conspiracy.

As to the bribery charge (Count Five), the Indictment fails to specify a single purported bribe payment, monetary or otherwise.  Instead, the Indictment vaguely refers to "hundreds of thousands of dollars in payments to Howe from the Syracuse Developer and the Buffalo Developer."  (Indictment ¶ 22).  This reference does not distinguish between the two developers — two entirely separate entities involved in completely unrelated RFP processes.  More importantly, it also fails to identify any payments whatsoever.  By doing so, the Indictment glosses over what may well be one of the most significant oddities in the Indictment:  that the Buffalo Developer did not make any payments to Howe.  As the government well knows, the only "payments" made were to a law firm the Buffalo Developer retained, which was affiliated with a government relations firm that employed Howe.  (*See* Indictment ¶ 10).  The Indictment fails to allege how lawful payments made to a law firm (that is affiliated with a government relations firm) suffice as "bribes" to any official state actor.

The Indictment specifies that Howe was retained as a "consultant" to SUNY Poly, but also offers the conclusory statement that Howe somehow "acted as an agent of SUNY Poly." (Indictment ¶ 11).  There are no factual allegations specifying how Howe "acted as an agent." More notably, there is no allegation in the Indictment that Howe acted as an agent *of Fort Schuyler*, the entity that actually issued the RFP and selected the "preferred developers" for Buffalo.  Thus, there are no factual allegations demonstrating the statutory prerequisite:  how the so-called "bribe" payments were made with any "intent to influence an agent <u>of a State government agency</u>" in connection with the RFP issued by Fort Schuyler (a private entity). (Indictment ¶ 47 (emphasis added)).

The Indictment alleges that Howe "arranged" for the Buffalo Developer to "obtain official State favors through Howe's position at SUNY Poly."  (Indictment ¶ 22).  Both wire

fraud counts include, as a central part of the alleged scheme, that Howe "used [his] official position[] to secretly tailor the [RFP]." (Indictment ¶¶ 39, 45). The Indictment does not specify what position Howe held "at SUNY Poly," nor does it allege what "official action" he purportedly took. (Indictment ¶¶ 22, 48 (emphasis added)). The only allegation with respect to Howe's work for SUNY Poly is that he was the employee of a government relations firm (Indictment ¶ 10), and that he was retained as a "consultant" for SUNY Poly (Indictment ¶ 11). By definition, an outside consultant employed by an independent consulting firm does not retain a position "at" his client's entity and, absent more, a consultant is not an agent. So we have an indictment largely founded on an allegation that Howe had some unnamed "official position" at SUNY Poly that empowered him to take unnamed "official action" on behalf of SUNY Poly (Indictment ¶ 45, 47), but those allegations are contradicted by other portions of the Indictment.

## ARGUMENT

Federal crimes are "solely creatures of statute" and, as such, a federal indictment can be challenged on a motion to dismiss "on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (citation omitted). An indictment must provide a "plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). Where an indictment fails to "allege the essential elements of the crime charged [it] offends both the Fifth and Sixth Amendments." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).

Furthermore, "an indictment must 'contain some amount of factual particularity'" to comport with the Constitutional safeguards afforded criminal defendants. *United States v. Ashley*, 905 F. Supp. 1146, 1153 (E.D.N.Y. 1995) (quoting *United States v. Upton*, 856 F. Supp. 727, 738 (E.D.N.Y. 1994)). This is necessary "to ensure that the prosecution will not fill in

elements of its case with facts other than those considered by the grand jury," and so that the defendant is "informed of the nature and cause of the accusation against him." *Pirro*, 212 F.3d at 92 (internal quotation marks and citations omitted).  Accordingly, where the charged offense includes terms of a generic or implicit nature, it is not sufficient that the indictment simply track the language of the statute, rather it must allege <u>facts</u> sufficient to establish the criminal conduct. *See Pirro*, 212 F.3d at 92-93; *accord United States v. Serrano*, 191 F. Supp. 3d 287, 290 (S.D.N.Y. 2016); *United States v. Awan*, 459 F. Supp. 2d 167, 175-76 (E.D.N.Y. 2006), *aff'd*, 384 F. App'x 9 (2d Cir. 2010).  This requirement effectuates the "important corollary purpose" of enabling a court "to evaluate whether facts alleged could support conviction." *Pirro*, 212 F.3d at 92 (citing *Russell v. United States*, 369 U.S. 749, 768-69 (1962)).  Where a defendant "objects to the indictment before trial," the defendant is "entitled to a more exacting review of the indictment than one who waits until after trial to object." *Pirro*, 212 F.3d at 92; *accord United States v. Sabbeth*, 262 F.3d 207, 218 (2d Cir. 2001).

## I.    THE WIRE FRAUD CHARGES SHOULD BE DISMISSED FOR FAILURE TO ALLEGE ESSENTIAL ELEMENTS OF THE CHARGED CRIMES.

Count One (wire fraud conspiracy) and Count Four (substantive wire fraud) should be dismissed for the Government's failure to allege the essential elements of the charged crimes. The federal fraud statutes prohibit the use of the mails and wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. §§ 1341, 1343; *see also United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991) ("Because the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way.").  The fraud statutes do "not make a federal crime of every deceit." *United States v. Walters*, 997 F.2d 1219, 1224 (7th Cir. 1993); *see Schwartz*, 924 F.2d at 416–17.  Rather, the statutes are "limited in scope to the

protection of property rights." *McNally v. United States*, 483 U.S. 350, 360 (1987); *see Schwartz*, 924 F.2d at 417. "[T]he object of the fraud [must] be 'property' in the victim's hands." *Cleveland v. United States*, 531 U.S. 12, 26 (2000). If a defendant acts with the intention to deceive another but not to deprive that party of "property," there is no wire fraud.

The essential elements of a mail or wire fraud violation are "'(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.'" *United States v. Finazzo*, 850 F.3d 94, 105 n.12 (2d Cir. 2017) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015), *cert. denied,* 136 S. Ct. 2487 (2016)). Wire fraud requires that some "actual harm or injury" to the concrete pecuniary interests of the victim, not some metaphysical harm, "was contemplated by the schemer." *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970). To prove a wire fraud conspiracy "the government must demonstrate the existence of the conspiracy and the defendant's knowing participation." *United States v. McGinn*, 787 F.3d 116, 124 (2d Cir. 2015).

The Indictment here is deficient because: (1) it fails to allege the existence of a scheme to defraud through material misrepresentations made with fraudulent intent; (2) it fails to adequately allege the required specific intent to harm some cognizable "property"; and (3) it fails to identify a single specific wire transmission. These legal deficiencies all independently warrant the dismissal of Counts One and Four as against the Buffalo Defendants.

### A. The Indictment Fails To Allege The Existence Of A Scheme Or Artifice To Defraud Through Material Misrepresentations Made With Fraudulent Intent.

The existence of a scheme to defraud is an essential element of wire fraud. *See Pasquantino v. United States*, 544 U.S. 349, 355 (2005). "To show a scheme or artifice to defraud, the government must show that: (1) a scheme to defraud existed; (2) the defendant ha[d] [the] specific intent to defraud; and (3) material misrepresentations." *United States v.*

*Falkowitz*, 214 F. Supp. 2d 365, 374 (S.D.N.Y. 2002).  Although the Indictment's flaws are perhaps most glaringly egregious with respect to the intent element (as discussed below), the Indictment also fails to adequately allege any of the other components of a scheme to defraud.

### 1. The Indictment Fails To Allege A Scheme To Defraud Fort Schuyler.

The Indictment would only make sense if the alleged improprieties in the RFP process — principally, the alluded-to pre-RFP communications between the Buffalo Defendants, Howe, and Kaloyeros — were known to the defendants to have been improper in a way that renders the failure to disclose those alluded-to communications a scheme to defraud.  That premise might make sense in a context where some rule or practice put participants on notice that such communications were forbidden.  But the Indictment does not (and cannot) allege that the Buffalo Defendants violated any statute, rule, or guideline relating to the Buffalo RFP process if they engaged in any such communications.  The Indictment itself alleges Fort Schuyler was intentionally "created as a non-profit real estate corporation."  (Indictment ¶ 7).  Fort Schuyler was created precisely because it would not be subject to the kinds of State procurement rules that apply to SUNY Poly.  Although the Indictment alleges certain information was shared with the Buffalo Developer in advance, that alone does not establish a scheme to defraud because there is no allegation that such pre-RFP communications were improper (and they were not).[4]

While the Indictment baldly claims that Fort Schuyler was "deceived," mere deception, without more, is insufficient.  *See United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution.").  If the harm alleged in the Indictment is simply that Fort Schuyler believed the

---

[4]  In fact, all entities and individuals familiar with the RFP process, such as other developers and Fort Schuyler, would have expected a pre-RFP exchange of information to develop the RFP — which is precisely what occurred here.  But the fundamental point on this motion is that the Indictment seeks to predicate a criminal scheme to defraud on ephemeral allegations of the "appearance of [] open competition" based on nothing but its say so, with no allegations that any rule or procedural requirements established the parameters of what would (and what would not) constitute a "fair, open, and competitive process."  (Indictment ¶¶ 23, 25).

RFP information was confidential and that it was deceived when the Buffalo Developer was provided with and used the information in drafting its proposal, or that the certification that the Buffalo Developer had not hired any lobbyists was deceptive, this would fail to establish wire fraud. *See Starr*, 816 F.2d at 98; *see also United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994) ("[L]ack of information that might have an impact on the decision regarding where government money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property.'").

Significantly, although the Indictment alleges that Kaloyeros "falsely represented to Fort Schuyler . . . that the bidding process[] for . . . the Buffalo RFP [was] fair, open, and competitive" (Indictment ¶ 25 (a)), there is no allegation that the Buffalo Defendants had any knowledge of these putative representations. That is particularly troubling since, again, no law, regulation, or guideline required the process to be "fair and open" — or defined what that would mean — or required any particular process at all. There is no allegation of any presumed expectation of a defined process with particular rules governing the Buffalo Defendants' conduct. Without that, it is hard to see how these allegations could possibly constitute a knowing scheme to defraud. Because Fort Schuyler is not a state agency or authority and is instead a non-profit private entity, the very specific rules governing how public entities must conduct the selection of contractors simply do not apply to it (and they are not alleged to have applied here). *See generally Hunts Point Terminal Produce Co-op. Ass'n, Inc. v. N.Y. City Econ. Dev. Corp.*, 36 A.D.3d 234, 245-46 (1st Dep't 2006) (finding fairness obligations governing RFPs issued by public entities do not apply to a non-profit development corporation).

Even in the context of public governmental entities selecting contractors, where legislation and regulations set forth specific requirements for bidding, public entities can include

specifications that favor some bidders over others. *See Blueline Commuter, Inc. v. Montgomery Cty.*, 126 A.D.3d 1161, 1163 (3d Dep't 2015) (in public bid context, government entities "are permitted to include bid specifications that may be more favorable to some bidders over others, as long as the public interest is served and the specifications are not intended to ensure that one particular bidder be awarded the contract"); *Brega Transport Corp. v. Brennan*, 105 A.D.3d 985, 987 (2d Dep't 2013) ("Municipalities may fix reasonable standards . . . even if they tend to favor one bidder over another."); *McArdle v. Bd. of Estimate of Mt. Vernon*, 347 N.Y.S.2d 349, 351-55 (Sup. Ct. Westchester Cnty. 1973), *aff'd*, 45 A.D.2d 822 (2d Dep't 1974) (consultant who prepared "detailed specifications for a contract subsequently to be bid upon by others" that were "specially tailored for [his] benefit" could participate in the bidding process and "accept the contract if awarded," provided all bidders had access to the specifications and "adequate time" to prepare bids). Under this case law, a specification that may favor one bidder over others "is not facially anticompetitive [if it] does not, in and of itself, guarantee the award of the contract to a particular bidder." *Blueline Commuter, Inc.*, 126 A.D.3d at 1163.

The First Department decision in *Hunts Point* is illustrative on this point. That case involved a disgruntled losing bidder for a lease on a parcel of land, which was awarded to another bidder by the New York City Economic Development Corporation (the "EDC") pursuant to an RFP process. The allegations included claims of collusion and of undisclosed specifications that favored the winning bidder. *Hunts Point*, 36 A.D.3d at 242-43. The losing bidder argued that the process was not run fairly and was characterized by "an alleged absence of competitive bidding." *Hunts Point*, 36 A.D.3d at 246. Emphasizing the fact that the EDC "is not a governmental agency but rather a not-for-profit development corporation," the First Department rejected the claim, noting that there were no rules or statutes "circumscribing EDC's

authority in issuing an RFP or what the content of such an RFP should be," and that EDC was not "required by law to conduct *any* competitive bidding process" because, as an RFP run by a private not-for-profit company, "the process at issue is wholly exempt from competitive bidding by law." *Hunts Point*, 36 A.D.3d at 245-46. The losing bidder sought to rely on case law applicable to government entities that establishes that when the government itself "solicits bids, it is required to act fairly toward all bidders." *Hunts Point*, 36 A.D.3d at 246 (quoting *Tri-State Aggregates Corp. v. Metro. Transp. Auth.*, 108 A.D.2d 645, 646 (1st Dep't 1985)). The First Department directly rejected the attempt to apply the obligation to run a "fair" process in the context of a non-profit private corporation affiliated with the City: "The application of this fairness obligation to EDC is, however, dubious at best since contrary to the hearing court's observation that EDC is a 'public agency,' EDC is a not-for-profit corporation under contract to the City, not a public authority." *Hunts Point*, 36 A.D.3d at 246 (citation omitted).

These cases provide the backdrop against which the Indictment's allegations must be weighed. In that context, the absence of any allegation that the Buffalo Defendants had reason to believe that the conduct alleged was improper or in violation of any applicable rules or regulations and the absence of any allegation as to what specifically would constitute a "fair, open, and competitive" process looms particularly large. *See Pirro*, 212 F.3d at 93 ("An omission cannot amount to a false statement [under the charged statute] without the crucial background fact that gives rise to the duty to disclose the fact that was omitted. . . . The indictment must therefore allege what made the omission in this case criminal.").

