# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | : |
|  | : |
| **v.** | :     **Case No. 1:16-cr-00776** |
|  | : |
| **JOSEPH PERCOCO,** | : |
|     a/k/a "Herb," | :     **ORAL ARGUMENT** |
| **ALAIN KALOYEROS,** | :     **REQUESTED** |
|     a/k/a "Dr. K," | : |
| **PETER GALBRAITH KELLY, JR.,** | : |
|     a/k/a "Braith," | : |
| **STEVEN AIELLO,** | : |
| **JOSEPH GERARDI,** | : |
| **LOUIS CIMINELLI,** | : |
| **MICHAEL LAIPPLE, and** | : |
| **KEVIN SCHULER,** | : |
|  | : |
|     **Defendants.** | : |
|  | : |

---

## JOINT MEMORANDUM OF LAW IN SUPPORT OF THE BUFFALO DEFENDANTS' MOTION FOR SEVERANCE PURSUANT TO FEDERAL RULES OF CRIMINAL PROCEDURE 8(B) AND 14

**LIPSITZ GREEN SCIME CAMBRIA LLP**
*Attorney for Defendant Michael Laipple*
Herbert L. Greenman
42 Delaware Avenue, Suite 120
Buffalo, New York 14202

**HODGSON RUSS LLP**
*Attorneys for Defendant Louis Ciminelli*
Daniel C. Oliverio
Timothy W. Hoover
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
716.856.4000

**CONNORS LLP**
*Attorneys for Defendant Kevin Schuler*
Terrence M. Connors
1000 Liberty Building
424 Main Street
Buffalo, New York 14202
716.852.5533

**DLA PIPER LLP (US)**
*Attorneys for Defendant Louis Ciminelli*
John M. Hillebrecht
Jessica A. Masella
1251 Avenue of the Americas
New York, New York 10020
212.335.4829

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

I. Allegations Of The Indictment ...................................................................... 3

    A. The Allegations Of The "Buffalo Billion Fraud And Bribery Scheme" ............... 4

    B. The Allegations Of The "Percoco Bribery Scheme" ............................ 9

II. Discovery Produced By The Government ....................................................... 19

ARGUMENT ..................................................................................................... 10

I. The Buffalo Defendants Are Improperly Joined And Should Be Severed. ..................... 13

    A. Proper Joinder Of Multiple Defendants Requires A Common Plan And A Substantial Identity Of Facts Or Participants Among The Schemes Alleged. ................................................................................. 14

    B. No Common Plan Exists Among The Schemes Alleged In The Indictment. ...... 16

    C. No Substantial Identity Of Facts Or Participants Exists Among The Schemes Alleged In The Indictment. ................................................. 20

II. Severance Is Also Warranted Pursuant To Rule 14 Because A Joint Trial Would Create Overwhelming Prejudice To The Buffalo Defendants. ........................... 27

CONCLUSION .................................................................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*Bruton v. United States*,
    391 U.S. 123 (1968) .......................................................................................................28

*Ingram v. United States*,
    272 F.2d 567 (4th Cir. 1959) ........................................................................................15

*Kotteakos v. United States*,
    328 U.S. 750 (1946) ................................................................................................14, 19

*Krulewitch v. United States*,
    336 U.S. 440 (1949) .......................................................................................................28

*United States v. Balter*,
    91 F.3d 427 (3d Cir. 1996) ............................................................................................28

*United States v. Carrozza*,
    728 F. Supp. 266 (S.D.N.Y. 1990), *aff'd*, 956 F.2d 1160 (2d Cir. 1992) ...................... passim

*United States v. Cervone*,
    907 F.2d 332 (2d Cir. 1990) ..........................................................................................14

*United States v. Feyrer*,
    333 F.3d 110 (2d Cir. 2003) .....................................................................................15, 20

*United States v. Fruchter*,
    104 F. Supp. 2d 289 (S.D.N.Y. 2000) ...........................................................................28

*United States v. Gallo*,
    668 F.Supp. 736 (E.D.N.Y. 1986) .................................................................................28

*United States v. Gallo*,
    No. 98 Cr. 338(JGK), 1999 WL 9848 (S.D.N.Y. 1999) .................................................20

*United States v. Gamaldi*,
    384 F. Supp. 529 (S.D.N.Y. 1974) ................................................................................15

*United States v. Giraldo*,
    859 F. Supp. 52 (E.D.N.Y. 1994) ......................................................................15, 20, 23

*United States v. Greenfield*,
    No. 01 CR 401(AGS), 2001 WL 1230538 (S.D.N.Y. Oct. 16, 2001) ..............................20

*United States v. Halper,*
  590F.2d 422 (2d Cir.1978)..........................................................................15, 22

*United States v. Kouzmine,*
  921 F. Supp. 1131 (S.D.N.Y. 1996) .....................................................15, 20, 27

*United States v. Lane,*
  474 U.S. 438 (1986) ...........................................................................................15

*United States v. Lech,*
  161 F.R.D. 255 (S.D.N.Y. 1995) .............................................................14, 23, 24

*United States v. McDermott,*
  245 F.3d 133 (2d Cir. 2001)..............................................................................30

*United States v. Nerlinger,*
  862 F.2d 967 (2d Cir. 1988).............................................................................16

*United States v. Ohle,*
  678 F. Supp. 2d 215 (S.D.N.Y. 2010).........................................................17, 27

*United States v. Onitiri,*
  No. 93 CR. 403 (S1) (WK), 1994 WL 256662 (S.D.N.Y. May 25, 1994) .............15

*United States v. Rajaratnam,*
  753 F. Supp. 2d 299 (S.D.N.Y. 2010)..........................................................15, 23

*United States v. Shkreli,*
  15-CR-637 (KAM) (E.D.N.Y. April 19, 2017) ....................................................32

*United States v. Turoff,*
  853 F.2d 1037 (2d Cir. 1988).....................................................................14, 17, 20

*United States v. Velasquez,*
  772 F.2d 1348 (7th Cir. 1985) ...........................................................................15

*United States v. Yaron,*
  No. S2-10-CR-363 GBD, 2011 WL 3279054 (S.D.N.Y. July 28, 2011) ............14, 24, 25

*Zafiro v. United States,*
  506 U.S. 534 (1993)..........................................................................................28

**RULES**

FED. R. CRIM. P. 8(b) ..............................................................................................14

FED. R. CRIM. P. 14 ................................................................................................27

## PRELIMINARY STATEMENT

Defendants Louis Ciminelli, Michael Laipple, and Kevin Schuler, all of whom were employed as executives of the Buffalo Developer during the relevant time period (the "Buffalo Defendants"), move pursuant to Federal Rules of Criminal Procedure 8(b) and 14 to sever the charges against them in Counts One, Four, and Five of the Indictment. As currently structured, the Indictment joins together four distinct alleged fraud schemes, which bear little overlap, other than the common participation of a few individuals — none of whom are the Buffalo Defendants. Indeed, the Indictment makes clear that the allegations concerning the Buffalo Defendants are entirely separate from all of the other schemes alleged and the Indictment does not allege — nor could it — that the Buffalo Defendants had any involvement in or even knowledge of the other three alleged schemes. It is axiomatic that an indictment may not properly join groups of defendants that are each alleged to have participated in separate fraud schemes, linked only by one or two common players, who alone had knowledge of the other schemes. That is what this Indictment purports to do, such that this Court should now correct it, by severing the charges against the Buffalo Defendants.[1]

In addition, the Indictment makes clear that a separate trial against only the Buffalo Defendants would be relatively short, as it would contain limited and circumscribed evidence relevant only to one of the four alleged schemes, almost none of which would be repeated at trials of other Defendants. To the extent that the Government attempts to argue that evidence of the other three alleged schemes could be introduced at a trial of the Buffalo Defendants — schemes that operated without their knowledge or participation — that evidence would serve no

---

[1] As the Court is aware, promptly after the initial indictment was filed in this case, the Buffalo Defendants moved to dismiss that indictment for lack of venue or, in the alternative, to transfer the case against them to the Western District of New York. In addition to the reasons set forth herein for severance of the Buffalo Defendants pursuant to Rules 8(b) and 14, severance is also warranted for the independent reason that the Court should transfer the case against them to the Western District of New York because their case should properly be tried in the Western District of New York.

proper purpose. It would not be probative of the allegations concerning the Buffalo Defendants, but could easily mislead the jury by creating the impression that the Buffalo Defendants are somehow affiliated with multiple criminal schemes, which they are not. Thus, evidence demonstrating that one or two of the Buffalo Defendants' alleged co-conspirators may have engaged in unrelated schemes with other individuals — unbeknownst to the Buffalo Defendants — would be unduly prejudicial, inflammatory, and would not be admissible at a trial of the Buffalo Defendants alone.