> **2.**  **The Indictment Fails To Allege Facts Sufficient To Establish That The Buffalo Defendants Acted With The Requisite Specific Intent.**

Proof of fraudulent intent — the specific intent to harm or defraud the victim of the scheme — "is an essential component of the 'scheme to defraud' element" of wire fraud. *United*

*States v. Walker*, 191 F.3d 326, 334 (2d Cir. 1999); *see also United States v. Starr*, 816 F.2d at 98. While the alleged scheme to defraud need not have been successful, to establish liability the defendant must have at least <u>contemplated</u> some actual harm or injury to the property rights of the victim in a fundamental way. *See United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996); *see also United States v. Finazzo*, 2014 WL 184134, at *10 (E.D.N.Y. Jan. 14, 2014) (quoting *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 2010)) (government must "'show that the defendant contemplated some actual harm or injury'" and that such harm related to "property right[s]"), *aff'd,* 850 F.3d 94 (2d Cir. 2017); *Starr*, 816 F.2d at 98 ("Moreover, the harm contemplated must affect the very nature of the bargain itself."); *United States v. Binday*, 804 F.3d 558, 578 (2d Cir. 2015). Accordingly, the defendant must have had the "conscious knowing intent to defraud" and must have "contemplated or intended some harm to the property rights of the victim." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted).

On its face, the Indictment fails to allege that Fort Schuyler was harmed as a result of the alleged scheme to defraud. The Buffalo Developer's response to the Buffalo RFP could not have caused Fort Schuyler actual harm because the Indictment fails to allege that Fort Schuyler received anything less than what it requested when it issued the Buffalo RFP: general information from local developers to assess the developers' qualifications for a potential future partnership with Fort Schuyler.

Importantly, deceit alone is insufficient to support wire fraud because 'the deceit must be coupled with a contemplated harm to the victim." *Binday*, 804 F.3d at 578. The defendant, therefore, must intend to do more than deceive the victim to violate the wire fraud statute — even if that deceit induces the victim to enter into the transaction. An "intent to deceive, and

even to induce, . . . does not, without more, constitute the 'fraudulent intent' required by the statute." *Regent Office Supply*, 421 F.2d at 1181.

Here, the Indictment fails to allege facts establishing that the Buffalo Defendants deceived Fort Schuyler at all, let alone that they contemplated harm to Fort Schuyler. While the Indictment alleges that the Buffalo Developer was "preselected" to win the "preferred developer" status for the Buffalo RFP (Indictment ¶ 23), the "preselected" allegation is a conclusory one, wholly at odds with the factual allegations of the Indictment. In common parlance, to "preselect" means "to choose in advance usually on the basis of a particular criterion." *Preselect*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/preselect (last visited May 18, 2017). But the government does not, in fact, allege that any alleged conspirator had the power to determine who would be deemed a "preferred developer," in advance or otherwise. To the contrary, the allegations are that the alleged conspirators "tailor[ed] the Buffalo RFP to include qualifications that would favor the Buffalo Developer in Fort Schuyler's selection process." (Indictment ¶ 24). The Indictment is devoid of allegations as to precisely <u>how</u> the RFP was supposedly drafted to favor the Buffalo Developer — a curious silence given the centrality of the allegation — and there is no allegation that the Buffalo Developer's response to the RFP was anything other than an honest and wholly accurate summary of its experience and qualifications. More to the instant point, neither the Buffalo Defendants nor their codefendants had the ability to "preselect" the winner, because the winners (plural) were selected by the independent Board of Fort Schuyler. (*See* Indictment ¶ 7).

Importantly, there is no allegation that the Buffalo Developer falsely represented its qualifications when responding to the RFP, or that Fort Schuyler was misled in any way as to the bona fide credentials, experience, and fitness of the Buffalo Developer. There is no allegation

that the Buffalo Developer was unqualified for the selection or less qualified than any other developer. Whatever "deceit" is alleged does not go to quality or price of the transaction and so is utterly disconnected from any contemplated harm to property. Given the absence of any such allegation, the Indictment wholly fails to allege that the Buffalo Defendants intended harm of the kind that went to "the very nature of the bargain itself" — which is what the law requires. *Starr*, 816 F.2d at 98; *see United States v. Kurtz*, 2008 WL 1820903, at *2 (W.D.N.Y. Apr. 21, 2008) ("As a consequence, the deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck.") (citing *Regent Office Supply*, 421 F.2d at 1182). One could say that there can be no fraud here because Fort Schuyler "received exactly what [it] paid for," *Kurtz*, 2008 WL 1820903, at *5 — were it not for the fact that the Buffalo RFP did not result in a contract and did not result in Fort Schuyler paying the Buffalo Developer a dime. Fort Schuyler received exactly what it bargained for — submission of truthful RFP responses from several qualified developers that resulted in the selection of not one but two "preferred developers" — but it did not "receive exactly what [it] paid for," because it did not pay <u>anything</u> for that result.

In fact, as issued, the RFP was as plain vanilla as they come — and, crucially, nearly identical to the Syracuse RFP and other Fort Schuyler RFPs[5] — and the Buffalo Developer's submission merely provided general information about the Buffalo Developer, including services offered, profiles of company management personnel, and examples of prior experience and current projects. (*See* Buffalo Developer Proposal, Masella Dec., Ex. B). Because the RFP was not tailored towards any particular project, the entire process unfolded at a high level of

---

[5] A comparison indicates that they are substantively identical. (*See* Masella Dec. ¶¶ 10–12 & Exs. G–I). These RFPs, far from being "tailored" to the Buffalo Developer's qualifications, are so generic that Fort Schuyler continued to use them as a template for other RFPs. (*See* Masella Dec. at ¶¶ 10–12 & Exs. G–I).

generality — there were no specifications, no financial information, no pricing information, and hence no "bid" in the usual sense, because there was nothing upon which to bid.

The facts alleged in the Indictment do not clarify how exactly the Buffalo Defendants allegedly deceived Fort Schuyler. In fact, the Indictment seems to provide otherwise — Fort Schuyler received exactly what it requested in the Buffalo Developer's response to the Buffalo RFP, which is not alleged to be deceptive as to qualifications or experience. A fine line exists "between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). Hence, "deceit that does not go to the nature of the bargain itself where the customers received exactly what they paid for is not sufficient absent contemplation of harm to the victims." *United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 464 (S.D.N.Y. 2013) (internal quotation marks omitted). While it is unclear how Fort Schuyler was deceived when it was provided with the exact information it solicited in the Buffalo Developer's response to the Buffalo RFP, even if there was deceit, again, this alone is insufficient absent evidence that such deception was coupled with contemplated harm. Accordingly, even assuming the Buffalo Defendants had in some way deceived Fort Schuyler, such deception would not establish the requisite fraudulent intent to support a wire fraud conviction, as the Indictment fails to establish the Buffalo Defendants contemplated any harm.

Significantly, the only allegations of any false statement relating to the Buffalo Defendants is the horribly misleading assertion that the "Buffalo Developer falsely certified that no one was retained, employed, or designated by or on behalf of the Buffalo Developer to

attempt to influence the procurement process," which was allegedly false because of Howe's engagement(through a law firm the Buffalo Developer had retained). (Indictment ¶ 25 (c)). Notably, the Indictment does not allege that this certification was made by any of the Buffalo Defendants — because, as the government well knows, the form being referenced was in fact completed by another individual. The Indictment does not allege that any of the Buffalo Defendants authorized that other individual to execute the certification and does not allege that any of the Buffalo Defendants even knew about the certification. As such, the alleged misrepresentation does not suffice to establish the fraudulent intent of the Buffalo Defendants, because the misrepresentation was not made by the Buffalo Defendants.

In any event, by design or inadvertence, the Indictment's characterization of the form at issue is woefully inaccurate. The form is Attachment E to the Buffalo Developer's response to the Buffalo RFP. It is headed in large bolded type:

**Disclosure of Lobbying Activity**

**Disclosure of any person or company that lobbied on your
behalf in relation to this RFP.**

**Disclosure of Lobbyist Form**

(Buffalo Developer Proposal, Masella Dec., Ex. B, at Attachment E). The body of the form is plainly directed towards the lobbying of State agencies, referring specifically to the requirements in respect of lobbying imposed on "[e]very covered agency or authority." (Buffalo Developer Proposal, Masella Dec., Ex. B, at Attachment E). As set forth above, Fort Schuyler is emphatically not a state agency or authority; it is a private entity, and designedly so. *See generally Hunts Point Terminal Produce Co-op. Ass'n*, 36 A.D.3d at 245–46. The form, in short, appears to be a standard form not really applicable to this RFP issued by Fort Schuyler (indeed, the form itself calls for the applicable "Solicitation or Contract Number" — of which

there is none, since the RFP is neither); indeed, the fine print reference to "the procurement process" on which the government focuses is also confusing because the RFP was a totally preliminary activity and was not a "procurement process."

More to the point, Howe was not a lobbyist "retained, employed or designated by or on behalf of the [Buffalo Developer] to attempt to influence the procurement process." Rather, Howe was retained as a consultant. Indeed, the engagement letters alluded to in the Indictment and discussed in detail below (*see infra* pp. 48–52), include the representation that the engagement would not involve any lobbying at all and hence would not require registrations as a lobbyist. (*See* Masella Dec. ¶ 13 & Ex. J). Here, there are no allegations suggesting that this misrepresentation was made by the Buffalo Defendants, no clear allegations as to its falsity, and no allegations suggesting the statement was made with <u>knowledge</u> of its falsity. Moreover, nothing about this alleged misrepresentation went to "[t]he very nature of the bargain itself," as required. *Starr*, 816 F.2d at 98.

Because the misstatements alleged here did not mislead Fort Schuyler as to the experience or other bona fides of the Buffalo Developer, they did not affect the value of what it was getting by selecting the Buffalo Developer as one of the preferred developers. Even assuming *arguendo* that the alleged misstatements may have been deceptive, they do not establish the necessary intent to harm Fort Schuyler in a pecuniary way, because they have literally nothing to do with the quality, adequacy, or price of the Buffalo Developer.

The Second Circuit fleshed out its view that contemplated harm to property going to the very nature of the bargain struck is required in two seminal cases — *Regent Office Supply* and *Starr*. A review of those cases underscores the fatal flaws in this Indictment. In *Regent Office Supply*, the defendants were salesmen who engaged in aggressive marketing techniques to sell

their office-supply products. 421 F.2d 1174 (2d Cir. 1970). They made numerous misrepresentations, such as stating that they had been referred by a friend or by an executive of the potential customer; that they had a large inventory to sell because of a death; and that the seller was a doctor who needed to dispose of stationery. The purpose of those misrepresentations was concededly to "secure sales." 421 F.2d at 1181. The Second Circuit reversed the convictions. According to the court, while the evidence proved that "the defendants intended to deceive their customers," it fell short of proving that they "intend[ed] to defraud them," because there was no showing that the defendants contemplated "some actual injury" to their customers where their "deceit did not go to the nature of the bargain itself." 421 F.2d at 1182. The conduct, in other words, included complete falsehoods designed to have the victim view the salesman in a positive light in advance of any discussion of substance regarding what they were selling and at what price.

The court held that even though the deceit may have been employed to induce the sale, there was no evidence of an intent to harm the customers because the customers got the promised office supplies at the bargained-for price. 421 F.2d at 1182. Accordingly, the court concluded that only false representations which are directed to the "quality, adequacy or price" of the goods themselves may establish fraudulent intent. 421 F.2d at 1179-80. In *Regent Office Supply* (just as here), the "government ask[ed] [the court] to infer some injury from the mere fact of the falseness of the representations and their connection with a commercial transaction," but the Second Circuit rejected the suggestion (just as Your Honor should here) "because the falsity of their representations was not shown to be capable of . . . influencing [the customer's] assessment of the value of the bargain to him." 421 F. Supp. at 1182.

*Starr* is to the same effect.  In *Starr*, the defendants contracted to provide mailing services to their customers, representing that the funds deposited with the defendants would be used only to pay the customers' first-class postage fees.  816 F.2d 94 (2d Cir. 1987).  In fact, the defendants buried their customers' higher-rate mailings in lower-rate bulk mailings, mailed them at the bulk rate without paying the Postal Service the correct postage, and pocketed the difference.  The Post Office unwittingly delivered them as if it had been paid the higher rate.  Defendants then sent altered Postal Service forms to their customers, falsely indicating that the legally correct postage had been paid.  *Starr*, 816 F.2d at 96.  The Second Circuit reversed the convictions.  For fraudulent intent to exist, the court explained, "deceit must be coupled with a contemplated harm to the victim" and "the harm contemplated must affect the very nature of the bargain itself."  Such harm is apparent where there exists a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.'"  816 F.2d at 98.  The customers' defeated expectations about "the use to which the money would be put" were real but insufficient, because the misrepresentations did not "affect the nature or quality of the services that was the basis of the customers' bargain."  816 F.2d at 99-100.  The customers were deceived, but the Second Circuit held there was no showing that the defendants had the specific intent to harm the customers.

To the contrary, the defendants were able to successfully mail the customers' items for delivery on time and to the proper destinations.  *Starr*, 816 F.2d at 98-99.  The misuse of the money was deceptive, but the court found "the evidence [did] not identify what harm, if any, the Starrs intended to inflict on their customers."  *Starr*, 816 F.2d at 99; *accord United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (where defendant's counterparties had "received all

they bargained for," the fact that the counterparties might have refused the bargain "had they been aware that [defendant] would receive a portion of the money" as a personal kickback, was not sufficient to support a mail fraud conviction).[6]

Any argument here that the Indictment alleges the requisite fraudulent intent because it provides that the Buffalo Defendants acted to deceive Fort Schuyler (as to the fairness of the RFP process and as to whether anyone lobbied on behalf of the Buffalo Developer to "influence the procurement process") in an effort to induce Fort Schuyler to enter into the transaction (*i.e.*, to select the Buffalo Developer as one of the "preferred developers") is unsupported by the law.[7] The Second Circuit held very similar factual scenarios insufficient to prove fraudulent intent in *Regent Office Supply* and *Starr*, where "the evidence had shown an intent to deceive and to induce the customers to enter into the transaction" for the defendants' potential profit. *Starr*, 816 F.2d at 98 (discussing *Regent Office Supply*). Just as those facts were insufficient in those cases, they are insufficient here.