A separate trial would also be straightforward and less confusing for the jury. There would be a greatly reduced need for motion practice, sidebars, and limiting instructions — all of which would be constantly required at a joint trial — because at a separate trial this Court would not have to wade through the quagmire of determining which evidence may be admitted against which subgroup of the eight defendants charged in four separate schemes. The unprecedented sprawl of the charges in this Indictment — containing allegations of four separate fraud schemes against eight defendants, who were not properly joined in the first place — compels severance for the Buffalo Defendants. Thus, severance is warranted pursuant to Rule 8(b), because the Buffalo Defendants are improperly joined with the other Defendants, and pursuant to Rule 14, to prevent undue prejudice and ensure a fair trial.[2]

---

[2] This severance motion is made on behalf of only the three Buffalo Defendants and seeks a separate trial for only the Buffalo Defendants. The Buffalo Defendants understand that Defendant Kaloyeros may seek to join their motion to transfer and for severance. Although Defendant Kaloyeros is properly joined with the Buffalo Defendants for the alleged conduct limited to the Buffalo RFP (a portion of the conduct alleged in Count One and the conduct alleged in Count Four), he is improperly joined with the Buffalo Defendants with respect to any additional alleged conduct, including that related to the Syracuse RFP. For the reasons set forth in more detail herein, the allegations of the Indictment make clear that a trial of only the Buffalo Defendants will be substantially shorter and will have little overlap with a trial involving any of the other Defendants. Therefore, because the Buffalo Defendants are improperly joined with all Defendants except for Defendant Kaloyeros (with respect to certain limited alleged conduct ) and to serve the public's and the Court's interests in efficiency, the Buffalo Defendants request that the Court sever the case against them and try the Buffalo Defendants in their own trial.

# STATEMENT OF FACTS

## I. Allegations Of The Indictment

The fifteen-count Indictment alleges what it calls "two wide-ranging and overlapping criminal schemes." (Indictment ¶ 1).[3] In actuality, it alleges no fewer than four, each of which is distinct and shares no nexus with the others: (i) an alleged conspiracy in which Defendant Percoco was paid bribes by the Energy Company in exchange for "official state favors" (the "Percoco/Energy Company Bribery Scheme"); (ii) an alleged conspiracy in which Defendant Percoco was paid bribes by the Syracuse Developer in exchange for "official state favors" (the "Percoco/Syracuse Developer Bribery Scheme"); (iii) an alleged scheme to fix the results of a RFP to identify a preferred developer for projects in Buffalo (the "Buffalo RFP Scheme"); and (iv) an alleged scheme to the fix results of a RFP to identify a preferred developer for projects in Syracuse (the "Syracuse RFP Scheme"). The Indictment lumps together the alleged Buffalo RFP Scheme and Syracuse RFP Scheme, and together brands them as a scheme regarding "The Preferred Developer RFPs."[4] But these two alleged schemes are undeniably separate. They involved different RFPs, different alleged bribes, paid by different parties, in different locations, and had plainly distinguishable objects. The Buffalo Defendants' charges stem only from the conduct alleged relating to the Buffalo RFP Scheme. They are not even alleged to have been aware of the other three schemes. Indeed, the four different schemes alleged only share in common the participation of one individual. That individual is Todd Howe, the Government's cooperating witness, who is not charged in the Indictment. Rather than setting forth two

---

[3] All references and citations herein to the "Indictment" are to the operative superseding indictment, S1 16 Cr. 776 (VEC), filed on May 11, 2017 (the "Indictment").

[4] The first two schemes (the Percoco/Energy Company Bribery Scheme and the Percoco/Syracuse Developer Bribery Scheme) are referred to collectively herein as "the Percoco Bribery Schemes."

"overlapping" conspiracies properly joined in the Indictment, a better description for what the Indictment purports to allege here would be "the many crimes of Todd Howe."

A.     The Allegations Of The "Buffalo Billion Fraud and Bribery Scheme"

The allegations of the so-called "Buffalo Billion Fraud and Bribery Scheme" encompass the conduct alleged in both the Buffalo and the Syracuse RFP Schemes.   In summary, the Buffalo Defendants as well as certain officers of an unrelated entity, the Syracuse Developer, are alleged to have engaged in wire fraud, each with Howe and Kaloyeros, to participate in a "bidding process" run by Fort Schuyler that somehow appeared to be more fair than it actually was.  (*Id*. ¶¶ 22-27).  Each of the processes — and therefore the alleged offense conduct — was entirely separate.  Fort Schuyler issued a Request for Proposal ("RFP") for each of Syracuse and Buffalo that mandated the selection of a local developer; so, by definition, there was no overlap in the RFP process — and none is alleged — between the Buffalo Defendants and those defendants employed by the Syracuse Developer (the "Syracuse Defendants").[5]  (*Id*. ¶¶ 23, 24). The language of the Indictment makes this clear.   In the relevant paragraphs, the Buffalo Developer and Syracuse Developer are alleged to have engaged in parallel, but not overlapping, conduct.   (*Id*. ¶ 22 ("in exchange for . . . payments to Howe from the Syracuse and Buffalo Developer, respectively"); ¶ 23 (Howe and Kaloyeros "had Fort Schuyler issue two requests for proposals . . . one for Syracuse (the 'Syracuse RFP') and one for Buffalo (the 'Buffalo RFP'), that would give the appearance of an open competition to choose 'preferred developers' in Syracuse and Buffalo, respectively"); ¶ 24 (Howe and Kaloyeros "agreed to and did provide secret information concerning the Syracuse RFP to [the Syracuse Defendants]" and Howe and

---

[5] Preceding the 38-page speaking Indictment, there was a 79-page Complaint in this case.  This Court can and should consider the allegations in both documents in evaluating the Buffalo Defendants' request for severance. Where we state herein that there are no allegations as to particular facts, we are referring to the totality of the allegations contained in all 117 pages of both documents.

Kaloyeros "agreed to and did provide secret information concerning the Buffalo RFP to [the Buffalo Defendants]")).

There is a single sentence in the Indictment that, perhaps anticipating this severance motion,[6] attempts to show concerted action by the Buffalo and Syracuse Defendants by alleging that they all "collaborated in secretly tailoring the Syracuse and Buffalo RFPs by, among other things, exchanging through Howe ideas for potential qualifications to be included in the Syracuse and Buffalo RFPs." (*Id.* ¶ 24). This allegation too falls far short of creating any basis for proper joinder here. Instead, it demonstrates more of the same alleged parallel, but not overlapping, conduct. Specifically, it shows that each of the Buffalo Defendants and Syracuse Defendants communicated with Howe about their respective RFPs. The Indictment does not allege that the Buffalo Defendants took any steps to influence the outcome of the Syracuse RFP process; nor does it allege that the Syracuse Developer took any steps to influence the Buffalo RFP process. The Buffalo Defendants are not alleged to have met or communicated directly with the Syracuse Defendants. The Buffalo Defendants are not alleged to have had any participation in — or even any knowledge of — the Syracuse RFP Scheme. There are no allegations that the conduct or results of one RFP Scheme in any way impacted the other. There are no allegations showing how allegedly communicating about potential qualifications, presumably different for different developers in different locations, would advance the purported schemes. The addition of an allegation that both groups "collaborated" by communicating through Howe — but not directly with each other — is not sufficient in the face of the overwhelming reality that these were separate processes with no overlap. To say these groups "collaborated" is a misnomer. It defies common sense and all of the other allegations in the Indictment that these distinct groups, each

---

[6] This sentence was not in the initial indictment, but was added to the Indictment returned approximately one week ago.

allegedly "secretly" tailoring a separate RFP in a different city to match their own different qualifications, would have "collaborated" when to do so would add no value and would only expose their allegedly criminal conduct to others. Thus, the Indictment makes clear that the charges stemming from what the Indictment terms the "Buffalo Billion Fraud and Bribery Scheme" relate to separate schemes.[7] The alleged schemes involve different facts, and even joining both together under the catchy subheading "Buffalo Billion" is improper.[8]

Moreover, although the Indictment describes what it calls a "bidding process" — a term of art in the procurement context — there was in fact no "bidding process." In fact, the Indictment makes clear that the entity issuing the RFP, Fort Schuyler, is a "non-profit" — in other words private — entity (*id*. ¶ 7), and, as such, was not subject to any state or municipal bidding requirements.[9] Nowhere does the Indictment specify any "bids" were solicited or made. Instead, the Indictment describes a process involving RFPs and responses, which were non-binding for both sides, and would not necessarily result in the selected firm actually receiving a contract. The RFP sought information about qualifications and experience — in other words, historical information that would inform Fort Schuyler about developers local to the respective areas. The RFP did not seek information related to pricing, proposals, or bids.