At most, the Indictment alleges efforts to deceive Fort Schuyler in an attempt to induce it to select the Buffalo Developer as one of the "preferred developers," based on a response to the RFP which is not alleged to have contained any falsehoods concerning the Buffalo Developer's qualifications, skills, or experience. The misrepresentations that are alleged are plainly "only collateral" to the selection of the Buffalo Developer based on a response to the RFP that is <u>not</u>

---

[6] These decisions on materiality are consistent with a long line of decisions at common law defining material misrepresentations as those which "affect[] and go[] to [the transaction's] very essence and substance." 1 William Williamson Kerr, *A Treatise on the Law of Fraud and Mistake* 34 (2d ed. 1883) (internal citation omitted). Under the common law, "[m]isrepresentations which are of such a nature as, if true, to add substantially to the value of property, or are calculated to increase substantially its apparent value, are material." *Id.* By contrast, "[i]t is not enough that [the misrepresentation] may have remotely or indirectly contributed to the transaction or may have supplied a motive to the other party to enter into it." *Id.* at 35. Misstatements of the type that do not go to the value of the thing at issue are immaterial as a matter of law.

[7] At certain points, the Indictment alleges that the Buffalo RFP led directly to a "contract" naming the Buffalo Developer as one of the "preferred developers." (*See* Indictment ¶ 45 (the RFP was "tailor[ed] . . . so that the Buffalo Developer . . . would be favored to win in the selection process for the contract")). As discussed above, the RFP led to no such contract. (*See supra* pp. 6–8).

alleged to include any misrepresentations as to the Buffalo Developer's qualifications for the role of "preferred developer." *Starr*, 816 F.2d at 98 (misrepresentations that "were only collateral to the sale and did not concern the quality or nature of the goods" do not suffice). Accordingly, even assuming the Indictment adequately alleges "deceit" that played a role in inducing Fort Schuyler to enter into the transaction, there is no way that the alleged misrepresentation could have "influenc[ed] [Fort Schuyler's] assessment of the value of the bargain," because the "collateral" misrepresentations have no relevance whatever to the "quality, adequacy or price" of the skills and experience truthfully touted in the Buffalo Developer's response to the RFP. As a matter of law, that does not suffice. *Regent Office Supply*, 421 F.2d at 1182.

Here, the Indictment fails to allege that Fort Schuyler was harmed by the Buffalo Defendants' purportedly deceptive conduct. As was the case in *Regent Office Supply* and *Starr*, there is no suggestion or allegation that the "object of the contract" was frustrated in any way, or that Fort Schuyler received anything less than what was reasonably anticipated. Fort Schuyler was not deprived of the benefit of its bargain in selecting the Buffalo Developer as a "preferred developer," nor was any such deprivation contemplated. As the wire fraud counts fail to allege the necessary fraudulent intent, they must be dismissed.

### 3. The Indictment Falls Short Because The Alleged Misstatements Are Not Material To The Transaction.

Even assuming, arguendo, that the government could establish the Buffalo Defendants' fraudulent intent — which, as discussed above, it cannot — the Indictment still fails to allege a cognizable scheme to defraud because the facts alleged do not establish the third element: the materiality of the Buffalo Defendants' alleged misrepresentations. *See Finazzo*, 850 F.3d at 110 n.16 ("The question of whether a defendant's misrepresentation was capable of influencing a decisionmaker should not be conflated with [the] requirement that that misrepresentation be

capable of resulting in 'tangible harm.'"); *see also United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (providing "the materiality of the misrepresentations" as a separate requirement of the "scheme to defraud" element).

Not all misrepresentations or omissions suffice; the misrepresentation or omission must be material and it must be one on which a person of ordinary prudence would rely. Material misrepresentations are those that tend to or are capable of influencing decision-makers. *United States v. Finazzo*, 850 F.3d 94, 109 n.16 (2d Cir. 2017). The Indictment's bare allegations fail to establish that any misrepresentation or undisclosed information involving the Buffalo RFP was material. The two alleged misrepresentations that the Indictment seems to rely on are (1) the alleged misrepresentation by Kaloyeros that the process was fair and open, and (2) the alleged misrepresentation that the Buffalo Defendants did not hire a lobbyist. As discussed above, the Indictment does not (and cannot) adequately allege that these representations were in fact misrepresentations (because they were not).

Moreover, the Indictment fails because it does not (and cannot) allege that these alleged misrepresentations were actually capable of influencing the decision on the RFP. In fact, the Indictment fails to allege how Kaloyeros's representation that the process was fair and open could have impacted Fort Schuyler's evaluation process. Kaloyeros is not alleged to have participated in the evaluation of the Buffalo RFP responses or the selection of the "preferred developers." As such, the Indictment's focus on this representation is misplaced. The Indictment fails to provide how Kaloyeros's representation had any capability of influencing the selection of the Buffalo Developer as a "preferred developer." Instead, the facts alleged support only the conclusion that the Buffalo Developer was ultimately selected as a "preferred

developer" by an independent, neutral evaluation committee empaneled by Fort Schuyler, which selected the Buffalo Developer on the merits of its truthful response to the Buffalo RFP.

Similarly, the alleged misrepresentation regarding the lobbying form was, in fact, anything but material to the Buffalo RFP. Both the Buffalo Developer and another developer were designated "preferred developers" as a result of the Buffalo RFP. (*See* Masella Dec. ¶ 14 & Ex. K). That second successful respondent simply omitted the lobbyist disclosure form altogether. (*See* Masella Dec. ¶ 15 & Ex. L). How can the Buffalo Developer's alleged misrepresentation on a form submitted in response to the Buffalo RFP be considered material to the transaction when the other successful developer awarded "preferred developer" status flat out failed to include the form in its submission but was selected anyway?

### B. The Indictment's Allegations Do Not Establish A Valid Property Interest As The Object Of Any Alleged Scheme To Defraud.

In addition to alleging that defendants made a false or fraudulent statement with the specific intent to harm the victim in a way that affected "the very nature of the bargain itself," *Starr*, 816 F.2d at 98, an indictment must also adequately allege that the putative scheme contemplated depriving another of money or property. Indeed, the Supreme Court has restricted Section 1341, and by extension Section 1343, "to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360 (1987). "As the Court long ago stated . . . the words 'to defraud' commonly refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *McNally*, 483 U.S. at 358. As the Second Circuit has held, if there is no property right "with which the defendant might interfere, we do not think that the defendant's plan to make misleading statements to the [intended victim] would have constituted a scheme to defraud." *United States v. Pierce*, 224 F.3d 158, 166 (2d Cir. 2000).

In this case, the Indictment alleges that the defendants made misrepresentations not about what they were "selling" (their sophisticated skills and experience), but about the nature of the bidding process that somehow deprived Fort Schuyler of money or property. Yet, nowhere in the Indictment does the government identify what cognizable property interest was the object of the alleged fraud. There is a conclusory allegation that six defendants (including the Syracuse Developer defendants who had nothing to do with the Buffalo RFP) "secretly rig[ged] the bidding process for State contracts worth hundreds of millions of dollars." (Indictment ¶ 1). Thus, the Indictment explicitly alleges these contracts as the "money and property" that was the object of the scheme. But as we have already seen, the Indictment elsewhere makes plain that the Buffalo RFP was not a "bidding process," was not tied to any specifically identified project, and did not itself result in the award of any contract. Being selected as one of the two "preferred developers" did not guarantee the award of anything, and the "preferred developer" status could be cancelled or revoked by Fort Schuyler at any time.[8] The Buffalo RFP itself made explicit that being named a "preferred developer" did not, in any way, guarantee any actual future contracts. (*See* Masella Dec., Ex. A (Buffalo RFP), at § 8.). Although the Buffalo Developer eventually obtained such contracts, it did so only after extensive negotiations and a wholly separate bidding process (this one requiring detailed specifications with prices bid and negotiated).

The Indictment does allege that by dint of being named a preferred provider, the Buffalo Developer was "permitted . . . to be chosen for SUNY Poly development projects . . . without further competitive bidding." (Indictment ¶ 16). But any such future contracts would be with

---

[8]    *See, e.g.*, Brian Sharp & Jon Campbell, *State to bid photonics work, re-evaluate HQ*, ROCHESTER DEMOCRAT & CHRONICLE, Oct. 21, 2016, *available at* http://www.democratandchronicle.com/story/news/2016/10/20/next-step-photonics-should-bring-clarity/924566601 (last visited May 18, 2017) (using an RFP nearly identical to the Buffalo RFP, Fort Schuyler selected preferred local developers for potential Rochester projects, but those preferred developers never received any contracts as a result:  "When it comes to the 'preferred developer' firms, LeChase spokeswoman Jennifer Miglioratti said via email Friday that the firm had not spoken with state officials on the matter but that this was a designation with 'no guarantee of anything to come of it, and nothing did.'").

Fort Schuyler — which, as explained above, was not bound by State rules requiring competitive bidding in the first place. So, while it is less than a model of clarity, it seems that the Indictment posits that Fort Schuyler was deprived of the right to require a competitive bidding process — which it was never obligated to require — on future contracts. But this is hardly clear. As a result, the defendants are left to speculate regarding the alleged deprivation to Fort Schuyler. *See United States v. Bobo*, 344 F.3d 1076, 1084 (11th Cir. 2003) ("An indictment that requires speculation on a fundamental part of the charge is insufficient."). The deprivation could be the difference in bids for future contracts had the "preferred developer" RFP process not been "rigged." Alternatively, it could be the "right" to a competitive process in those future bids, which is also apparently alleged as the object of the fraud. (*See* Indictment ¶ 16). The crux of the issue is that the alleged deprivation could be any number of things. *See Bobo*, 344 F.3d at 1085 ("Due to the inadequacies in the indictment, we cannot discern what scheme the jury found [defendant] had committed.").

At most, and as best we can understand them, the allegations are that:

a) The Buffalo Defendants "secretly tailor[ed] the Buffalo RFP" to favor the Buffalo Developer;

b) The Buffalo Developer submitted a response to the RFP that is not alleged to have included any false or misleading statements regarding its qualifications, skills, and experience;

c) The decision-makers at Fort Schuyler considered all the responses under the impression that the RFP process was "fair, open, and competitive," and named the Buffalo Developer and one other developer as the "preferred developers";

d) That designation carried with it no contract or agreement and no right to receive contracts for any actual project, but "permitted" the two "preferred developers" to seek actual contracts without competitive bidding (which Fort Schuyler was not otherwise obligated by any rule to require); and,

e) Some months later, in March 2014, Fort Schuyler and the Buffalo Developer negotiated for an actual project, a process that is not alleged to have included any false or misleading statements but included vigorous arms-length negotiations with Fort Schuyler that resulted in a major contract that the

>Buffalo Developer executed, with no allegations that the execution was of inferior quality or at an excessive price.

It is hard to fathom how this series of attenuated allegations can be seen as alleging contemplated economic harm of any cognizable property right that goes to the heart of any bargain.

In fact to the extent the focus here is the "right" to a "fair" "competitive process," it is clear that the Indictment does not allege the deprivation of a cognizable property right. "To determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right." *United States v. Henry*, 29 F.3d 112, 114–15 (3d Cir. 1994) (citing *United States v. Evans*, 844 F.2d 36, 41 (2d Cir. 1988)). Two of the hallmarks of traditional property are exclusivity and transferability. *See United States v. Alsugair*, 256 F. Supp. 2d 306, 313 (D.N.J. 2003). The putative right to a competitive process does not bear these indicia of traditional property rights. A competitive process is neither exclusive to Fort Schuyler, nor is it transferable. *See United States v. Alkaabi*, 223 F. Supp. 2d 583, 590 (D.N.J. 2002) (holding that the integrity of a testing process was not a traditional property right under the fraud statutes).

Furthermore, at least one circuit court has rejected the position that the "right" to a "fair" bidding process was a cognizable property right. *See Henry*, 29 F.3d at 115. There, defendants allegedly rigged the process by which banks made competitive bids for the deposit of a government agency's funds with the bank that offered the highest interest. The indictment was predicated on the defendants' corruption of the bidding process and the deprivation to other bidding banks of "a fair and honest opportunity to receive this public money." The court opined that "[t]he issue, therefore, [wa]s whether the competing banks' interest in having a fair opportunity to bid for something that would become their property if and when it were received [wa]s in itself property." *Henry*, 29 F.3d at 115. The Third Circuit found the conduct unethical,

but held it was not a deprivation of property as required by *McNally* and affirmed the district court's dismissal of the indictment. *See Henry*, 29 F.3d at 113 ("Clearly, each bidding bank's chance of receiving property — the deposits if its bid were accepted — was, at least in part, dependent on the condition that the bidding process would be fair. This condition, which is all that the bidding banks allegedly lost, was thus valuable to them, but it is not a traditionally recognized, enforceable property right.").

*Henry* teaches that although an expectation that a bidding process be fair can indeed be something a party values, it is not a property right protected by the federal wire fraud statute. Thus, the Indictment's allegations either that Fort Schuyler was somehow deprived of a "fair, open and competitive" RFP process (Indictment ¶ 25(a)), or of a competitive process in seeking bids for future contracts (Indictment ¶ 16), are each too inchoate an expectation to constitute the type of property interest necessary to establish wire fraud.[9]

Although the wire fraud statute protects both tangible and intangible property, certain types of intangible property have been found to fall outside the scope of the mail and wire fraud statutes. *See, e.g.*, *Cleveland v. United States*, 531 U.S. 12, 15 (2000) (license to operate video poker machines not property in hands of the public licensor); *United States v. Novod*, 923 F.2d 970, 973 (2d Cir. 1991), *on rehearing,* 927 F.2d 726 (2d Cir. 1991) (scheme to fraudulently obtain a state permit to operate a dump site does not constitute mail fraud, since a permit is not property); *United States v. Turner*, 465 F.3d 667, 670-80 (6th Cir. 2006) (dismissing wire fraud case alleging scheme to violate state campaign finance laws thereby assisting the election of officials who then received state salaries because neither the state nor its citizens had a valid

---

[9]   Alternatively, if the government argues that defendants deprived Fort Schuyler of other bids, this hypothetical position is also deficient. *See Novak*, 443 F.3d at 159 ("Although the Government insists that the contractors would not have paid for the no-show hours had they been aware that Novak would receive a portion of the money, that hypothetical contention is inadequate to support a finding of fraudulent intent.").

property right in that salary money); *United States v. Alsugair*, 256 F. Supp. 2d at 314 (educational testing service's administration and scoring of its exam are not traditional property interests protected by fraud statutes); *United States v. Campbell*, 291 F. Supp. 2d 547, 555 (E.D. Mich. 2003) (right of union members to compete for jobs is not "property," in prosecution of union officials who deprived members of such right by securing jobs for third parties).