---

[7] The relevant charges are Counts One, Two, Three, Four, and Five of the Indictment. Although the Buffalo Developer and the Syracuse Developer are charged together in Count One with a wire fraud conspiracy charge, there are separate substantive charges for each. The defendants employed by the Syracuse Developer are charged in Counts Two (wire fraud) and Three (bribery) and the Buffalo Defendants are charged in Counts Four (wire fraud) and Five (bribery). This is not surprising. It would be even more obviously improper to charge defendants who otherwise had no interaction, association, or overlapping conduct together in a single substantive count. It is just as improper to string them together in a single conspiracy count where there is no overlapping conduct.

[8] "Buffalo Billion" is a term Governor Andrew Cuomo coined in 2012 to describe an initiative to stimulate the economy of areas in Western New York, including Buffalo. The "Buffalo Billion" was not a formal program or bank account. The initiative involved plans to infuse about $1 billion into Western New York through state grants and tax breaks to stimulate economic development. Syracuse is located in Central — not Western — New York. Any implication that the Syracuse RFP Scheme bears any relation to the Buffalo Billion initiative is wrong.

[9] Fort Schuyler is a not-for-profit, private, special-purpose entity affiliated with the State University of New York. Fort Schuyler is not a "state" entity. These sorts of entities — which are not new and have been used for decades — create a positive impact on economic development since they need not abide by the anachronistic and dated bidding requirements and restrictions of New York state law.

In addition, the Indictment alleges that the RFP process "would give the appearance of an open competition" but then alleges that the Buffalo Developer was somehow "preselected by Howe and Kaloyeros" in advance to become a "preferred developer." (*Id.* ¶ 23). In fact, both the Buffalo Developer *and* a second and unrelated Buffalo construction firm won "preferred developer" status as a result of the same RFP process here.[10] Ultimately, three firms completed responses in the RFP process for Buffalo. It is hard to see how being among two of three finalists amounts to being "preselected" in advance. There are also no allegations that anyone involved in the selection process, including the members of the Board of Directors of Fort Schuyler, were unduly pressured or influenced to select one respondent over another.[11]

The Buffalo Defendants are also charged with bribery in connection with this first scheme, although the Indictment does not specify a single bribe payment, monetary or otherwise. Instead, the Indictment vaguely refers to "hundreds of thousands of dollars in payments to Howe from the Syracuse Developer and the Buffalo Developer." (*Id.* ¶ 22). Not only does the Indictment not distinguish between the two entities — entirely separate and unrelated entities involved in entirely separate RFP processes — but it also fails to identify any payments. In fact, the only "payments" the Buffalo Developer made were to a law firm.[12] The law firm engaged its wholly-owned subsidiary, where Howe was employed. The law firm paid Howe a salary, which was not determined by the Buffalo Defendants.

---

[10] The fact that another developer was also selected as a "preferred developer" pursuant to the same RFP process was included in the Complaint filed in this case (Complaint ¶ 77(e)), although this fact does not appear in the Indictment.

[11] Instead, the Complaint makes clear that the Fort Schuyler Board of Directors "based its decisions on, among other things, matrices created by the evaluation committee in which the evaluation committee compared each bidder's submission to the qualifications set forth in the relevant RFP." (Complaint ¶ 77(e)).

[12] This is in contrast to the allegations concerning the Syracuse Defendants, who are alleged to have paid Howe bonuses totaling $385,000 — in addition to the regular payments to the law firm — which bonuses were paid directly to Howe and to another entity controlled and owned by Howe. (Complaint ¶ 71(b)).

The bribery count has other infirmities too. As a threshold matter, it fails to allege how lawful payments to a law firm, which then engaged its subsidiary that employed Howe, suffice as "bribes" for any official state actor. The Indictment specifies that Howe was hired as a "consultant" to CNSE, then SUNY Poly (*id*. ¶ 11), but also offers the conclusory statement that Howe somehow "acted as an agent of SUNY Poly." (*Id*.).[13] There are no specific factual allegations describing how Howe "acted as an agent." There is no allegation in the Indictment that Howe acted as an agent of Fort Schuyler — the entity that actually issued the RFP and selected the preferred developer for Buffalo.[14]

The Indictment makes a passing reference to "sizable contributions to the Governor's reelection campaign" that were made by the Buffalo Developer. (*Id*. ¶ 23). But the Indictment fails to mention that those campaign contributions, among many contributions made over the course of many years to various political candidates, were all lawful, properly disclosed, and openly made in the name of the Buffalo Developer and/or the Buffalo Defendants. The Buffalo Defendants are not alleged to have had any improper association with Joseph Percoco or anyone else employed by the Governor. Therefore, the Indictment's reference to the Buffalo Developer's lawful contributions to the Governor cannot somehow create criminal liability or tie the Buffalo Defendants' alleged conduct to any of the other various schemes set forth in the Indictment.

---

[13] The Indictment alleges that Howe "arranged" for LP Ciminelli to "obtain official State favors through Howe's position at SUNY Poly." (Indictment ¶ 22). The Indictment does not specify what position Howe held "*at* SUNY Poly." (*Id.* ¶ 22 (emphasis added)). Indeed, the only allegation with respect to Howe's work with SUNY Poly is that he was the primary employee of a government relations firm (*id.* ¶ 10) and that he was retained as a "consultant" for SUNY Poly. (*Id.* ¶ 11). By definition, an outside consultant employed by an independent consulting firm does not retain a position "at" his client's entity.

[14] The definition of an "agent" is further discussed in the memorandum of law in support of the Buffalo Defendants' motion to dismiss the Indictment. *See* Joint Memorandum of Law in Support of the Buffalo Defendants' Motion to Dismiss the Indictment Pursuant to Federal Rule of Criminal Procedure 12 (May 19, 2017) ("MTD Mem.") at 52–54.

B.    The Allegations Of The "Percoco Bribery Scheme"

In the so-called "Percoco Bribery Scheme," which is itself actually two separate schemes (the "Percoco/Energy Company Bribery Scheme" and the "Percoco/Syracuse Developer Bribery Scheme"), the Indictment alleges, in broad strokes, that Howe arranged for two of his clients, the Energy Company and the Syracuse Developer, to pay bribes to Percoco in return for "official State favors." (Indictment ¶ 28). Among other things, the Indictment details the "bribes" which allegedly took the form of "low-show" jobs for Percoco's wife, payments concealed through a "pass-through" consultant, and payments concealed through a "shell company controlled by Howe." (*Id.* ¶¶ 30, 34). The Indictment also details purported "official State favors," such as helping the Energy Company to obtain a purchase agreement with the State helping to reverse an adverse decision that would have required the Syracuse Developer to enter into a costly agreement with labor unions. (*Id.* ¶¶ 28-36).

Neither the Buffalo Defendants nor the Buffalo Developer are mentioned in any way in connection with these purported schemes. The Buffalo Defendants are not alleged to have been involved in these schemes. No such concealed payments or shell companies are alleged in any form in connection with any of the charges involving the Buffalo Defendants. The Buffalo Defendants are not even alleged to have been aware of these schemes. Simply put, the Percoco Bribery Schemes have absolutely nothing to do with the Buffalo Defendants.

II.    **Discovery Produced By The Government**

The Government has identified approximately 275 categories of documents it intends to or already has produced to each of the Co-Defendants. In total, the Government will produce material amounting to more than eleven million pages. However, as described *supra*, the Indictment's allegations regarding the Buffalo Defendants have only limited overlap with the

allegations against the other Defendants. Consequently, the overwhelming majority of the Government's production is irrelevant to the Buffalo Defendants.

To name one example, 35 of the approximately 275 categories of information relate directly to Defendant Percoco, and an additional 11 categories of information relate directly to Defendant Kelly. The 46 categories of documents alone comprise hundreds of thousands of pages of discovery, as well as forensic images of multiple electronic devices (including, from Defendant Percoco alone, five computers, one external hard drive, and a cellphone). However, it is highly unlikely that these voluminous documents and forensic images will contain any information relevant to the Buffalo Defendants. There are no allegations that the Buffalo Defendants conspired with, or even met, with Defendants Percoco and Kelly. Thus, an examination of the discovery makes clear that there would be little or no overlap between the potential trial exhibits (and corresponding witnesses) offered against the Buffalo Defendants at trial and those offered against the other Defendants. This is not surprising. Despite the Indictment's description of "overlapping schemes," the allegations contained in the Indictment demonstrate that there is no material overlap between the factual allegations against the Buffalo Defendants and those against the other Defendants.