In *Cleveland v. United States*, 531 U.S. 12 (2000), the Court addressed the definition of "property," concluding that Section 1341 "requires the object of the fraud to be 'property' in the victim's hands." 531 U.S. at 15, 26. The Court held that because a Louisiana video-poker license was not "property" of the state before it was issued, defrauding Louisiana to obtain such a license did not constitute mail fraud.[10] *See* 531 U.S. at 20-22. Of similar import to *Cleveland* is the Fifth Circuit's decision in *United States v. Griffin*, 324 F.3d 330 (5th Cir. 2003). That case considered whether unissued federal income tax credits that serve as incentives for developers to build low-income housing constituted property under the mail fraud statute. *See Griffin*, 324 F.3d at 354. The government argued that these tax credits were different than the video poker license at issue in *Cleveland*, because the tax credits were a valuable commodity and an economic incentive designed to foster government policy. *Griffin*, 324 F.3d at 352. The Fifth Circuit rejected that argument, holding that the tax credits had insufficient value to the state to constitute property; the "only property interest the State ha[d] in the tax credits [was] purely abstract or theoretical." *Griffin*, 324 F.3d at 355.

---

[10] *See United States v. LeVeque*, 283 F.3d 1098, 1102-03 (9th Cir. 2002) (a hunting license is not property for purposes of the mail fraud statute); *see also United States v. Peter*, 310 F.3d 709, 715 (11th Cir. 2002) (misrepresentations in applying for liquor license did not violate the mail fraud statute). Many circuits had reached the conclusion that licenses were not property for purposes of mail or wire fraud even before *Cleveland* was decided. *See, e.g., United States v. Shotts*, 145 F.3d 1289, 1296 (11th Cir. 1998); *United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990).

Further illustrating this point (while relying heavily on *Cleveland*) is the Supreme Court's decision in *Sekhar v. United States*, 133 S. Ct. 2720 (2013). There, the defendant threatened a government official to induce him to recommend that a government agency agree in a non-binding way to invest in the defendant's fund, which agreement would only become binding when and if the agency entered into a limited partnership agreement with the fund. *Sekhar*, 133 S. Ct. at 2723; *see Sekhar*, 133 S. Ct. at 2728 (Alito, J., concurring) (characterizing putative property interest as official's "internal suggestion to his superior that the state government issue a non-binding commitment to invest in [defendant's] fund"). The Supreme Court held that "a yet-to-be-issued recommendation that would merely approve (but not effect) a particular investment" was not a protectable property interest under the Hobbs Act, and was "[e]ven less so" than the license at issue in *Cleveland*. *Sekhar*, 133 S. Ct. at 2727. As the concurrence noted, "the term 'property' plainly does not reach everything that a person may hold dear; nor does it extend to everything that might in some indirect way portend the possibility of future economic gain," and as a result the case before it "stretches the concept of property beyond the breaking point." *Sekhar*, 133 S. Ct. at 2728 (Alito, J., concurring).

Like the license in *Cleveland* or the tax credits in *Griffin* or the recommendation to issue a non-binding commitment in *Sekhar*, the ability of Fort Schuyler to designate "preferred developers" that would be "permitted" to bid on future contracts (Indictment ¶ 16) was not a property right — or, if it was, it was a "purely abstract or theoretical" one and thus insufficient under the wire fraud statute. *Griffin*, 324 F.3d at 355. Here, the RFP was implemented with the sole purpose of identifying "preferred developers" who would thereafter seek to win actual contracts for actual projects. The designation of certain "preferred developers" is similar to a license — perhaps a step in the process towards making money, but not, in itself, a cognizable

property interest of Fort Schuyler under the wire fraud statute. The mere prospect of future contractual relations is not a tangible property interest.[11] Because the Buffalo RFP process did not involve the award of a contract, but rather the permission to potentially receive a contract in the future, the RFP process was akin to the award of a permit or license (albeit by a private entity) — and such permits are not property while still in the hands of the issuer. *See Cleveland*, 531 U.S. at 20-26; *Novod*, 923 F.2d 970, 973. Indeed, it was substantially less tangible than a license or a permit. A license or permit generally enables the recipient to act unilaterally, consistent with that license or permit; once I have a permit to run a certain business, I have an advantage over those without such a permit and can immediately set about using that permit to make money. Here, status as a "preferred developer" gave the recipients of that status literally nothing concrete or tangible. At best, it provided an opportunity wholly contingent on Fort Schuyler — in its sole and unfettered discretion — to enter into a separate bidding process for a future contract for an actual project (or not). It was, again at best, something "that might in some indirect way portend the possibility of future economic gain," *Sekhar*, 133 S. Ct. at 2728, with that mere possibility being far from guaranteed. That is too "abstract or theoretical" a right to fall under the cloak of federal criminal law.

Accordingly, the decision to name the Buffalo Developer one of two "preferred developers" cannot itself be the object of a properly pled wire fraud charge, because that decision is plainly not the kind of "property" that the statute endeavors to protect. Indeed, the Indictment "stretches the concept of property beyond the breaking point." *Sekhar*, 133 S. Ct. at 2728. To

---

[11] *See Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1343, 1351–52 (2d Cir. 1994) (contractor had no property right in lost profits from future government contracts because, under New York law, "bidders lack property rights in future contracts to be awarded under competitive bidding procedures"); *see also Eastway Const. Corp. v. City of N.Y.*, 762 F.2d 243, 249-50 (2d Cir. 1985) (City's refusal to allow contractor to participate in redevelopment projects did not violate contractor's rights in that contractor did not have property interest in continuing to participate in projects).

the extent that the government argues the property right that was the object of the scheme to defraud was Fort Schuyler's intangible right to a "fair, open, and competitive" Buffalo RFP (*see* Indictment ¶ 45), as discussed above that is not a cognizable property right either. *See Henry*, 29 F.3d at 116 (affirming dismissal of indictment and finding that a fair bidding opportunity was not a traditionally recognized, enforceable property right).

That the Indictment falls far short here is illustrated by the fact that there is absolutely no allegation — not a word — suggesting that the Buffalo Developer's response to the RFP included a single falsehood regarding its qualifications, skills, or experience. Nor is there any suggestion that the subsequent negotiations for an actual contract involved any such misrepresentations. Nor is there even a hint of a claim that the Buffalo Developer's performance was sub-par or its prices anything other than fair. The Second Circuit has upheld cases "where defendants' misrepresentations pertained to the quality of the services bargained for,"[12] but there is nothing even close to that alleged here. And, as discussed above, the Second Circuit has "repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain." *Binday*, 804 F.3d at 570-571.

Illustrating these problems at the heart of the Indictment is the Second Circuit's decision in *United States v. Mittelstaedt*. 31 F.3d 1208 (2d Cir. 1994). There, the defendant served as a consulting engineer for two Long Island communities and used his position to influence the town planning boards with respect to real estate projects in which he had an undisclosed interest. *Mittelstaedt*, 31 F.3d at 1210-11. He was charged with mail fraud, and the district court instructed the jury that "the right to material information concerning the expenditure of public

---

[12] *See United States v. Walker*, 191 F.3d at 335-36 (finding requisite harm established where defendant attorneys "consistently misrepresented to their clients the nature and quality of the legal services they were providing . . . for a hefty fee"); *accord United States v. Paccione*, 949 F.2d 1183, 1196 (2d Cir. 1991) ("Use of the mails in furtherance of a scheme to offer services in exchange for a fee, with the intent not to perform those services, is within the reach of [18 U.S.C.] § 1341.").

monies[ ] is a property right, intangible though it is, and it is included in the mail fraud statute."

*Mittelstaedt*, 31 F.3d at 1216.  The defendant contended that the district court erred in refusing to

give a proposed charge that the undisclosed information must have "placed the Village at an[ ]

economic disadvantage" in that the defendant's undisclosed interest must have "caused the

Village to purchase the property at a higher cost than it would have otherwise paid."

*Mittelstaedt*, 31 F.3d at 1216-17 (internal quotation marks omitted).  The Second Circuit agreed

with the defendant, holding:

> Where an individual standing in a fiduciary relation to another
> conceals material information that the fiduciary is legally obliged
> to disclose, that non-disclosure does not give rise to mail fraud
> liability unless the omission can or does result in some tangible
> harm. . . . [L]ack of information that might have an impact on the
> decision regarding where government money is spent, without
> more, is not a tangible harm and therefore does not constitute a
> deprivation of section 1341 "property."   To be material, the
> information withheld either must be of some independent value or
> must bear on the ultimate value of the transaction.  To convict, the
> government had to establish that the omission caused (or was
> intended to cause) actual harm to the village of a pecuniary nature
> <u>or</u> that the village could have negotiated a better deal for itself if it
> had not been deceived.

*Mittelstaedt*, 31 F.3d at 1217–18 (emphasis in original) (citation omitted).  No matter how one

defines the "transaction" at issue here (and as discussed above, the Indictment is all over the lot

on that one), there is no plausible allegation that the failure to disclose, for example, the alleged

pre-RFP communications alleged, affected the "ultimate value of the transaction."  *Mittelstaedt*,

31 F.3d at 1217–18.

By contrast, the Second Circuit's recent decision in *United States v. Finazzo* illustrates

the kind of economic harm to a victim that the wire fraud statute is designed to protect against.

850 F.3d 94 (2d Cir. 2017).  There, defendant induced Aéropostale to enter into disadvantageous

agreements in which Aéropostale paid excessive prices for inferior products.  *See Finazzo*, 850

F.3d at 115 (defendant employee secured supply agreements in favor of an entity he secretly owned, thereby inducing victim to enter into "disadvantageous bargains" resulting in sub-par service, lower quality goods, and higher prices). Here, there are no allegations that the experiences, skill level, and other qualifications that led to the Buffalo Developer's selection as one of the "preferred developers" were inferior to any other local developer eligible to have participated in the Buffalo RFP. As the RFP did not involve any pricing aspect and did not result in any contract for services, it cannot be alleged that the Buffalo Developer's prices were excessive (because there were no prices, as there was no contract for any particular project). There is not even any allegation that the contracts the Buffalo Developer ultimately negotiated were based on misrepresentations, resulted in inferior service, or included excessive prices.

In *Finazzo*, the scheme to defraud related to the grant of specific contracts and was supported by specific evidence of tangible economic harm to Aéropostale. 850 F.3d at 114–15 (defendant's "T-shirts and fleeces were inferior in quality to other vendors" and substantially pricier). By contrast, here the government simply provides the vague allegation that Fort Schuyler was deceived. (Indictment ¶ 25). The Indictment fails to allege that Fort Schuyler suffered any tangible economic harm, or that there was ever the potential for such by virtue of the allegedly flawed Buffalo RFP process. Even assuming arguendo that the other elements of wire fraud are adequately alleged (and they are not), the Indictment must be dismissed because the alleged object of the scheme was not a cognizable property right. Like the license in *Cleveland*, the expectation of a fair bidding process in *Henry*, and the concealment of information that could have impacted where government money was spent in *Mittelstaedt*, the alleged object of the scheme charged here is simply not "property" within the ambit of the wire fraud statute.

The prosecution cannot salvage the Indictment by arguing the "right to control" theory of property because the Indictment contains no such allegation and, even if it did, that theory does not align with what the Indictment <u>does</u> allege. As discussed above, the Indictment explicitly identifies the "money and property" that was the object of the alleged scheme as "the award of significant taxpayer-funded development contracts." (Indictment ¶ 39; *cf.* ¶ 1 (defendants "secretly rig[ged] the bidding process for State contracts worth hundreds of millions of dollars"), ¶ 22 (process was rigged to obtain "State contracts . . . worth hundreds of millions of dollars")). As the Fifth Circuit has observed, "when a grand jury charges one specific theory of a scheme to defraud, the defendant may not be convicted based on another theory." *United States v. Radley*, 632 F.3d 177, 185 (5th Cir. 2011). The prosecution knows how to include a right to control theory in an indictment when that is what it has asked the grand jury to charge.[13] Similarly, the courts know when the language of an indictment fails to allege a specific theory of wire fraud.[14]

Here, the Indictment does not provide any indication that the theory of wire fraud advanced by the prosecution sounds in the "right to control" theory. There is nothing to suggest

---

[13] *See, e.g.*, *United States v. Viloski*, 557 F. App'x 28, 33 (2d Cir. 2014) (defendant received sufficient notice where indictment "expressly allege[d] a violation of the right to control" theory by spelling out that the object of the scheme was "to obtain money and property, and to deprive [the victim] of potentially valuable information that could impact on its economic decisions"); *United States v. D'Amato*, 39 F.3d 1249, 1255 (2d Cir. 1994) (indictment alleged right to control theory by charging that mailing was used to "defraud [the victims] of the right to control the expenditure of corporate funds"); *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 1991) (indictment charged victims were "defrauded of the $1.14 million in payments as well as the 'right to control' how the money was spent").