## ARGUMENT

As a threshold matter, the Buffalo Defendants should be severed pursuant to Federal Rule of Criminal Procedure 8(b) because they were improperly joined with the other Defendants. That is because there is no factual nexus between the charges against the Buffalo Defendants and the charges against the other Defendants. The Indictment purports to allege two conspiracies, but in actuality alleges no fewer than four, each of which is distinct and shares no nexus with the others: (i) the Percoco/Energy Company Bribery Scheme; (ii) the Percoco/Syracuse Developer Bribery Scheme; (iii) the Buffalo RFP Scheme; and (iv) the Syracuse RFP Scheme. The

Indictment lumps together the alleged Buffalo RFP Scheme and Syracuse RFP Scheme, and together brands them as one scheme involving the "Preferred Developer RFPs." But these two alleged schemes are undeniably separate. They involved different RFPs, different alleged bribes, paid by different parties, in different locations, and had plainly distinguishable objects. The Buffalo Defendants' charges stem only from the conduct alleged relating to the Buffalo RFP Scheme; indeed, none of the Buffalo Defendants are mentioned in connection with the conduct alleged relating to any of the other three schemes.

The only commonality among these four conspiracies is the participation of Todd Howe — the Government's cooperating witness — in each of the alleged schemes. The fact that the Government's witness committed a series of crimes, and is alleged to have done so with different subgroups of the charged Defendants, cannot create the basis for proper joinder. That is because the existence of a single common conspirator among multiple conspiracies is not sufficient to establish that all of the Defendants participated in the "same series of acts or transactions," as is required for proper joinder of multiple defendants by Rule 8(b). Because the Buffalo Defendants are strung together with other groups of Defendants charged with completely unrelated criminal conduct, it is patently unfair to try the Buffalo Defendants together with the others at a joint trial. Therefore, Rule 8(b) compels severance for the Buffalo Defendants.

Alternatively, should the Court find that joinder of these separate offenses is proper under Rule 8(b), the Buffalo Defendants will suffer such overwhelming prejudice that severance is warranted under Rule 14 in order to protect the Buffalo Defendants' right to a constitutionally fair trial. Although the risk of spillover prejudice can ordinarily be overcome, it is particularly dangerous in this case and therefore compels severance. In particular, the (i) complexity of the Indictment's allegations (which involve at least four separate conspiracies, each perpetrated by a

different subgroup of the eight Defendants); (ii) sheer volume of evidence admissible at a joint trial that would be unrelated to the Buffalo Defendants' charges; (iii) evidence admissible against other Defendants that is more explicit and demonstrates greater degrees of culpability than that admissible against the Buffalo Defendants; (iv) complicated jury instructions that will be required at a joint trial, where, for example, the admissibility of co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E) will apply differently with respect to eight defendants each alleged to be involved in one or more of four separate schemes; and (v) unwieldy motion practice and sidebar argument that will occur, as groups of counsel for eight defendants attempt to navigate these evidentiary issues for each of their respective clients, demonstrate the unprecedented complexity of a joint trial in this case. Under these circumstances, it will be impossible for the Court to conduct an orderly joint trial and for any jury to reliably differentiate between the evidence that is admissible against the Buffalo Defendants and the evidence that is admissible only against the other Defendants. The only way to safeguard the Buffalo Defendants' right to a fair trial is to sever the charges against them and try them separately. While juries are presumed to follow legal instructions, in a case involving this number of Defendants charged in four complicated and unrelated schemes, the jury's ability to do so will be stretched to its breaking point.

Balanced against the overwhelming prejudice that would result from a joint trial, none of the usual justifications in favor of a joint trial apply in this case. Where, as here, there is virtually no overlap between the documentary and testimonial evidence that would be offered at a trial of the Buffalo Defendants with that offered at a trial of the other Defendants, it cannot be said that a joint trial would serve to avoid duplication of effort, preserve judicial economy, promote efficiency, or avoid inconsistent results. As such, severance is also warranted pursuant

to Rule 14 because a separate trial for the Buffalo Defendants would actually be more efficient for the Court, the jury, and the public. Accordingly, the Buffalo Defendants respectfully request that the charges against them in Counts One, Four, and Five of the Indictment be severed, so that they can receive a fair trial during which an impartial jury can consider the evidence — or lack thereof — against them with respect to these allegations.[15]

## I. The Buffalo Defendants Are Improperly Joined And Should Be Severed.

Rule 8(b) compels severance for the Buffalo Defendants in this case. Although the Indictment purports to charge the Buffalo Defendant in a single conspiracy with the Syracuse Defendants (in the so-called RFP Scheme), the allegations of the Indictment, the voluminous discovery produced to date, and the Government's own statements make clear that the alleged RFP Scheme is in fact two separate conspiracies and that the overlap between the charges against the Buffalo Defendants and the Syracuse Defendants is near non-existent. At most, the Indictment alleges that two different groups of Defendants each — separately and with no overlapping conduct — acted to defraud Fort Schuyler in separate RFP processes. The Government will likely argue that there are two alleged co-conspirators (Todd Howe and Defendant Kaloyeros) common to both RFP Schemes. But the caselaw makes clear that the existence of two common participants in otherwise unrelated schemes is not sufficient to support proper joinder. And it is even more obvious that the Buffalo Defendants are improperly joined with the other two alleged schemes — in which they are not even mentioned

---

[15] As the Court is aware, the Buffalo Defendants previously filed a motion to dismiss for lack of venue or, in the alternative, for transfer of their case to the Western District of New York. As set forth in detail in that motion, severance of the Buffalo Defendants is also warranted on the independent basis that their case should be transferred to the Western District of New York. In addition, the Buffalo Defendants maintain that they are constitutionally entitled to a trial in the Western District of New York. Thus, the Court should not construe this severance motion as any indication that trial in the Southern District of New York is proper or that venue has been adequately alleged.

in the Indictment.  Thus, because they were improperly joined under Rule 8(b), severance of the Buffalo Defendants is required.

> A.    Proper Joinder of Multiple Defendants Requires a Common Plan and a Substantial Identity of Facts or Participants Among the Schemes Alleged.

The joinder of multiple defendants or offenses in a single action is governed by Federal Rule of Criminal Procedure 8.  Where, as here, multiple defendants and offenses are charged in a single indictment, joinder is tested solely under Rule 8(b).  *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988).  Rule 8(b) states that the joinder of multiple defendants in a single indictment is proper if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  FED. R. CRIM. P. 8(b).  "[T]wo separate transactions do not constitute a series within the meaning of Rule 8(b) merely because they are of a similar character or involve one or more common participants."  *United States v. Yaron*, No. S2-10-CR-363 GBD, 2011 WL 3279054, *7 (S.D.N.Y. July 28, 2011) (internal quotation and citation omitted).  Instead, "multiple defendants may be tried together only if the charged acts are part of a series of acts or transactions constituting an offense or offenses."  *Turoff*, 853 F.2d at 1043 (internal citation and quotation omitted).

Joinder is proper only where the acts of two or more defendants "(1) arise out of a common plan or scheme, or (2) are unified by some substantial identity of facts or participants."  *United States v. Lech*, 161 F.R.D. 255, 256 (S.D.N.Y. 1995)*; see also United States v. Cervone*, 907 F.2d 332, 340-41 (2d Cir. 1990).  Critically, it is not sufficient for the government to merely allege the "existence of similarities between some of the actors or some of the crimes," but instead must allege a "common scheme or plan."  *United States v. Carrozza*, 728 F. Supp. 266, 270 (S.D.N.Y. 1990), *aff'd*, 956 F.2d 1160 (2d Cir. 1992); *see also Kotteakos v. United States*, 328 U.S. 750, 771-772 (1946).

"[J]oinder is improper where '[c]ommission of one of the offenses neither depended upon nor necessarily led to the commission of the other' and 'proof of the one act neither constituted nor depended upon proof of the other.'" *United States v. Rajaratnam*, 753 F. Supp. 2d 299, 304 (S.D.N.Y. 2010) (quoting *United States v. Halper*, 590 F.2d 422, 429 (2d Cir.1978)). "It is equally clear . . . that 'defendants charged with two separate – albeit similar – conspiracies having one common participant are not, without more, properly joined.'" *United States v. Giraldo*, 859 F. Supp. 52, 55 (E.D.N.Y. 1994) (internal quotation marks and citation omitted). Rather, the separate conspiracies must "arise from a common plan or scheme and so could alternatively have been charged as a single conspiracy.'" *United States v. Onitiri*, No. 93 CR. 403 (S1) (WK), 1994 WL 256662, *1 (S.D.N.Y. May 25, 1994)*; see also United States v. Velasquez*, 772 F.2d 1348, 1353, 1352-53 (7th Cir. 1985).