[14] *See Henry*, 29 F.3d at 114 (argument on appeal that defendants defrauded victim of its "right to control how its money was invested" articulated a theory that was "not advanced in the indictment and cannot save it on appeal"); *Griffin*, 324 F.3d at 356 (it was plain error for district court to have instructed jury on "honest services" theory of wire fraud where "the indictment did not contain a reference" to that theory); *Kurtz*, 2008 WL 1820903 at *6 (dismissing case because "the indictment does not sufficiently allege" the government's theory of fraud, where indictment did not define "property" as "the right to define the sale of its property"); *cf. United States v. Mariani*, 90 F. Supp. 2d 574, 586, 588 (M.D. Pa. 2000) ("the government is contending that the term 'property' as used in the indictment means whatever may constitute property, without any specification by the Grand Jury. The government may not "contend that forms of property not articulated in the indictment are the objects of the scheme to defraud, especially where, as here, the indictment specifies other forms of property"); *see also United States v. Telink, Inc.*, 702 F. Supp. 805, 808-09 (S.D. Cal 1988) (rejecting theories of "money and property" not articulated in the indictment; "[a]n indictment must allege with specificity how the property loss occurred in order to safeguard constitutional rights guaranteed by the Fifth and Sixth Amendments"), *aff'd*, 910 F.2d 598 (9th Cir. 1990).

that this theory of wire fraud was considered and charged by the grand jury. "[T]he mere fact that the indictment allege[s] a scheme to obtain 'money and property' d[oes] not give the government free rein to define the alleged objects of the scheme." *United States v. Mariani*, 90 F. Supp. 2d at 586.

Even if the prosecution were to belatedly claim a "right to control" theory, and even if the Court were to find such a theory was adequately alleged (which it plainly was not), the theory would not save the Indictment. "The right to control one's assets' does not render every transaction induced by deceit actionable under the . . . the fraud statutes[,] [r]ather, the deceit must deprive the victim 'of potentially valuable economic information.'" *Binday*, 804 F.3d at 570 (quoting *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir 1991)); *see also United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998) (quoting *United States v. Dinome*, 86 F.3d 277, 284 (2d Cir. 1996)) ("In cases resting upon the so-called 'right to control' theory of mail fraud, 'the information withheld either must be of some independent value or must bear on the ultimate value of the transaction.'").

As discussed above, the only misrepresentation alleged to have been made has literally nothing to do with the qualifications of the Buffalo Developer, the quality of any contemplated services, or any pricing information and thus cannot "bear on the ultimate value of the transaction." The fraud statutes are "'limited in scope to the protection of *property rights*,' and the ethereal right to accurate information doesn't fit that description." *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) (quoting *McNally*, 483 U.S. at 360) (emphasis in original). "Nor can it plausibly be said that the right to accurate information amounts to an interest that 'has long been recognized as property.'" *Sadler*, 750 F.3d at 591 (quoting *Cleveland*, 531 U.S. at 23); *see Sadler*, 750 F.3d at 591 ("Even when Congress amended the fraud statutes to cover

*some* intangible rights, it did not stretch the statute to cover the right to accurate information before making an otherwise fair exchange.") (emphasis in original).

"[M]isrepresentations or non-disclosure of information cannot support a conviction under the 'right to control' theory unless those misrepresentations or non-disclosures can or do result in tangible economic harm. This economic harm can be manifested directly—such as by increasing the price the victim paid for a good—or indirectly—such as by providing the victim with lower-quality goods than it otherwise could have received." *Finazzo*, 850 F.3d at 111. The tangible economic harm requirement is an essential element of the "right to control" theory. *See Finazzo*, 850 F.3d at 113 n.20 (tangible-harm requirement is succinctly stated as: "[t]he loss of the right to control money or property *only* constitutes deprivation of money or property if the scheme could cause or did cause tangible economic harm to the victim") (emphasis added). There are no such allegations here.

### C. The Indictment Fails To Allege Any Specific Wire Transmissions.

Counts One and Four of the Indictment are also fatally deficient for their lack of specificity. The Counts fail to identify any wire transmissions made by the Buffalo Defendants in furtherance of the alleged scheme. As such, the Indictment does not provide a definite statement of the essential facts constituting the charged offenses. *See Pirro*, 212 F.3d at 92-93. Indeed, it does not identify "the offense" at all.

The wire fraud statute requires an interstate wire transmission in furtherance of a scheme to defraud. *See* 18 U.S.C. § 1343. Importantly, it is the "[mail or wire transmission that] represents the 'individual act' prohibited, not the fraudulent scheme." *United States v. Ramirez*, 420 F.3d 134, 145 (2d Cir. 2005) (quoting *United States v. Gardner*, 65 F.3d 82, 85 (8th Cir. 1995)). Here, the Indictment fails to provide any facts setting forth any specific wire transmissions. The Indictment fails to provide the requisite specificity demanded by Rule 7(c)(1)

and the Constitution.  The result is exactly what such constitutional protections are intended to prevent:  the Buffalo Defendants are left only to speculate as to the nature of the communications for which they are charged and they face a moving target and the prospect that a petit jury may be asked by the government to adjudge them guilty of accusations that never were presented to a grand jury.

This latter concern is why a bill of particulars will not suffice.  We recognize that in the past Your Honor has suggested that a bill of particulars can supply the allegations that the Indictment so conspicuously lacks.  *See United States v. Silver*, 117 F. Supp. 3d 461, 471 (S.D.N.Y. 2015).  We respectfully submit that, while that remedy might address the notice problem, it does nothing to address the more fundamental problem.  The specific wire transmissions are not just evidential detail, nor are they simply an element of the crime; the wire transmissions are the crime.  *See Ramirez*, 420 F.3d at 145.  It cannot be the law that the government can obtain an indictment that does not identify the act "that constitutes the prohibited conduct," *United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002), and then fill that lacuna at its leisure with a bill of particulars — opting post facto to identify specific wire transmissions that were presumably not presented to the Grand Jury.  That presents irremediable Fifth Amendment problems.

The Fifth Amendment requires that all felony charges be indicted by a Grand Jury.  Once an indictment is returned, its charges therefore cannot be broadened (except in a superseding indictment).  Any other broadening of an indictment "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Stirone v. United States*, 361 U.S. 212, 217 (1960).  Though the Buffalo Defendants would certainly be

prejudiced by the government's broadening of its charges, that need not be so to render the government's resulting constructive amendment improper. As the Second Circuit has observed:

> We are unimpressed by the government's argument that no grand jury clause violation occurred because defense counsel were not "surprised" by the admission of such evidence. The substantial right implicated here is not notice; it is the "right to be tried only on charges presented in an indictment returned by a grand jury", *Stirone*, 361 U.S. at 217, 80 S. Ct. at 273, and violation of this right requires reversal of the conviction.

*United States v. Roshko*, 969 F.2d 1, 6 (2d Cir. 1992). Simply put, "[w]hen a constructive amendment affects an essential element of the charged offense, it is a per se violation of the grand jury provision of the Fifth Amendment and requires reversal without a showing of prejudice." *Guidice*, 2007 WL 1987746, at *4 (citing *United States v. Coyne*, 4 F.3d 100, 112 (2d Cir. 1993)). Here, the specific wire transmissions are more than an essential element, they are the "charged offense" — only here they are simply not charged at all. That is a fatal flaw that the prosecutor simply lacks the power to fix on her own. Because the government failed to ask the Grand Jury to return an indictment identifying what "prohibited conduct" it sought to prosecute, to permit it unilaterally to do so now would "broaden[] the possible bases for conviction beyond those presented by the grand jury." *United States v. Floresca*, 38 F.3d 706, 710 (4th Cir. 1994). As the Seventh Circuit has observed, any effort by the government to pursue "different offenses or theories of conviction than charged by the grand jury is fatal. It is reversible per se." *United States v. Pedigo*, 12 F.3d 618, 631 (7th Cir. 1994). If that is what the government seeks to do here, it should not be countenanced. The Indictment must be dismissed.

## II. THE BRIBERY CHARGE (COUNT FIVE) SHOULD BE DISMISSED FOR FAILURE TO ALLEGE ESSENTIAL ELEMENTS OF SECTION 666.

The government's bribery allegations against the Buffalo Defendants are so thin that it is impossible to determine from the Indictment on what "facts" they are alleged to have bribed

Howe. There are no identified payments, monetary or otherwise. There are no dates, times, or locations of any purported payments. Strikingly absent from the Indictment are any details, at all, as to the actual "bribe" payments. *See, e.g.*, *United States v. Siddiqi*, No. 06 Cr. 377 (SWK), 2007 WL 549420, at *2 (S.D.N.Y. Feb. 21, 2007) (defendant entitled to notice of the approximate date and amount of illegal payments that he received, as well as the identity of the person who made such payments); *United States v. Savin*, 2001 WL 243533, at *2-6 (S.D.N.Y. Mar. 7, 2001) (ordering government to provide a bill of particulars specifying, inter alia, the dates and amounts of each alleged fraudulent transfer, the account numbers to and from which transfers were made, and the manner and entities used to make such transfers); *United States v. Lino*, 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001) (requiring government to provide bill of particulars specifying "whom [the defendant] agreed to bribe, the pension fund with which the bribe recipient was affiliated, and the amount of the bribe"). The Indictment alleges, in a failing effort to establish the constitutionality of the statute, that Howe engaged in "official action" in exchange for the purported "bribes" (Indictment ¶ 45), but no such "official action" is identified. *See United States v. Ganim*, 256 F. App'x 399, 401 (2d Cir. 2007) (government sufficiently alleged requisite *quid pro quo* to support Section 666 count where each bribery-related count of the supplemented indictment set forth benefits defendant received in exchange for his promises to perform official acts).

The Indictment does not even identify a relevant "government agency" that Howe was supposedly acting as an "agent" of, or articulate in what way he was an "agent." At most, the Indictment alleges that the Buffalo Defendants paid "bribes" to Howe "in his capacity as an agent and representative of SUNY Poly," "in exchange for, to influence, and to reward the taking of official action . . . in connection with obtaining the Buffalo RFP." (Indictment ¶ 47). The

Indictment does not specify how Howe took "official action" as an "agent" of SUNY Poly with respect to the Buffalo RFP (Indictment ¶ 47), when the Buffalo RFP was in fact issued and evaluated by Fort Schuyler — a totally distinct private entity for which there are no allegations that Howe acted as an "agent" — and there is no allegation that SUNY Poly had any role in the Buffalo RFP process that would have enabled SUNY Poly to take any action. Perhaps mixing apples and oranges, the Indictment also tosses in an allegation that Howe somehow used his "official position" with respect to the Buffalo RFP (Indictment ¶ 45), but does not specify what "position," at which entity, or how he did so.

From these sparse allegations, the Indictment spins a bribery theory that is so attenuated and convoluted it is difficult, if not impossible, to follow. The relevant statute, Section 666, enumerates a number of prerequisites for a violation of that provision. *See* 18 U.S.C. § 666. The assumptions necessary to string together our best guess as to the government's theory of how the conduct here even arguably implicates liability under Section 666 — none of which are sustained by the actual allegations in the Indictment — underscore how the Indictment falls short.

Before discussing the Indictment, however, we briefly address the statute. By its terms, Second 666 does not include an explicit "official action" element. As the Supreme Court made plain in its recent *McDonnell* decision, such an element is necessary to cabin bribery statutes in a way which keeps them within constitutional boundaries. *McDonnell*, 136 S. Ct. 2355 (2016). The absence of such an element renders Section 666 unconstitutional on its face. The reasons why this is so are ably set forth in the memorandum in support of defendant Peter Galbraith Kelly's motion to dismiss, which we adopt and join in full and which we respectfully request be incorporated herein by reference. However, in the alternative, even confronting the charge the

prosecution has chosen, one which seeks to engraft onto Section 666 an "official action" element, the Indictment must be dismissed.

The Buffalo Defendants are charged with the payment of bribes in violation of the federal-programs bribery statute, 18 U.S.C. § 666 (Count Five).  Section 666 applies to any "organization, government, or agency [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  18 U.S.C. § 666(b).  The statute imposes criminal liability for anyone who "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of [an applicable organization, government or agency], in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more."  18 U.S.C. § 666(a)(2).  Expressly excluded from the statute, however, are payments in the nature of "bona fide salary . . . or other compensation paid . . . in the usual course of business." 18 U.S.C. § 666(c).

Reading the statute together with the Indictment's allegations reveals the glaring holes as to the Buffalo Defendants, including that:  (i) the Buffalo Defendants did not "corruptly" give or offer anything to Howe (instead, the law firm was retained and paid pursuant to an agreement with an affiliated law firm); (ii) Howe was not an "agent" of any governmental organization (instead, he was, at most, retained as a consultant); (iii) if he was an "agent" of any organization, then he is alleged to have been an agent of SUNY Poly, which did not issue the Buffalo RFP or conduct an evaluation of the responses (instead, Fort Schuyler, a totally distinct and private entity is alleged to have issued the Buffalo RFP and evaluated the responses); (iv) Fort Schuyler is not a qualifying "organization" under Section 666 (and the Indictment does not even allege

that it is); (v) SUNY Poly could not and did not take any "official action" (and none is alleged); (vi) no entity, including Fort Schuyler, took "official action" with respect to the Buffalo RFP; and (vii) there is no connection between the alleged "bribe" and any "business" or "transaction" "involving anything of value of $5,000 or more." Any one of these infirmities is fatal to Count Five. Accordingly, Count Five must be dismissed as against the Buffalo Defendants.

### A. There Was No Corrupt Offer Or Agreement To Give Anything Of Value.

The Indictment is fatally deficient for its failure to allege any facts establishing that the Buffalo Defendants "corruptly g[ave], offer[ed], or agree[d] to give anything of value to any person, with [the] intent to influence or reward." 18 U.S.C. § 666(a)(2). The government must prove a defendant's corrupt intent in the giving or offering of a bribe. *See United States v. Rooney*, 37 F.3d 847, 852-53 (2d Cir. 1994) ("[T]he use of the term corruptly in § 666 entails the violation of some duty owed to the government or to the public in general."). To act "corruptly" requires proof that the defendant was conscious of wrongdoing. *See United States v. Veliz*, 800 F.3d 63, 71 n.6 (2d Cir. 2015). A defendant's specific intent to bribe may be established by evidence of an illegal *quid pro quo* agreement, which is defined as "a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority." *United States v. Ganim*, 510 F.3d 134, 141 (2d Cir. 2007). [15]

### 1. The Indictment Fails To Adequately Allege The Buffalo Defendants Paid Bribes Or Illegal Gratuities.

The Indictment does not allege any specific bribes the Buffalo Defendants purportedly paid to Howe in return for "official action" (which is also not identified). *See United States v.*

---

[15] The Second Circuit has also held, contrary to several other circuits, that Section 666 criminalizes gratuities. *See Ganim*, 510 F.3d at 150 ("[A] payment made to 'influence' connotes bribery, whereas a payment made to 'reward' connotes an illegal gratuity."). The Buffalo Defendants reserve their right to petition for *en banc* review of the Second Circuit's improper extension of Section 666 to criminalize gratuities. *See, e.g.*, *United States v. Jennings*, 160 F.3d 1006, 1015 n.4 (4th Cir. 1998) (such an interpretation is inconsistent with the text and history of the statute).

*Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) (government must prove that defendant had a specific intent to give something of value in exchange for an official act). In fact, the Indictment does not specify a single bribe payment to Howe. This is a striking absence — no actual payments alleged — in an Indictment charging bribery. But it is not surprising in this case. As the government well knows, the Buffalo Defendants *never* made any payments directly to Howe. The only payments that have anything to do with Howe were payments the Buffalo Developer made to a well-known Albany law firm (Whiteman, Osterman & Hanna LLP ("WOH")), which did legal work for the Buffalo Developer and which in turn owned WOH Government Solutions LLP ("WOHGS"), an affiliated government relations entity, which in turn employed Howe.[16]

Significantly, as discussed below, this arrangement with the Albany law firm long predates any inkling of the Buffalo RFP. Of equal significance, there are no allegations of hidden payments or gifts to Howe of any sort. Instead, the Indictment vaguely references "hundreds of thousands of dollars in payments to Howe from the Syracuse Developer *and* the Buffalo Developer." (Indictment ¶ 22 (emphasis added)). Not only does the Indictment fail to identify any specific payments, it also fails to distinguish between the Syracuse and Buffalo Developers — entirely separate entities, involved in entirely separate RFP processes. The Indictment simply alleges that the Buffalo Defendants "paid bribes to Todd Howe in exchange for, to influence, and to reward the taking of official action in his capacity as an agent and representative of SUNY Poly, in connection with obtaining the Buffalo RFP." (Indictment ¶ 47).

---

[16] The Indictment alleges simply that Howe was "retained by and received payments from" the Buffalo Developer. (Indictment ¶ 12). The retention letters that underlay this somewhat garbled allegation are annexed as Exhibit J to the Masella Declaration. The Buffalo Developer's retention of WOH (and by extension WOHGS and by further extension Howe) commenced in January 2013 — nine months before the announcement of the Buffalo RFP. The Buffalo Developer's retention of WOH continued long after the Buffalo RFP, through 2016. As the retention letters make clear, and as the government well knows, each year the Buffalo Developer paid WOH a flat annual fee, through equal quarterly or monthly payments. There is no allegation that the Buffalo Developer ever paid WOHGS directly (because it never did) and no allegation that it ever paid Howe directly (because it never did). There is similarly no allegation that the Buffalo Developer controlled, determined, or even knew (because it did not) the amount that Howe was in turn paid by WOH.

The lack of factual specificity with respect to what payments were made, how they were made, when they were made, by whom they were made, and for what purpose (*e.g.*, in exchange for which "official acts" they were made) warrants dismissal of Count Five standing alone. The Indictment's allegations, vague as they are, leave the Buffalo Defendants fundamentally unable to identify the allegedly offending conduct with which they are charged. *See, e.g.*, *Pirro*, 212 F.3d at 93 (indictment must state facts specific enough to describe a particular criminal act).

Moreover, the Indictment fails to adequately allege any facts which would suggest the existence of a *quid pro quo* relationship in which bribes were paid <u>in return for</u> specific "official acts" — which is required. *See United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013). Indeed, no "official acts" at all are specified. Howe is not alleged to have voted, decided, or acted in any particular way with respect to any particular issue pertaining to the Buffalo RFP. And in fact he did not. This failure to allege that the purported payments were "in exchange for" some pertinent "official action" taken by Howe "in his capacity as an agent . . . of SUNY Poly," in connection with an RFP as to which SUNY Poly could not and did not take any "official action" (because it was an RFP implemented by a distinct private entity, not SUNY Poly) also requires dismissal of Count Five.[17]

### 2. Any Payments That May Have Been Made To Howe Were Not Made With The Requisite Corrupt Intent And Cannot Establish Criminal Liability Within The Meaning Of Section 666.

The Indictment also fails to adequately allege facts from which corrupt intent might be inferred, such as facts specific to the temporal relationship between the payments and favorable treatment, the communications between the parties to the allegedly illicit transaction, or other

---

[17]  In this section, we have focused on the Indictment's failure to allege that any bribes or gratuities were made in exchange for any "official action," or *quid pro quo*. The bribery count fails — and should be dismissed — for the additional reason that there is no "official action" alleged, and none was taken. A comprehensive discussion of the "official action" requirement can be found *infra* at pp. 61 to 67. As set forth above, these arguments need be addressed only if the Court rejects the constitutional challenge to Section 666.

indicia of an illegal scheme.  *See United States v. Rosen*, 716 F.3d 691, 703 (2d Cir. 2013).  To

the contrary, the absence of any allegations tending to show that the alleged bribe payments were

"corruptly" made is stark.

Indeed, the facts as alleged undercut any inference that any payments from the Buffalo

Developer were made "corruptly," because (among other reasons):  (i) the only payments made

by the Buffalo Developer were made to a law firm (WOH) — not directly to Howe or even to the

firm where he worked (WOHGS);[18] (ii) the payments were made pursuant to a retainer agreement

for an engagement that began months before there was any indication of an impending Buffalo

RFP; (iii) the payments amounted to a flat annual rate set each year and paid in quarterly or

monthly installments; and (iv) the flat annual payments were pursuant to an annual retainer

agreement that was entered into on a per annum basis.  Balanced against the lack of a single

allegation specifying that the means, manner, or amount of payments were somehow "corruptly"

made, the Indictment's silence on this point speaks loudly.

This case is similar to *United States v. Rooney*, where the Second Circuit held the

defendant's conviction could not stand because his conduct was not "corrupt."  37 F.3d at 854.

There, defendant undertook to develop a housing project, which was funded through a federal

agency.  Defendant solicited a contractor to build a pond in exchange for the defendant applying

for additional federal loans for immediate payment to the contractor for accrued bills.  *See*

*Rooney*, 37 F.3d at 849-50.  The government's theory at trial was that defendant's offer to apply

for additional federal funding so that he could immediately pay the contractor in exchange for

the contractor's construction of a pond constituted a corrupt solicitation of a thing of value for

the purposes of Section 666.  *Rooney*, 37 F.3d at 852.  The court noted that the defendant "is not

---

[18]    Notably, the Indictment does not charge the law firm, nor does it even suggest that the law firm was somehow engaged in any culpable conduct.  That is as it should be.  It was not, nor was the Buffalo Developer.

a public official.  Nor is he a member of a private nonprofit organization which has responsibility for distributing federal funds.  Rather, he is a private individual involved in a private development project that happens to have as its lender the federal agency." *Rooney*, 37 F.3d at 850.  The Second Circuit looked to the legislative history of Section 666 and noted that the statute was enacted "to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." *Rooney*, 37 F.3d at 851.  The court focused its analysis on whether the *quid pro quo* exchange suggested by the government could amount to a "corrupt solicitation." *Rooney*, 37 F.3d at 852.  Finding that a violation of the bribery component of the statute requires a breach of duty, and because the underlying solicitation could not be considered corrupt, the court concluded that defendant did not violate an official or public duty owed to the government or the public at large.  *Rooney*, 37 F.3d at 854. Noting that the legislative history made clear the statute was not intended to apply to acceptable commercial and business practices or to constrain lawful commercial business transactions, the Second Circuit overturned Rooney's conviction and held "[w]e have no reason to believe that Congress would endorse an interpretation so broad as to chill legitimate negotiations by private developers using federal loans." *Rooney*, 37 F.3d at 854.  As in *Rooney*, the Buffalo Developer's lawful engagement of an individual to perform consulting services does not amount to "corrupt" intent.

Although the Buffalo Developer only ever paid the law firm (WOH), presumably the law firm compensated Howe in some fashion during the several years of the engagement.  There are no allegations that the Buffalo Developer determined, influenced, or even knew the amount of compensation eventually received by Howe (and it did not).  Importantly, however, expressly

excluded from the scope of Section 666 are payments in the nature of "bona fide salary . . . or other compensation paid."  18 U.S.C. § 666(c).  The Indictment does not contain any allegations as to how any payments made to Howe by WOH could constitute anything other than "bona fide salary," a category of payment expressly excluded from the reach of Section 666.

Accordingly, Count Five of the Indictment is fatally deficient in that:  (1) it fails to specify any actual bribe or gratuities that were paid in return for official action; (2) it fails to establish corrupt intent with respect to any payments that may have been made by the Buffalo Defendants; and (3) it fails to allege how lawful and proper payments to a law firm (whose affiliate government relations firm employed Howe) pursuant to an engagement agreement, in the form of annual flat fees, may constitute "bribes" under Section 666.

## B.  Howe Is Not An Agent Of Any Pertinent Governmental Organization.

As it stands, the Indictment alleges Howe was "retained as a consultant" for SUNY Poly and somehow also "acted as an agent of SUNY Poly."  (Indictment ¶ 11).  There are no factual allegations that Howe had any official capacity whatsoever, other than passing references to how his unidentified "official position" enabled him to execute the purported scheme.  (*See, e.g.*, Indictment ¶¶ 39, 45).  Crucially, there are no allegations that Howe was an employee of SUNY Poly, that he had any authority to act on behalf of SUNY Poly, or that he had any authority to bind SUNY Poly.  Indeed, there are no allegations that Howe did anything in particular at SUNY Poly.  The Indictment's failure to allege facts demonstrating Howe was an agent of any governmental organization requires the dismissal of Count Five.

The only allegation with respect to Howe's work with SUNY Poly provides that he was the primary employee of a government relations firm and that he was retained as a "consultant" for SUNY Poly and "acted as [its] agent."  (Indictment ¶ 11).  Section 666 defines "agent" to mean "a person authorized to act on behalf of another person or a government and, in the case of

an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). Notably, there is not a single allegation that suggests Howe had the "authori[ty] to act on behalf" of SUNY Poly. 18 U.S.C. § 666(d)(1). As such, in no way does the Indictment adequately allege that Howe was an "agent" of SUNY Poly, as is required under Section 666. There is also no allegation that any of the Buffalo Defendants believed Howe to be an agent of SUNY Poly. Here, the Indictment's allegations do not support the conclusion that Howe was a state agent. Rather, the allegations actually present in the Indictment — slim though they are — in fact *contradict* any such inference and establish that Howe acted in his capacity as a private-sector consultant and nothing more.

*United States v. Sunia*, 643 F. Supp. 2d 51 (D.D.C. 2009), is directly on point. In that case, the court granted defendant's motion to dismiss the Section 666 count of the indictment. There, the government alleged defendant, counsel to the legislative branch of the American Samoan government, participated in a conspiracy to secure lucrative contracts with the Department of Education. *Sunia*, 643 F. Supp. 2d at 56-57. The court granted defendant's motion to dismiss, finding defendant was not an employee or agent of the territory's executive branch agencies receiving the federal funds underlying the Section 666 charge. 643 F. Supp. 2d at 68. The court held that those departments did not have any power, authority, or control over defendant's duties as an employee of the legislative branch, and there was no indication that defendant had any ability to control or administer the employees, programs or funds of those departments or any legal authority to bind those departments. *Sunia*, 643 F. Supp. 2d at 68. As the *Sunia* court held, "the only plausible interpretation of § 666(a)(1)(A) . . . is one that restricts criminal liability for the conversion of funds from an agency receiving federal funds to agents *of that particular agency.*" *Sunia*, 643 F. Supp. 2d at 63 (emphasis added); *see also United States*

*v. Phillips*, 219 F.3d 404, 413-14 (5th Cir. 2000) (Section 666 requires "some nexus between the criminal conduct and the agency receiving federal assistance"). Again, here the allegations fail to provide any indication that Howe had the authority to bind or act on behalf of SUNY Poly. Absent such factual allegations, and in the face of contrary allegations that Howe was a private-sector consultant, there is no basis upon which to conclude that Howe acted as an agent of SUNY Poly. Because there are no facts alleged to support that Howe was an agent of any governmental organization at any time, the Indictment fails to allege an essential element of a Section 666 offense and Count Five should be dismissed accordingly.

Even if the Indictment's bold conclusory allegation that Howe was somehow an "agent" of SUNY Poly suffices, there remains a more fundamental problem. There is a total disconnect between that putative fact and the scheme alleged — a scheme to "secretly rig *Fort Schuyler's* bidding process . . . for the Buffalo RFP." (Indictment ¶¶ 22-24 (emphasis added)). The Indictment contradicts itself when it alleges that SUNY Poly (through Howe) took "official action" regarding the Buffalo RFP when the rest of the Indictment makes clear it was "Fort Schuyler's selection process for the Buffalo RFP" that Howe was supposedly bribed to influence. (Indictment ¶ 24). To reiterate: Fort Schuyler is not SUNY Poly and Fort Schuyler is not the government. Fort Schuyler is a private entity. The Indictment fails to allege any facts which would establish that Howe was an agent of any governmental organization responsible for the subject RFP, or that the Buffalo Defendants had reason to believe that was the case. As such, there are no allegations demonstrating the statutory prerequisite — that the purported "bribe" payments had any "intent to influence an agent of a State government agency." (Indictment ¶ 47 (referencing 18 U.S.C. § 666(a)(2)). Court Five must be dismissed on that basis as well.

## C.    Fort Schuyler Is Not A Qualifying State Agency.

The Indictment alleges that Fort Schuyler was "created as a non-profit real estate corporation affiliated with SUNY Poly that could enter into contracts with private companies on SUNY Poly's behalf, for the purpose of carrying out development projects paid for with State funding."  (Indictment ¶ 7).  While SUNY Poly's status as a public university that receives federal funds might make it a qualifying agency for the purposes of Section 666, the same cannot be said of Fort Schuyler.  Similarly, while the Research Foundation received federal funding, it too is separate and distinct from Fort Schuyler, even if it "paid the salaries" for certain individuals "affiliated" with Fort Schuyler.  (Indictment ¶ 7).  Notably, while the Indictment explicitly alleges that both SUNY Poly and the Research Foundation were qualifying agencies "receiv[ing] federal funds in excess of $10,000 per year" (Indictment ¶¶ 3,4), nowhere does it allege that Fort Schuyler receives any federal funds at all.[19]

There are no allegations that Fort Schuyler was controlled by or acted as the arm of SUNY Poly, or allegations even attempting to show how Fort Schuyler, as a private entity, could possibly fall within the scope of Section 666.  Although Fort Schuyler was created to implement certain public-private contractual arrangements as an "affiliate" of SUNY Poly, that act of creation and incorporation as a non-profit corporation has consequences.  Fort Schuyler is a distinct entity.  As best we can tell, the government's theory appears to be that the independent actions of an entirely distinct non-profit entity may be attributed to a qualifying agency to establish liability under Section 666.  That is not the law.  *See* 18 U.S.C. §§ 666(a)(2), (b).