"Where multiple defendants are charged with offenses in no way connected, and are tried together, they are prejudiced by that very fact, and the trial judge has no discretion to deny relief." *United States v. Gamaldi*, 384 F. Supp. 529, 530 (S.D.N.Y. 1974) (quoting *Ingram v. United States*, 272 F.2d 567, 570 (4th Cir. 1959)). Thus, misjoinder demands severance and no showing of prejudice is required because it is presumed. *United States v. Lane*, 474 U.S. 438, 449 n.12 (1986) ("Rule 8(b) requires . . . the granting of a motion for severance unless its standards are met, even in the absence of prejudice . . . ."); *see also United States v. Feyrer*, 333 F.3d 110, 113 (2d Cir. 2003) (same).

As Judge Kaplan has opined, this is for good reason. Otherwise, a defendant charged with others involved in different conspiracies is "burdened with the risks inherent in joinder of those alleged conspiracies simply because he had the misfortune of being charged with another defendant who was subject also to other accusations." *United States v. Kouzmine*, 921 F. Supp.

1131, 1133 (S.D.N.Y. 1996).   If the Court fails to sever the Buffalo Defendants from the other

Defendants, that is what will have happened here.   The Buffalo Defendants should not be

burdened with three other conspiracies in which they had no involvement, simply because they

are alleged to have engaged in one scheme with individuals who were — unbeknownst to the

Buffalo Defendants — engaged in alleged conduct pertaining to three other schemes.

B.   No Common Plan Exists Among The Schemes Alleged In The Indictment.

The Indictment fails to allege a "common plan or scheme" that unites the various

schemes contained in the Indictment.   Instead, the Indictment alleges numerous separate and

distinct schemes — the two Percoco Bribery Schemes, the Syracuse RFP Scheme, and the

Buffalo RFP Scheme — that bear an insufficient relationship to one another to warrant proper

joinder.   Indeed, the Buffalo Defendants are implicated in only one of the schemes, and *none* of

the Indictment's fifteen counts names all eight defendants.   The Indictment does not even allege

that the Buffalo Defendants were aware of the existence of the other schemes.   Simply put, there

are no grounds on which the Buffalo Defendants can be properly joined with the Defendants who

are charged in counts arising from the other alleged schemes.

The Government's allegations implicate the Buffalo Defendants in only the Buffalo RFP

Scheme.   Although the Buffalo RFP Scheme and the Syracuse RFP Scheme are charged together

within a single conspiracy count, the allegations of the Indictment — and common sense —

make clear that these are in fact two separate conspiracies.[16]   At best, the Indictment can be said

---

[16] A "non-frivolous conspiracy charge" is ordinarily sufficient to support joinder under Rule 8(b).   *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988).   However, where, as here, there are detailed factual allegations demonstrating that the charged conspiracy is in fact two separate schemes, the fact that the Buffalo Defendants are charged in one count with the Syracuse Defendants and Defendant Kaloyeros is not a barrier to this Court severing them — as is required by Rule 8(b) — because they were not joined properly in the first place.   *See, e.g., United States v. Carrozza*, 728 F. Supp. 266, 270 (S.D.N.Y. 1990) (severing defendant Carrozza from other defendants charged in a single conspiracy count with him).

As set forth in detail herein, the Indictment alleges four — not two — separate conspiracies and the Buffalo Defendants are only alleged to have been involved in one.   In fact, if tried at a joint trial, the Buffalo Defendants

to allege that the Syracuse and Buffalo RFP Schemes were executed in a similar manner and towards a similar end around the same time period. At most, the allegations are that the Syracuse Defendants and the Buffalo Defendants each separately paid bribes to Howe with the aim of fixing a different RFP offered to identify a preferred developer local to their respective areas, but the alleged commonalities end there. As an initial matter, and at risk of belaboring the obvious, the two schemes involved completely different RFPs: the Buffalo RFP Scheme allegedly fixed the results of an RFP to identify the preferred developer for Buffalo, while the Syracuse RFP Scheme allegedly fixed the results of an RFP to identify the preferred developer for Syracuse. Even more, the Buffalo and Syracuse RFP Schemes were not in any way symbiotic. There are no allegations that the commission of the Buffalo RFP Scheme in any way caused, triggered, or relied on the commission of the Syracuse RFP Scheme, or vice versa. Instead, as alleged by the Indictment, each of these alleged schemes operated completely independently of the other. Thus, the joinder of the Buffalo RFP Scheme bears none of the hallmarks of proper joinder; it cannot be said that "one scheme stemmed from the other," *Turoff*, 853 F.2d at 1044, or even that there was any knowledge by the Buffalo Defendants about the other schemes which "is not required, but it is an indicator of whether or not there is a common scheme or purpose," *United States v. Ohle*, 678 F. Supp. 2d 215, 225 (S.D.N.Y. 2010).

The Government will almost certainly try to salvage the improper joinder of the Syracuse and Buffalo RFP Schemes by arguing that there are overlapping participants in each. In particular, the Government may attempt to argue a so-called "wheel conspiracy" exists, with its

anticipate requesting jury instructions explaining that the wire fraud conspiracy count, in which they are charged with the Syracuse Defendants is duplicitous, and that, as such, they are entitled to a multiple conspiracies charge. *See* United States Attorney's Criminal Resource Manual, https://www.justice.gov/usam/criminal-resource-manual-919-multiplicity-duplicity-single-document-policy (last accessed May 18, 2017) ("Duplicity is the joining in a single count of two or more distinct and separate offenses."). Such jury instructions will add complexity and confusion to an already-complex trial. Thus, granting severance at this junction with obviate this issue, streamlining the trial and eliminating juror confusion.

own cooperating witness (Todd Howe) and Defendant Kaloyeros at the "hub" and the Syracuse Defendants and Syracuse RFP Scheme connected to the Buffalo Defendants by the wheel's "spokes." However, while Howe and Defendant Kaloyeros may be at the purported "hub" of the two RFP Schemes the Indictment alleges are "common," the Buffalo Defendants are improperly joined, where, as here, there is no outer rim connecting the Buffalo Defendants to the Syracuse Defendants. The recent addition of a single sentence in the Indictment, purporting to show that the Syracuse Defendants somehow "collaborated" with the Buffalo Defendants, because they each "exchang[ed] through Howe ideas for potential qualifications" (Indictment ¶ 24), cannot provide the necessary outer rim connection. This lone allegation does not show any link between the Syracuse and Buffalo Defendants. There is no allegation that they communicated directly or that their purported communication was for any common goal or purpose. Instead, at most, it shows – consistent with the other allegations in the Indictment – that each of the Syracuse Defendants and the Buffalo Defendants were separately communicating with Howe purportedly related to separate RFPs for Syracuse and Buffalo, respectively.

*United States v. Carrozza*, 728 F. Supp. 266 (S.D.N.Y. 1990), is directly on point. In that case Carrozza, who ran a gambling business, was charged with multiple other defendants in extortion and extortion conspiracy charges, in relation to various debt collection activities. *Id*. at 268-69. The government there argued that Carrozza and his co-defendants, one of whom ran a gambling business with Carrozza and another of whom had his own gambling businesses, used the same individual to collect debts from extortion victims, such that there was a "common scheme or plan." *Id*. The district court noted that "[g]enerally a conspiracy charge will facilitate the establishment of the necessary common scheme or plan," but not in this case; although the debt collector "is located at the center of the wheel and is joined to each of the defendants, there

is virtually no outer rim connecting Carrozza to the other defendants." *Id.* at 270. *See also Kotteakos,* 328 U.S. at 755 (finding that "[t]hieves who dispose of their loot to a single receiver — a single 'fence' — do not by that fact alone become confederates: they may, but it takes more than knowledge that he is a 'fence' to make them such."). In *Carrozza*, the district court rejected the government's argument that the "persistent use of [the debt collector] by each defendant links them in a common scheme." *Carrozza*, 728 F. Supp. at 270. The alleged "hub" in the instant case — Defendant Kaloyeros and Todd Howe — are akin to the debt collector in *Carrozza*. As such, the alleged "persistent use" of Defendant Kaloyeros and Howe by various groups toward similar aims is not sufficient to support proper joinder of the various groups. Where the Buffalo Defendants and the Syracuse Defendants are each alleged to have used Defendant Kaloyeros and Howe to defraud Fort Schuyler — separately, in separate RFP processes, without any involvement or even knowledge of the other — through the "hub," there is no sufficient "outer rim," to support proper joinder.