---

[19]    While the Indictment alleges that SUNY Poly and the Research Foundation received "federal funds," it does not allege that they received federal "*benefits* in excess of $10,000" as required under Section 666(b).  18 U.S.C. § 666(b) (emphasis added).  This distinction is of substantive significance.  *See Fischer v. United States*, 529 U.S. 667, 682 (2000).

The Indictment does not allege that a private entity's RFP process by which it selected a "preferred developer" was subject to public bidding requirements. It plainly was not. *See Hunts Point*, 36 A.D.3d at 246 (finding fairness obligations governing RFPs issued by public entities do not apply to a non-profit development corporation). It does not allege that SUNY Poly had any authority to oversee or control Fort Schuyler's RFP process or that it did so. Similarly, the Indictment does not allege facts suggesting that the selection by Fort Schuyler of a "preferred developer" constituted "official action" by SUNY Poly or that the internal decisions of a private non-profit entity may be considered acts of state agencies.

Notwithstanding the government's apparent unstated presupposition that Fort Schuyler's status as an "affiliate" of SUNY Poly makes Fort Schuyler itself a qualifying agency under Section 666 (which we address below), as noted above there are no allegations that Howe was an agent of Fort Schuyler — which is the relevant organization with respect to every aspect of the Buffalo RFP. There are no allegations that Howe, by virtue of his "capacity as an agent" of SUNY Poly, had the ability to take "official actions" relating to a private entity's internal RFP process or that Howe took any such actions. Furthermore, there are no allegations that Howe acted to advise or pressure any other official to exercise any formal governmental (or non-governmental) power. The Indictment provides no factual allegations concerning the "official action" purportedly taken by Howe, which is alleged to have benefited the Buffalo Defendants.

The unspoken premise of the bribery count seems to possibly be that because Fort Schuyler was "affiliated" with SUNY Poly and worked on "SUNY Poly-related development projects" (Indictment ¶ 7), that is close enough. Assuming that is the government's theory and assuming that is what the Grand Jury charged (which is not at all clear), the Indictment would still be fatally flawed. The Supreme Court's decision in *Fischer v. United States* and cases

applying it make plain that the conduct alleged in the Indictment is simply too far removed and attenuated from any relevant federal benefits. 529 U.S. 667 (2000).

*Fischer* raised the question of whether a hospital that participated in the Medicare program and concededly received millions of dollars in federal "funds" was a recipient of "benefits" as required under Section 666 and hence was a qualifying agency. The defendant argued that the "benefits" were those of the Medicare patients. The government argued that the fact that the funds came from a "federal-program source" sufficed to answer the question. 529 U.S. at 677. The Supreme Court rejected the government's claim, making clear that not all recipient fraud involving federal disbursements falls under Section 666. 529 U.S. at 681. Although it held that the hospital at issue was covered due to the structure of the Medicare system and the fact that the hospital received substantial payments not directly linked "to the immediate costs of an individual treatment procedure," the Court carefully limited the scope of government "benefits" covered by Section 666. As the Supreme Court held:

> Our discussion should not be taken to suggest that federal funds disbursed under an assistance program will result in coverage of all recipient fraud under § 666(b). Any receipt of federal funds can, at some level of generality, be characterized as a benefit. The statute does not employ this broad, almost limitless use of the term. Doing so would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance. To determine whether an organization participating in a federal assistance program receives "benefits," an examination must be undertaken of the program's structure, operation, and purpose. The inquiry should examine the conditions under which the organization receives the federal payments. The answer could depend, as it does here, on whether the recipient's own operations are one of the reasons for maintaining the program. Health care organizations participating in the Medicare program satisfy this standard.

529 U.S. at 681.

A recent appellate decision applying *Fischer* illuminates the infirmities of the Indictment. James Doran was a professor at Florida State University ("FSU"). He was also "a director and

officer of the Student Investment Fund ('SIF'), a non-profit corporation established by FSU for charitable and educational purposes." *United States v. Doran*, No. 16-10927, 2017 WL 1487222, at *1 (11th Cir. Apr. 26, 2017). Doran embezzled money from the SIF. He was convicted under Section 666 even though the SIF itself received no federal benefits. The government argued that Doran's conduct came "within the ambit of § 666 because the SIF was closely affiliated with FSU which did receive millions of federal dollars and that Doran, an FSU professor, was acting as an agent of FSU when he committed the crime in issue." 2017 WL 1487222, at *2. That argument, of course, parallels to an uncanny degree the allegations in our Indictment. The SIF (a "non-profit corporation" established by a state university and affiliated with it) was, like Fort Schuyler (a "non-profit real estate corporation" established by a state university and affiliated with it), the target of the alleged misconduct. *Compare* 2017 WL 1487222, at *2 ("the SIF was the victimized organization") *with* (Indictment ¶ 24 (alleging that scheme targeted "Fort Schuyler's selection process")). Yet neither the SIF nor Fort Schuyler were alleged to have received federal benefits. In both cases, the government sought to straddle that gap by arguing that the defendant (or a co-conspirator) was an agent of the state university, which did receive federal benefits. *Compare* 2017 WL 1487222, at *2 (government's argument that Section 666 applies to the SIF because defendant "was acting as an agent of FSU") *with* (Indictment ¶ 47 (Howe acted "in his capacity as an agent . . . of SUNY Poly")).[20]

On these very similar facts, the Eleventh Circuit did not hesitate to throw out the government's case. It began with the commonsensical proposition that the SIF was the relevant organization under Section 666, because it "was the subject of the embezzlement." 2017 WL

---

[20] The Indictment also alleges that the Research Foundation "paid the salaries of many individuals affiliated with SUNY Poly and Fort Schuyler" (Indictment ¶ 7), but it falls short of alleging that the Research Foundation paid those individuals in their capacities as Fort Schuyler employees or officers. As a FSU professor, Doran also had his salary paid by FSU. This allegation therefore also fails to connect Fort Schuyler with benefits received under a federal program.

1487222, at *2. It went on to hold that "[t]he Government is mistaken in focusing on FSU as the victimized organization and in conflating FSU and the SIF"; despite their close affiliation and the fact that Doran was employed by FSU, there was no basis "to treat FSU and the SIF as one and the same." 2017 WL 1487222, at *2. In words that resonate here, Doran's employment at FSU was "irrelevant inasmuch as he did not embezzle any FSU funds. Thus, any agency relationship he had with FSU is of no moment." 2017 WL 1487222, at *3.[21]

As the *Doran* court noted, relying on *Fischer*, Section 666 may be expansive but "its net cannot be cast so widely as to encompass the wrongdoing that occurred here, for the Government has not demonstrated any federal interest." 2017 WL 1487222, at *3. Despite the close affiliation of the SIF with FSU and despite Doran's status as an employee of FSU, Section 666 did not reach the SIF, a legally-distinct entity. A contrary ruling "'would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance.'" *Doran*, 2017 WL 1487222, at *3 (quoting *Fischer*, 529 U.S. at 681). This Court should heed the same prudential concerns because the Indictment here carries with it the selfsame risks. Count Five should be dismissed because the Indictment contains no allegation, as required by *Fischer*, that receipt of any funds by Fort Schuyler was sufficiently linked to the "structure, operation, and purpose" of any federal program to turn Fort Schuyler's receipt of federal funds (if any, since

---

[21] In *Doran*, the Eleventh Circuit relied heavily on *Fischer* and on its own 2015 decision in *United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015). McLean was a commissioner of the City of Margate. He was also a board member of the Margate Community Redevelopment Agency (the "MCRA"). In fact, the board of the MCRA was comprised entirely of City Commissioners. While "the MCRA [was] a separate legal entity, the City was financially accountable for the MCRA and the MCRA [was] part of the government's operations." 802 F.3d at 1241. The City received federal funds and transferred some of its federal funds to the MCRA. It was the MCRA that was the target of the alleged bribe scheme. 802 F.3d at 1243–44. Relying on *Fischer*, the Circuit held that even that level of overlap and even the fact that the City "transferred . . . federal funds to the MCRA" was not enough to treat the MCRA itself as a qualifying agency under Section 666. That was because *Fischer's* requirement that before federal funds would be considered federal "benefits" one must address the "structure, operation, and purpose" of the federal funding program was not met. The government's case lacked "any evidence identifying the relationship between the program authorizing a disbursement of federal funds and the ultimate use of those funds at the local level." 802 F.3d at 1244. Holding that its decision was necessary "to ensure [Section 666] comports with the Constitution and that it does not invade the domain of the States' police power," the court affirmed the trial court's judgment of acquittal. 802 F.3d at 1230.

none is even alleged) into receipt of a "benefit."  *See Fischer*, 529 U.S. at 681; *see also Doran*, 2017 WL 1487222, at *3.

**D.    The Alleged Corrupt Conduct Was Not In Connection With A Transaction Or Business Of The Agency Involving Anything Of Value Of $5,000 Or More.**

Even assuming that the Indictment sufficiently alleged facts to show that Howe was paid bribes and took "official action in his capacity as an agent . . . of SUNY Poly," the Indictment nonetheless fails to allege that the alleged corrupt conduct was in connection with a transaction or business of <u>that</u> agency (SUNY Poly).  *See United States v. Bonito*, 57 F.3d 167, 174 (2d Cir. 1995).  In this respect, the Indictment does not allege that the Buffalo Defendants sought official action with respect to the alleged Section 666-qualifying state agency — because the Indictment does not allege that any qualifying state agency was in a position to take any "official action" on the Buffalo RFP or had any influence whatsoever over "Fort Schuyler's selection process for the Buffalo RFP."  (Indictment ¶ 24).

As discussed above, the Indictment pointedly does not allege that Fort Schuyler itself was a qualifying Section 666 agency and concedes that Fort Schuyler was a private non-profit real estate corporation created to "enter into contracts with private companies"; it was Fort Schuyler (not SUNY Poly) that, according to the Indictment, "was charged with selecting private companies to partner with Fort Schuyler in SUNY Poly-related development projects." (Indictment ¶ 7).  Herein lies the great disconnect in the Indictment — SUNY Poly might be a qualifying agency for the purposes of Section 666, but the face of the Indictment makes plain that SUNY Poly itself could not and did not take any "official action" on the Buffalo RFP, because the Buffalo RFP was not a "transaction or business" <u>of</u> SUNY Poly.  It was a transaction entirely controlled and effectuated by Fort Schuyler.

## E.  *McDonnell*'s Definition Of "Official Action" Necessitates The Dismissal Of Count Five.

Even assuming all of Count Five's aforementioned deficiencies are not fatal — which they are — the Indictment fails to allege any conduct which could possibly constitute "official action."[22]  Bribery "occurs when an unlawful payment is made in exchange for 'official action.'" *United States v. Skelos*, No. 15 CR 317(KMW), 2015 WL 6159326, at *3 (S.D.N.Y. Oct. 20, 2015); *see also United States v. Rosen*, 716 F.3d at 700 (2d Cir. 2013) (government must prove specific intent to give something of value in exchange for an official act); *cf.* (Indictment ¶ 45 (bribes were paid to Howe "in exchange for . . . official action")).

In *McDonnell v. United States* the Supreme Court significantly narrowed the interpretation of an "official act."  136 S. Ct. 2355 (2016).  McDonnell, the Governor of Virginia, was charged with taking bribes from a businessman named Jonnie Williams in exchange for favors to advance Williams's dietary supplement business.  Although McDonnell was charged with bribery under the Hobbs Act, the parties agreed that they would define bribery with reference to the federal bribery statute, 18 U.S.C. § 201.  Under Section 201, "official act" is defined as a "decision or action on any question, matter, cause, suit, proceeding or controversy."  18 U.S.C. § 201(a)(3).  McDonnell was alleged to have taken various "official acts," including, "arranging meetings for Williams with other Virginia officials" to discuss Williams's company's dietary supplement, "hosting events" for Williams's company at the Governor's mansion, and "contacting other government officials" with respect to research studies of Williams's dietary supplement.  136 S. Ct. at 2361 (internal quotation marks omitted).

---

[22]  As noted above, because Section 666 does not include an "official act" requirement of its face, the statute is unconstitutional  These arguments are made in the alternative, and are focused on the insufficiency of the allegations of "official action" in the Indictment (assuming <u>arguendo</u> that an indictment can supply a necessary element missing from the statute's text).  As discussed below, the allegations here raise additional constitutional problems even if the statute were facially constitutional.

The Supreme Court reversed the Fourth Circuit's decision upholding McDonnell's conviction, holding that the alleged actions did not fit the definition of "official act." 136 S. Ct. at 2367-73.

Quoting Section 201, the Supreme Court defined an "official act" as "a decision or action on a 'question, matter, cause, suit, proceeding or controversy.'" 136 S. Ct. at 2371. The Court articulated "two requirements" necessary to establish a valid "official act." 136 S. Ct. at 2368. *First*, the government "must identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." 136 S. Ct. at 2367–68 (quoting § 201(a)(3)). This requires "something specific and focused," and it "must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." 136 S. Ct. at 2372, 2368–70. *Second*, the government "must prove that the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." 136 S. Ct. at 2368. This might include "using his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." 136 S. Ct. at 2372. "Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so) — without more — does not fit that definition of 'official act.'" 136 S. Ct. at 2372. Such is the case even in instances where the "event, meeting, or speech is related to a pending question or matter." 136 S. Ct. at 2370.