The lack of a link between the Buffalo RFP Scheme and the Percoco Bribery Schemes is even more apparent. There, the Indictment alleges that several defendants — none of whom are the Buffalo Defendants — made illicit payments to Defendant Percoco to induce him to take "official actions" that benefited their respective companies — none of which employed or were in any way affiliated with the Buffalo Defendants. The Indictment makes no allegation that the Percoco Bribery Schemes had any causal effect—and none is logically apparent — on the Buffalo RFP Scheme: the success or failure of one scheme in no way affected the other. Indeed, Defendant Percoco is not charged and not even mentioned in the allegations regarding the Buffalo RFP Scheme. There is no allegation that the Buffalo Defendants were even aware of — never mind involved in — the Percoco Bribery Schemes. Where, as here, the Buffalo

Defendants are not even alleged to have had knowledge of the other three schemes, they cannot be properly joined. *United States v. Gallo*, No. 98 Cr. 338(JGK), 1999 WL 9848, at \*3-4 (S.D.N.Y. 1999) (severing trials of two crime families where the indictment did "not indicate that the two sets of defendants were even aware of each other, much less that they had any common purpose or aim"); *United States v. Greenfield*, No. 01 CR 401(AGS), 2001 WL 1230538, at \*3-4 (S.D.N.Y. Oct. 16, 2001) (granting severance where Government failed to allege a common goal or purpose among multiple schemes, and Government only alleged that defendant had any involvement in one of the schemes); *Kouzmine*, 921 F. Supp. at 1133-34 (granting severance where there was "no evidence that the defendants joined in the indictment[] were aware of or joined all of the schemes alleged); *Giraldo*, 859 F. Supp. at 54 (granting severance of two separate conspiracies where the government failed to allege that the two "shared a common plan," and there was no allegation that the defendants "knew of or were involved in any overall scheme") (citation and quotation omitted).

C.    No Substantial Identity Of Facts Or Participants Exists Among
       The Schemes Alleged In The Indictment.

Nor do the allegations bear any of the hallmarks demonstrating a "substantial identity of facts or participants," such that "a reasonable person would easily recognize the common factual elements," sufficient to support proper joinder. *Turoff*, 853 F.2d at 1044. It cannot be said, as is required for joinder, that "even if the district court had tried [the] two defendants separately, the evidence at one trial would essentially [have] duplicate[d] the evidence at the other," *Feyrer*, 333 F.3d at 114, or that "proof of one scheme is indispensable for a full understanding of the other," *Turoff*, 853 F.2d at 1044.

Instead, the Indictment demonstrates that there is no overlap in the allegations underlying the Buffalo RFP Scheme and those underlying the Percoco Bribery Schemes and Syracuse RFP

Scheme. The key facts to be determined at trial of the Buffalo Defendants will involve a limited time period (the few months' time leading up to and including the Buffalo RFP process) and circumscribed conduct (the Buffalo Defendants' limited interactions with and communications with Todd Howe and Defendant Kaloyeros relating to the Buffalo RFP), none of which overlaps with the allegations relating to the other three schemes. In particular, the key facts to be determined at trial will be, among others, whether (i) the Buffalo Developer's payments to a law firm associated with a consulting firm that employed Howe, pursuant to a retainer agreement for consulting services, constituted a "bribe" by the Buffalo Defendants paid to Howe;[17] (ii) Howe was acting as an agent of any qualifying government "organization"; (iii) if he was, then whether the Buffalo Defendants knew of Howe's status as an "agent";[18] (iv) any "official action" on behalf of the Buffalo Defendants resulted from the "bribe";[19] (v) the Buffalo Defendants correctly certified that they had not retained any lobbyists with respect to the Buffalo RFP;[20] and

---

[17] The Government will not be able to prove that the Buffalo Defendants made a bribe to Howe. Indeed, the Indictment fails to allege a single bribe payment by the Buffalo Defendants to Howe. And with good reason: neither the Buffalo Defendants nor the Buffalo Developer ever bribed Howe. In fact, neither the Buffalo Defendants nor LPCiminelli ever made any direct payments of any kind – of money, gifts, or anything of value – to Howe. *See* MTD Mem. at 47–49.

[18] The Government will not be able to prove that Howe was an agent of any qualifying government "organization" and that the Buffalo defendants knew that. Indeed, the Indictment is devoid of any factual allegations that would establish Howe as an agent of any government organization or Fort Schuyler — the private entity that issued the RFP and selected the preferred developer for Buffalo. *See* MTD Mem. at 52–58.

[19] Even if the Government could establish that the Buffalo Defendants bribed Howe (which it cannot), it will not be able to establish that any official action was taken in response to that alleged bribe that benefitted the Buffalo Defendants. First, Howe had no authority or power to determine the outcome of the Buffalo RFP process. Second, the Buffalo RFP process only awarded the Buffalo Developer (along with another developer the Government has not implicated in this alleged scheme) preferred developer status by Fort Schuyler — a private company set up precisely to allow the greater flexibility afforded to a private entity. Before the Buffalo Developer was actually awarded any contracts supported by government funding, it had to qualify for those projects and reach agreement as to pricing pursuant to vigorous and arm's length negotiations over a year after the RFP was issued. *See* MTD Mem. at 7, 29–31.

[20] The Government will not be able to prove false certification on the "Disclosure of Lobbying Activity" form that was attached to the Buffalo Developer's RFP response. Instead, the Buffalo Developer's engagement agreement with the law firm through which the Buffalo Developer retained Howe expressly states that the scope of its representation does "not include New York State or Federal lobbying; and, therefore, no registration would be required with the New York State Joint Commission on Public Ethics . . . ." (May 19, 2017 Declaration of Jessica A. Masella ("Masella Dec.") ¶ 13 & Ex. J); *see also* MTD Mem. at 20–22.

(vi) whether the results of the Buffalo RFP process were predetermined.[21]  Putting aside the fact that the Government will not be able to meet its burden of proof regarding these facts, we can see no connection — and none is alleged — between any of these facts and the facts relevant to the counts arising from the Percoco Bribery Schemes or the Syracuse RFP Scheme.  Thus, joinder of the Buffalo Defendants with the others is improper because "[c]omission of one of the offenses neither depended upon nor necessarily led to the commission of the other," and "proof of the one act neither constituted nor depended upon proof of the other."  *Halper*, 590 F.2d at 429 (discussing lack of connection between schemes).

The lack of overlap in factual allegations underlying the various schemes is underscored by the discovery the Government provided to Defendants.  (*See* Discovery Index for All Defendants, Masella Dec., Ex. T).  To name but one example, while the Government may need all or some of the 170,000 pages of emails it has thus far produced from Defendant Percoco's and his wife's files and the contents of seven electronic devices (including computers and a cellphone) to make its case against the non-Buffalo Defendants, those documents will provide no insight into the charges against the Buffalo Defendants because there is no allegation that any interactions between the Buffalo Defendants and Defendant Percoco, to the extent they exist, have anything to do with the charges in this case.  Likewise, the select categories of documents the Government produced that might have some bearing on the allegations against the Buffalo Defendants will be of no relevance to the other Defendants for the same reason.

Nor is there any significant overlap among the key players in these four schemes.  The counts arising from the Buffalo RFP Scheme are brought against only the Buffalo Defendants and Defendant Kaloyeros.  The Buffalo Defendants are not implicated in any other scheme; only

---

[21] *See supra* n.17–20.

Kaloyeros is implicated in both the Buffalo RFP Scheme and another scheme (the Syracuse RFP Scheme). Thus, overlap among the participants in the Buffalo RFP Scheme and the other schemes is limited to a single co-defendant, and even then that co-defendant has no connection to the other schemes alleged in the Indictment. Even though the Buffalo Defendants are charged in a single conspiracy count with the Syracuse Defendants, the Syracuse Defendants had *absolutely no involvement* in the alleged Buffalo RFP Scheme, and the Buffalo Defendants had *absolutely no involvement* in the Syracuse RFP Scheme. This is to be expected; indeed, each of the RFPs specified that only *local* developers could apply. Courts in the Second Circuit consistently hold that overlap of several participants is insufficient grounds on which to sustain joinder. *See, e.g., Rajaratnam*, 753 F. Supp. 2d at 307 (severing various insider trading conspiracy counts from others despite the government's representation that the case is a "Venn diagram in which the 'key figure at the center of each scheme also participates in the other'"); *Lech*, 161 F.R.D. at 257-258 (S.D.N.Y. 1995) (severing bribery conspiracy count charging three defendants from two other bribery conspiracy counts charging two of the three defendants); *Giraldo*, 859 F. Supp. at 54-55 (severing drug conspiracy count charging three defendants and Giraldo from drug conspiracy count charging Giraldo alone).