In rejecting the government's construction, the Court provided that such an "expansive interpretation of 'official act' would raise significant constitutional concerns." 136 S. Ct. at 2372. Furthermore, the Court held that such an interpretation would raise a "serious" due process concern, as the interpretation of "official act" would be indefinite and subject to "'arbitrary and

discriminatory enforcement.'"  The Court provided that a "more constrained interpretation" was necessary to avoid this "vagueness shoal."  136 S. Ct. at 2373 (quoting *Skilling v. United States*, 561 U.S. 358, 368,402–03 (2010)).

Although the *McDonnell* Court adopted the language of Section 201 in sketching the definition of "official action," because Section 666 (the statute charged here) was enacted to extend the federal bribery prohibitions of Section 201 to bribes offered to state and local officials, the Supreme Court's narrow interpretation of "official action" under Section 201 would logically extend to any "official action" element of Section 666 as well.  Indeed, the Second Circuit has consistently held that for the purposes of Section 666, "bribery occurs when an unlawful payment is made in exchange for 'official action.'"  *United States v. Skelos*, 2015 WL 6159326, at *3 (S.D.N.Y. Oct. 20, 2015); *cf. United States v. Rosen*, 716 F.3d at 700.  In apparent recognition of this law and of the constitutional problems posed by the absence of an "official action" element in the statute's text, the government here has explicitly alleged that the Buffalo Defendants "paid bribes to Todd Howe in exchange for . . . the taking of official action." (Indictment ¶ 47).

Here, while the Indictment uses the generic phrase "official action," that falls short.  An indictment must state facts specific enough to describe a particular criminal act, rather than a type of crime.  *Pirro*, 212 F.3d at 93.  The prosecution may not rely on these two generic words to advise the Buffalo Defendants of their charged criminal conduct.  *Awan*, 459 F. Supp. 2d at 175 (dismissing indictment because it used the "generic expression 'material support,' . . . without specifying which of a variety of activities . . . the defendant must defend against or which the grand jury considered").  The government is obligated to link Howe's alleged "official acts" to a "specific and focused" matter that was pending or could have been

brought before SUNY Poly.  *McDonnell*, 136 S. Ct. at 2372.  That they have not even attempted to do so speaks volumes and no doubt reflects the simple but fatal fact — made clear by other portions of the Indictment — that SUNY Poly could not and did not take any "official action" in connection with "Fort Schuyler's selection process for the Buffalo RFP."  (Indictment ¶ 24).

If Section 666 is applied in the broad manner advanced in the Indictment, then it is unconstitutionally vague.  A statute is unconstitutionally vague where it fails to "define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement."  *Skilling v. United States*, 561 U.S. 358, 402-03 (2010) (internal citation omitted).  The government's theory in this case threatens both of these constitutional precepts.  Any interpretation of "official action" broad enough to encompass Howe's actions on these allegations would preclude fair warning of what constitutes an offense under Section 666.  It would also result in the unrestrained expansion of "official action" into the private sector, affording the government carte blanche to prosecute conduct that Section 666 was never intended to police, and which has always been the province of state criminal jurisdictions.  The interpretation of "official action" seemingly advanced by the government would encompass actions taken by private entities so long as they are labeled "affiliates" of state agencies.  Such a definition will inevitably result in arbitrary and discriminatory enforcement as it would then reach an indefinite category of actions that are simply "'official acts' in some sense."  *United States v. Sun-Diamond*, 526 U.S. 398, 407 (1999).

Furthermore, such an interpretation would chill contractual arrangements between private parties wholly removed from any federal nexus, by virtue of one entity's affiliation with a state agency.  As the Supreme Court cautioned in refusing to afford the "federal benefits" prong of

Section 666 the broad interpretation pressed by the government: "Doing so would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance." *Fischer*, 529 U.S. at 681; *accord McLean*, 802 F.3d at 1230 (enforcing the outer limits of Section 666 necessary to "ensure the statute comports with the Constitution and that [prosecutions under Section 666 do] not invade the domain of the States' police power").

The government's attempt to extend the bounds of Section 666 to encompass private contractual relationships is violative of the fundamental principles of federalism. Section 666 permits the federal government to interfere with a state's self-governance only where federal benefits are at stake. The government's broad application of the statute to encompass private contractual relations is inherently antithetical to this restriction.

Accordingly, Count Five is substantially overbroad, as it fails to link any purported "official acts" to any "specific or focused" matter that was pending or could have been brought before SUNY Poly. *See McDonnell*, 136 S. Ct. at 2372. The issue of whether to award the RFP and to whom it would be awarded cannot be a question or matter that could be brought before SUNY Poly — because, again, it was simply not SUNY Poly's RFP and SUNY Poly had no role in the RFP process. The Indictment is, accordingly, fundamentally flawed. Fort Schuyler's RFP process did not, and could not, require authorities at SUNY Poly to "make a decision or take an action" "on" the pending "question or matter" because that decision was reserved for Fort Schuyler, a private entity, and was expressly outside the authority of SUNY Poly. The Indictment's failure to allege a "matter" pending before SUNY Poly requires dismissal.

However, even assuming Fort Schuyler's RFP process and the resulting decision selecting two "preferred developers" somehow qualifies as a "matter" before SUNY Poly — a truly befuddling suggestion — the Indictment also fails with respect to the second prong of

*McDonnell*.  The actions alleged in the Indictment do not qualify as "official acts" because they do not amount to a "decision or action" on any pending "matter."  The Indictment fails to allege that Howe acted in any way to effectuate a decision taken by SUNY Poly (or Fort Schuyler) with respect to the Buffalo RFP process.  Howe is not alleged to have participated in the decision-making process by which Fort Schuyler selected the Buffalo Developer as one of two "preferred developers" for the Buffalo area.  How could any action by Howe constitute the "formal exercise of governmental power" that *McDonnell* requires to establish an "official act," when there is no indication that SUNY Poly, the entity Howe is alleged to have been an agent of, even had the authority or the "governmental power" to influence a private entity's RFP process?  It could not.

If the government's theory (and again its theory is far from clear) is that Howe generally used his position in a manner that ultimately advantaged the Buffalo Developer in the Buffalo RFP process, it is insufficient.  An agreement to use one's official position (whatever Howe's may have been) to benefit another person, without more, does not constitute an "official act" under *McDonnell*.  The Supreme Court expressly rejected this theory, noting that it was not a crime to use one's official position to arrange and attend meetings benefiting a private party, to host events aimed at fostering support for the private party's objectives, or to "express[] support" for those objectives in one's official capacity.  136 S. Ct. at 2361, 2365–66, 2371–72.

Count Five fails to allege any set of facts which could be construed to satisfy the definition of "official action" under *McDonnell*.  It must be dismissed.

### III.  IN THE ALTERNATIVE, THE COURT SHOULD ORDER THE GOVERNMENT TO FILE A BILL OF PARTICULARS.

If the Court does not dismiss the Indictment as against the Buffalo Defendants, it should order the government to file a bill of particulars pursuant to Federal Rule of Criminal Procedure

7(f).[23]  A bill of particulars functions "to allow a defendant to 'identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'"  *United States v. Kahale*, 789 F. Supp. 2d 359, 370 (E.D.N.Y. 2009), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012) (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  A bill of particulars is warranted where, as here, "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999); *see United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (same).  In such instances, a bill of particulars "will be required even if the effect is disclosure of the Government's evidence or theories."  *United States v. Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356, at *3 (S.D.N.Y. Jan. 2, 2001) (citing *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998)).

While the Indictment sets forth in great detail the contours of the government's theory for prosecution of the other named defendants, it is devoid of specific factual allegations relating to the Buffalo Defendants.  As detailed above, the 35-page speaking Indictment fails to specify, among other things, the offending wire transmissions, the scheme or artifice to defraud, the types of acts the Buffalo Defendants sought from Howe, the "official action" Howe took or agreed to take, or the principal means and methods of any purportedly improper payments.

The government's voluminous discovery only heightens the need for the government to identify basic information concerning the bribes it alleges were paid.  *See Bortnovsky*, 820 F.2d at 575 ("providing mountains of documents to defense counsel" when the indictment contained general allegations of fraud "impermissibly shifted" the burden of proof to the defendants,

---

[23]  *See* Masella Decl. ¶¶ 24–25.

necessitating a bill of particulars); *see also Lino*, 2001 WL 8356, at *13 (noting that the "problems posed by the scope of the indictment are compounded by the voluminous amount of discovery in this case").

**A.    The Wire Fraud Charges (Counts One & Four).**

**1.    The Indictment Fails To Specify The Scheme Or Artifice To Defraud.**

With respect to Count One, the Court should order the government to specify the alleged scheme or artifice to defraud, including:  (a) information concerning the means and method of the scheme; (b) the specific communications made in furtherance of the scheme; (c) the participants involved in the scheme; (d) the specific statutes, rules, and/or guidelines (if any) that the Buffalo Defendants are alleged to have violated; and, (e) the money or property alleged to have been the object of the conspiracy.  *See United States v. Ashley*, 905 F. Supp. 1146, 1159-60 (E.D.N.Y. 1995).

**2.    The Indictment Fails To Specify The Offending Wire Transmissions.**

With respect to Counts One and Four, the Court should direct the government to identify those wire transmissions upon which it intends to rely.  *See United States v. Silver*, 117 F. Supp. 3d at 471.  The government should be required to identify the dates and times of the transmissions, the recipients of the transmissions, and the subject matter or content of the transmissions.  *See, e.g.*, *United States v. Zandstra*, No. 00 CR 209 RWS, 2000 WL 1368050, at *6 (S.D.N.Y. Sept. 20, 2000).

**B.    The Bribery Charge (Count Five).**

Regarding the bribery charge, the Court should order the government to provide:  (1) information relating to Howe's status as an agent of a governmental organization; (2) the substance and extent of the "official acts" alleged by the government; and (3) the nature and specifics of any payments alleged to be bribes or gratuities.

### 1. Howe's Agency.

As to Howe's alleged status as an "agent," this information must include such details as: (a) the organizations to which Howe is alleged to have been an agent; (b) the purported dates of any alleged agency relationships; (c) the contractual documents evincing such agency relationships; (d) information pertaining to the role Howe played as an agent to each organization and Howe's purported authority to act on behalf of each organization; (e) clarification of Howe's purported role, authority and decision-making power at each organization; (f) any authority Howe possessed to bind each respective organization; and, (g) detailed information establishing the relationship between SUNY Poly and Fort Schuyler.

### 2. The Indictment Fails To Specify the Substance And Extent Of The "Official Acts" Alleged By The Government.

The Court should, at the very least, order that the government specify the "official acts" at issue. Unlike the allegations of "official action" taken for the benefit of the Syracuse Developer or the Energy Company (*see* Indictment ¶¶ 31, 35), the Indictment fails to provide any such detail with respect to the "official acts" supposedly taken for the benefit of the Buffalo Defendants. The Indictment fails to identify any specific acts, let alone valid "official acts" under *McDonnell*, taken by Howe in exchange for allegedly improper payments. The only allegation vaguely describing the purported "official act" underlying Count Five provides that the defendants "[paid bribes to Todd Howe in exchange for . . . the taking of official action . . . in connection with obtaining the Buffalo RFP." (Indictment ¶ 47). At the outset, this allegation is impermissibly ambiguous as it fails to identify any "official act." The government should describe with specificity the "official acts" it intends to prove.

### 3. The Indictment Fails To Specify Critical Aspects Of The Alleged Conduct, Including The Nature And Payment Of The Alleged Bribes.

The Indictment simply alleges that from 2013 to 2015, the Buffalo Defendants *and* the Syracuse Defendants paid Howe "hundreds of thousands of dollars" in bribes in exchange for official action. (*See* Indictment ¶¶ 1, 47). The Indictment's vague allegations fail to identify the relevant payments the government contends were bribes or how each payment was made, when it was made, to whom it was made, or who made it. Accordingly, the government should be ordered to identify: (a) the individual the Buffalo Defendants allegedly agreed to bribe; (b) the affiliation or capacity of the bribe recipient; (c) the date and time of the alleged bribe payment; (d) the amount of cash, property, or thing of value, constituting any purportedly improper payments alleged to have been bribes; and, (e) the method of payment, including whether the bribe is alleged to have been made to Howe directly, or through third parties. *See Lino*, 2001 WL 8356, at *4, *6 (requiring government to specify for each bribe payment the individual the defendant agreed to bribe, the affiliation of the bribe recipient, and the amount of bribe; and requiring government to specify the cash, property, or things of value allegedly received by separate defendant).

## CONCLUSION

For the foregoing reasons, the Buffalo Defendants respectfully request the Court dismiss all charges against them pursuant to Federal Rule of Criminal Procedure 12 for the Indictment's failure to allege the requisite elements of the charged crimes. Alternatively, the Court should enter an order directing the government to provide a bill of particulars so that the Buffalo Defendants are not deprived of their right to a fair trial.

Dated:    New York, New York
          May 19, 2017

                            Respectfully submitted,

                            **HODGSON RUSS LLP**
                            *Attorneys for Defendant Louis Ciminelli*

                            By:  /s/Timothy W. Hoover
                                  Daniel C. Oliverio
                                  Timothy W. Hoover
                            The Guaranty Building
                            140 Pearl Street, Suite 100
                            Buffalo, New York 14202-4040
                            716.856.4000
                            doliverio@hodgsonruss.com
                            thoover@hodgsonruss.com

                            **DLA PIPER LLP (US)**
                            *Attorneys for Defendant Louis Ciminelli*

                            By:  /s/ John M. Hillebrecht
                                  John M. Hillebrecht
                                  Jessica A. Masella
                            1251 Avenue of the Americas
                            New York, New York 10020
                            212.335.4829
                            john.hillebrecht@dlapiper.com
                            jessica.masella@dlapiper.com

**LIPSITZ GREEN SCIME CAMBRIA LLP**
*Attorneys for Defendant Michael Laipple*

By:   /s/Herbert L. Greenman
       Herbert L. Greenman
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
716.849.1333
hgreenman@lglaw.com

**CONNORS LLP**
*Attorneys for Defendant Kevin Schuler*

By:   /s/Terrence M. Connors
       Terrence M. Connors
1000 Liberty Building
424 Main Street
Buffalo, New York 14202
716.852.5533
tmc@connorsllp.com