Nevertheless, the Government may attempt to argue that the schemes are properly joined because they all relate to allegations of public corruption in connection with economic revitalization initiatives within New York State. But that is akin to saying that all insider trading cases in a certain state, or all narcotics trafficking in a geographic area, could be joined in one trial. The Government may also argue that joinder is appropriate because Howe will be called to offer testimony with respect to each of the schemes and against each of the Defendants.[22] That

---

[22] Even the economic revitalization efforts — which alone cannot provide a basis for proper joinder — are distinct as between Syracuse and Buffalo and further reveal the separation of the alleged schemes. As explained previously,

argument is wrong. The means and methods by which the Government will prove its case should be of little concern to this Court in deciding severance pursuant to Rule 8(b), as that cannot shed any light on whether the defendants were properly joined in the first place.

Below follows a summary of two cases in which courts have granted severance on similar — but even less compelling — facts than those presented here. In *United States v. Lech*, then-District Judge Sotomayor severed the charges against one defendant — Lech — who was charged with conspiring with his two co-defendants to secure an asbestos removal contract by bribing officials of the New York City Board of Education ("BOE"). 161 F.R.D. at 256. Lech's co-defendants were also charged in the same indictment with counts arising from two other bribery schemes that involved the same BOE official. *Id.* The Government did not contend that Lech was aware of the other schemes, alleging only that Lech was vaguely aware that his co-conspirators had prior dealings with this BOE official. *Id.* The court found that the near non-existent connection between Lech and the other schemes was "insufficient to support Lech's joinder," particularly in light of the "very little, if any, knowledge" Lech had of the other schemes, and severed the charges against him. *Id.* at 257-58. Here, Howe and Defendant Kaloyeros are akin to the overlapping participation of the BOE official — which was not sufficient to support joinder in *Lech*. And the Buffalo Defendants are not even alleged to have had the "very little" knowledge of the other schemes that the defendants may have had in *Lech*.

Similarly, in *Yaron*, 2011 WL 3279054, the district court granted severance where seven defendants were charged with crimes arising from separate conspiracies to fix the award of two construction contracts tendered by New York-Presbyterian Hospital — one for the removal of asbestos, the other for installation of an HVAC system. *Id.* at *1-2. All seven defendants were

the "Buffalo Billion" initiative focused on Western New York, while other revitalization efforts focused on Central New York.

charged in the asbestos conspiracy counts, but only three were charged in the HVAC conspiracy counts. The defendants not charged with the HVAC conspiracy counts moved for severance, and the court granted their motion. The court reasoned that "nothing in the Superseding Indictment allege[d] that [the moving defendants] knew of or actively sought to involve themselves in the HVAC Conspiracy, which weigh[ed] heavily in favor of severance." *Id.* at *8. Moreover, despite the involvement of three common participants, the court found that there was "no allegation . . . of a common plan or purpose amongst the joined defendants." *Id.* at *9. The absence of a "key link" between the schemes indicating that "one scheme stemmed from the other," doomed the government's attempted joinder. *Id.* Similarly, here, the Indictment does not allege that any of the Buffalo Defendants "knew or actively sought to involve themselves" in the other conspiracies charged, which key factor resulted in the *Yaron* defendants' severance, even where there were three participants overlapping in both schemes.

Even the Government's own statements confirm that the charges against the Buffalo Defendants should be severed because there is no requisite overlap. During the status conference before this Court on April 6, 2017, the Government referred to the Syracuse Defendants as the "overlap" between what it calls a single RFP Scheme and a single Percoco Bribery Scheme. (April 6, 2016 Tr. at 20 ("There is significant overlap. There are two defendants who fall into both schemes.")).[23] This characterization offered by the Government supports severance. Because the so-called "RFP Scheme" is really two separate schemes (one for Buffalo and one for Syracuse), the purported "overlap" of the Syracuse Defendants does not weigh in favor of a joint trial. Instead, it weighs in favor of severance. The Syracuse scheme can be split cleanly from the Buffalo scheme. The Government cannot show any common purpose, and other than Todd

---

[23] The Government also referred to a "cooperating witness" and "multiple witnesses" as additional overlap, but those items go to the issue of overlap with respect to the Government's presentation of evidence at trial, as opposed to overlap in the actual underlying facts of the charged conduct that is required for proper joinder under Rule 8(b).

Howe and Defendant Kaloyeros, each of whom participated in each of the alleged separate RFP Schemes, the Government cannot even show that the other Defendants had knowledge of the others.

Similarly, the Government's own diagrams provide additional confirmation. During the press conference announcing the charges in this case, the Government had to use two separate diagrams to graphically represent the charges. (These are attached to the Masella Declaration as Exhibit M). The diagram depicting the "Alleged Percoco Bribery Scheme" has no bearing on the Buffalo Defendants, because they are not charged or mentioned in connection with those allegations and indeed, they do not appear on that diagram. The other diagram, depicting the "Alleged Bid-Rigging Scheme," shows what appears to be a wheel conspiracy — with Howe and Defendant Kaloyeros at the center — but with "virtually no outer rim," *Carrozza*, 728 F. Supp. at 270, connecting the Buffalo Defendants to any other Defendants. (Masella Dec., Ex. M). That is because there is none. Instead, what the diagram depicts is payments flowing from the Syracuse Developer to Todd Howe, and separate payments (consisting of $100,000 in a yearly retainer fee, paid not to Howe but to a law firm associated with Howe) flowing from the Buffalo Developer. There are no connections depicted — and none are alleged — between the Buffalo Developer and the Syracuse Developer. (Masella Dec., Ex. M). The box depicted at the bottom entitled "Rigged State Contracts," should, in this illustration, actually be two boxes, as the Indictment makes clear that the eventual contracts in each of Syracuse and Buffalo (which were not awarded as a direct result of the RFPs) were entirely separate contracts, for separate projects, in different cities. If that box were correctly depicted as two boxes, there would be *no connection* between two independent circles on the diagram.

Lest there be any room left for doubt, the decisions of *Lech*, *Yaron*, and other cases cited herein are not outliers, but instead are representative of a well-settled rule of law, that is girded by its consistent application. That is the joinder of alleged schemes bearing only superficial similarities is improper and severance is necessary to ensure justice. *See, e.g., United States v. Ohle*, 678 F. Supp. 2d 215, 227 (S.D.N.Y. 2010) (severing defendant's trial because the scheme from which the charges against him arose was only "marginal[ly]" similar to the other conspiracy alleged in the indictment, and the Second Circuit has "consistently required a far more substantial connection"); *Kouzmine*, 921 F. Supp. at 1133 (severing defendant's trial where "there was no evidence that the defendants joined in the indictments were aware of or joined in all of the schemes alleged"). Accordingly, because the charges against the Buffalo Defendants are improperly joined with those against the other Defendants, the Court should sever the Buffalo Defendants and try the charges against them separately.

## II. Severance Is Also Warranted Pursuant To Rule 14 Because A Joint Trial Would Create Overwhelming Prejudice To The Buffalo Defendants.

Even if the Buffalo Defendants could be properly joined to this action—and to be certain, they cannot—severance would still be warranted, because a joint trial would be unduly prejudicial and they would not receive a fair trial. Federal Rule of Criminal Procedure 14 provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

FED. R. CRIM. P. 14. "Rule 14 recognizes that joinder, even when proper under Rule 8(b), may prejudice either a defendant or the government," and grants trial courts the discretion to sever an action when there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or

innocence." *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993). In determining if severance is warranted, the trial court must weigh the possibility and impact of prejudice resulting from a joint trial against the need for judicial economy. *See Bruton v. United States*, 391 U.S. 123, 131 n.6 (1968) (Rules 8(b) and 14 are "designed to promote economy and efficiency and to avoid a multiplicity of trials, where these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial").

Of primary concern is that the Buffalo Defendants' right to a fair trial will be compromised by "spillover evidence" — *i.e.*, "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone." *United States v. Fruchter*, 104 F. Supp. 2d 289, 309 (S.D.N.Y. 2000). "Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice." *Zafiro*, 506 U.S. at 539. Defendants are hard pressed to make their "case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together." *Krulewitch v. United States*, 336 U.S. 440, 454 (1949) (J. Jackson, concurring). "[C]ourts must be scrupulous to avoid the spectre of guilt by association — or, more likely, guilt by confusion." *United States v. Gallo*, 668 F. Supp. 736, 750 (E.D.N.Y. 1987) (granting severance). The potential for confusion is especially acute where the indictment is complex and, as pleaded, defendants have different levels of alleged culpability. *United States v. Balter*, 91 F.3d 427, 432-33 (3d Cir. 1996).

Although courts frequently find that "spillover prejudice" can be cured by appropriate jury instructions at a joint trial, such is not the case here. In this case, the complexity of the allegations and the nature of the "spillover" evidence create a high risk of improper prejudice to the Buffalo Defendants from a joint trial. With respect to the complexity of the charges, in order

to reach a proper verdict in this case, the jury will have to first understand, among other factual issues (i) the nature of the RFP process in this case, which was not a so-called "bidding" process such as is commonly used for public work, but which is nonetheless frequently referred to as a "bid" or "bidding process" in the Indictment, the Complaint, and the press related to this case; (ii) the nature of the relevant organizations, including Fort Schuyler and SUNY Poly; (iii) the relevant roles and authority — or lack thereof — of various players, including Defendant Kaloyeros and Howe to bind those organizations as agents; and (iv) the nature of a RFP process and what types of pre-RFP communications are ordinarily properly undertaken by the participating parties. These issues are sufficiently complicated that the Buffalo Defendants intend to call one or more expert witnesses to assist the jury in its understanding of them. And that is before the jury even reaches the legal issues, which are how — if at all — the federal wire fraud and bribery statutes apply to any of this alleged conduct. The allegations in this case are in no way simple or straightforward or commonplace.

In addition to the complexity of the factual and legal issues in this case, the nature of the "spillover" evidence presents a significant risk of undue prejudice to the Buffalo Defendants if a joint trial were to be conducted. In attempting to prove the counts arising from the Syracuse RFP Scheme and the Percoco Bribery Schemes, the Government will attempt to present direct evidence in both documentary and testimonial form that Defendant Percoco and Howe solicited and received bribes from the Syracuse Defendants (in furtherance of the Syracuse Bribery Scheme) and Defendant Kelly (in furtherance of the Energy Company Bribery Scheme) and that Howe solicited and received bribes from the Syracuse Defendants (in furtherance of the Syracuse RFP Scheme). With respect to these separate alleged schemes, the Indictment includes allegations, among others, that Defendant Kelly arranged for the Energy Company to create a

"low-show" job for Defendant Percoco's wife (Indictment ¶ 30), that bribe payments to Defendant Percoco and his wife were concealed through a "pass-through" consultant (Indictment ¶ 30(a)), and that bribe payments by the Syracuse Developer to Defendant Percoco were made through a "shell company controlled by Howe" (Indictment ¶ 34). There are no similar allegations concerning concealed payments of any kind regarding the Buffalo Defendants.

To the contrary, the whole of the alleged bribe payment by the Buffalo Defendants is that the Buffalo Developer made payments to its law firm pursuant to a regular retainer agreement and the law firm paid Howe a regular salary.[24] The Buffalo Defendants are not implicated in either of the alleged Percoco Bribery Schemes or the Syracuse RFP Scheme, but nevertheless will be seated at the defense table next to the targets of this evidence. It is not difficult to imagine a scenario in which a confused jury, despite the Court's best efforts to provide clear instructions and the jury's best intentions, assumes that "birds of a feather are flocked together," and tips the scales in favor of conviction because of the Buffalo Defendants' forced association with the Defendants to the other schemes. To ask the jury to separate out the evidence as regards the Buffalo Defendants, from the evidence regarding the other five Defendants, who are involved in three other distinct schemes, is asking the jury to perform "impossible feats of mental dexterity" especially where there is a "large disparity" between the Government's case against the Buffalo Defendants and the case against the other Defendants. *United States v. McDermott*, 245 F.3d 133, 139-40 (2d Cir. 2001) (reversing judgment of conviction and remanding for a severed trial where one defendant was not aware of a separate scheme such that he suffered spillover prejudice at a joint trial due to the "large disparity" in evidence).

---

[24] The motion to dismiss contains a discussion of the bribery charge as it relates to a salary or other regular payment. *See* MTD Mem. at 47–52.

In addition, statements of co-conspirators in conspiracies unrelated to the Buffalo Defendants would presumably be admitted evidence in a joint trial. In a case such as this, alleging four separate conspiracies with numerous co-conspirators, the admission of co-conspirator statements may number in the dozens or more. Even though such statements would not be admissible against the Buffalo Defendants, it would be hard — if not impossible — for the jury to keep it all straight.

The serious risk of prejudice to the Buffalo Defendants resulting from a joint trial is not even offset in this case — as it ordinarily might be — by serving the interests of judicial efficiency. Instead, the amount of evidence against the Buffalo Defendants appears to be substantially less — such that a trial against them will be substantially shorter — than that against the other Defendants. Thus, the usual arguments advanced by the government in opposition to a severance motion — that a joint trial would save the Court, the government, and potential witnesses time and resources — do not appear to apply at all in this case as to the Buffalo Defendants. Indeed, in this case it would actually save time and be more efficient for the Court to hold two separate trials, thus obviating the need for the Buffalo Defendants, and their counsel and witnesses, to sit through all of the evidence and accommodate the schedules of counsel and witnesses completely unrelated to the charges against them. Moreover, each of the three Buffalo Defendants intends to advance a substantial defense case, none of which would be applicable to the other Defendants.

In addition to creating an inefficient trial for the Court and jury, the Court will need to provide constant instructions to the jury about what evidence they may consider with regard to each of the eight Defendants. It is inevitable that such instructions will precipitate collateral disagreements between Defendants and the Government, resulting in drawn-out motion practice,

oral arguments and sidebars, which will serve only to further tax the Court's resources and confuse the jury. The Honorable Kiyo A. Matsumoto in the Eastern District of New York recently found that the potential for "frequent objections" and "a litany of side bar debates" that would "likely confuse the jury in what is already a complex case" involving two defendants and multiple fraud schemes was reason enough to sever the charges and conduct two separate trials. *United States v. Shkreli*, No. 15-CR-637 (KAM), Slip op. at 20 (E.D.N.Y. April 19, 2017).

To the extent that the Government argues that one of its own witnesses, the cooperating witness Todd Howe, would have to testify twice if the charges are severed, that warrants little consideration. It is common in this District and elsewhere that a cooperating witness has to testify at more than one trial, where, as here, he provides testimony concerning allegations related to completely separate schemes. Balanced against the inconvenience to the Court, the lay witnesses, the jurors, and the Defendants, the inconvenience to the Government and Todd Howe should not influence the Court's decision to sever the Buffalo Defendants to eliminate undue prejudice to them and to streamline the case for the Court, jurors, and lay witnesses. Accordingly, the Court should grant the Buffalo Defendants a separate trial in which they receive individualized consideration of the evidence — or lack thereof — against them.

## CONCLUSION

For the reasons discussed, the joinder of the Buffalo Defendants with the other Defendants in this case was improper under Rule 8(b) and they must be severed. In the alternative, the Court should exercise its discretion under Rule 14 to sever the Buffalo Defendants because they cannot receive a fair trial and will be severely prejudiced if they are tried with the other Defendants. Thus, Louis Ciminelli, Kevin Schuler, and Michael Laipple respectfully request that their trial be severed from that of the other named Defendants.

Dated:   Buffalo, New York
        May 19, 2017

Respectfully submitted,

**HODGSON RUSS LLP**

*Attorneys for Defendant Louis Ciminelli*

By:  /s/Daniel C. Oliverio          

Daniel C. Oliverio
Timothy W. Hoover
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
716.856.4000
doliverio@hodgsonruss.com
thoover@hodgsonruss.com

**DLA PIPER LLP (US)**

*Attorneys for Defendant Louis Ciminelli*

By:  /s/John M. Hillebrecht        

John M. Hillebrecht
Jessica A. Masella
1251 Avenue of the Americas
New York, New York
215.335.4829
john.hillebrecht@dlapiper.com
jessica.masella@dlapiper.com

**LIPSITZ GREEN SCIME CAMBRIA LLP**

*Attorneys for Defendant Michael Laipple*


By:   /s/Herbert L. Greenman

Herbert L. Greenman
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
716.849.1333
hgreenman@lglaw.com

**CONNORS LLP**

*Attorneys for Defendant Kevin Schuler*


By:   /s/Terrence M. Connors

Terrence M. Connors
James W. Grable, Jr.
1000 Liberty Building
424 Main Street
Buffalo, New York 14202
716.852.5533
tmc@connorsllp.com