

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 19, 2018

**BY ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Louis Ciminelli*, S2 16 Cr. 776 (VEC)

Dear Judge Caproni:

      The defendant in the above-captioned case, Louis Ciminelli, is scheduled to be sentenced on November 28, 2018, having been convicted, following a jury trial, of one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and one count of wire fraud, in violation of 18 U.S.C. § 1343, arising from his participation in a fraudulent scheme to direct hundreds of millions of New York State taxpayer dollars to his company. Under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the sentencing range applicable to the defendant's conduct is 108 to 135 months' imprisonment. For the reasons set forth below, in order to satisfy the goals of sentencing, and consistent with the recommendation of the United States Probation Office, the Government respectfully submits that the defendant should be sentenced principally to a substantial term of imprisonment, though, in light of the sentencing factors set forth in 18 U.S.C. § 3553(a), a sentence below the applicable Guidelines range is warranted in this case.

## I.    BACKGROUND

### A.    Offense Conduct

      From approximately 2013 through 2015, Ciminelli engaged in a scheme to rig and corrupt the process leading to New York State-funded construction contracts worth in total more than $850 million. Ciminelli's co-defendant, Alain Kaloyeros, the head of a college of the State University of New York, used his position and influence to tailor the bidding process for those contracts to favor the clients of his lobbyist, Todd Howe—namely, the Syracuse-based real estate development company owned in part by Steven Aiello and Joseph Gerardi (COR Development) and the Buffalo-based construction company owned by Ciminelli (LPCiminelli). (Presentence Investigation Report ("PSR") ¶¶ 38-42, 45-49.) Kaloyeros, Howe, Aiello, Gerardi, and Ciminelli worked together to deceive Fort Schuyler Management Corporation ("Fort Schuyler," a not-for-profit

affiliated with the State University of New York) by, among other things, secretly tailoring the required qualifications for those development deals so that COR Development and LPCiminelli would be awarded contracts in Syracuse and Buffalo, respectively, without meaningful competition, while falsely representing to Fort Schuyler that the bidding process was legitimate and competitive. (PSR ¶ 50.)

The opportunity for this fraud arose from New York Governor Andrew Cuomo's initiative—referred to broadly as the "Buffalo Billion"—to invest a billion dollars in the Upstate New York region in an effort to revive the Upstate economies and bring jobs back to the region. (PSR ¶ 45.) The Governor's Office empowered Kaloyeros—who was head of the College of Nanoscale Science and Engineering ("CNSE") and ran Fort Schuyler—to propose projects to be funded with State money, and entrusted Kaloyeros to oversee the application processes for those projects. (PSR ¶ 46.)

Kaloyeros could not have reached this position of trust and power without the help of Todd Howe. In or around January 2012, Kaloyeros retained Howe to serve as a consultant to CNSE. (PSR ¶ 47.) Howe's intimacy and influence with the Governor and his senior advisors allowed Howe to alleviate the Governor's Office's suspicions of Kaloyeros, and eventually to position Kaloyeros to lead the Buffalo Billion initiative. (PSR ¶ 47.) Howe's connections allowed Kaloyeros to retain a prominent and lucrative job within the State University of New York ("SUNY")—indeed, Kaloyeros has been widely reported as having been the highest paid State employee in New York. During this same time period, Howe helped Kaloyeros gain the Governor's support for establishing Kaloyeros's own SUNY campus to lead—a position of prestige and importance to Kaloyeros. (PSR ¶ 47.)

Consistent with Fort Schuyler's practices, as well as the practices and policies of SUNY, the SUNY Research Foundation, and the State of New York, and at Kaloyeros's direction, Fort Schuyler issued request for proposals ("RFPs") to create a public competition to select construction partners for the Buffalo Billion projects. (PSR ¶ 48.) Unbeknownst to the individuals at Fort Schuyler charged with administering the competition and selecting a winner, however, Kaloyeros and Howe secretly solicited from Aiello, Gerardi, and Ciminelli qualifications of COR Development and LPCiminelli to put in the RFPs so that the RFPs would request qualifications unique to those companies. (PSR ¶ 51.) In addition, Kaloyeros and Howe provided the pre-selected developers with advance copies of the RFP and solicited their feedback, advantages that were not given to any other development company. (PSR ¶ 52.)

Although the day-to-day responsibilities for working with Kaloyeros to shape the RFPs (and later to choose a second winner of the RFP to disguise the fraudulent scheme) was delegated to Kevin Schuler, a Senior Vice President at LPCiminelli, and Ciminelli's son (Frank Ciminelli), Ciminelli maintained the direct relationship with Kaloyeros and even opened a Gmail account to receive a draft RFP from Kaloyeros for editing. (*See* PSR ¶¶ 53-55, 59; Tr. 1051 (testimony of Kevin Schuler), 1706-08 (testimony of Justin Ellard).) After FBI agents interviewed competitors in Buffalo, New York, Ciminelli opened his Gmail account—which he had not used for any purpose other than receiving the RFP from Kaloyeros—and deleted the emails from Kaloyeros in an effort to hide his conduct. (PSR ¶ 59.)

As a result of this scheme, LPCiminelli was named a "Preferred Developer" of CNSE in Buffalo, New York, and ultimately awarded a construction management contract worth approximately $750 million. (PSR ¶ 58.) Of that $750 million, LPCiminelli retained a 3.5% management fee, or approximately $26,250,000. (*See* PSR ¶ 65.)

### B. Guilty Verdict and Sentencings

On July 12, 2018, a jury returned a verdict of guilty as to all counts against Ciminelli and his co-defendants, Kaloyeros, Aiello, and Gerardi. Specifically, Ciminelli was convicted of one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and one count of wire fraud, in violation of 18 U.S.C. § 1343, each of which carries a maximum term of imprisonment of 20 years.

None of Ciminelli's co-defendants at trial have been sentenced. However, two of Ciminelli's co-defendants in the S2 Indictment have been sentenced based on separate conduct. Specifically, Joseph Percoco was sentenced by the Court principally to a term of imprisonment of 72 months based on his receipt of bribes from Aiello, Gerardi, and Peter Galbraith Kelly. Kelly was sentenced principally to a term of imprisonment of 14 months for defrauding his employer into hiring Percoco's wife.

## II. APPLICABLE GUIDELINES RANGE

The Government and the Probation Office agree that Ciminelli's total offense level is 31, which, when combined with a Criminal History Category of I, yields a Guidelines sentencing range of 108 to 135 months' imprisonment. (PSR ¶¶ 79, 83, 126.) Specifically, the applicable Guidelines provision, Section 2B1.1, provides for a base offense level of 7 and, as relevant here, an enhancement based on the actual or intended loss from the offense. Because there was an actual or intended loss, but that loss cannot reasonably be determined, the gain to LPCiminelli from the offense—calculated as the fees charged by the company—is used as an alternative measure of loss, resulting in a 22-level enhancement, corresponding to a $26,250,000 gain. *See* U.S.S.G. § 2B1.1(b) & cmt. 3. Additionally, due to Ciminelli's attempt to obstruct the investigation in this case, an additional 2-level enhancement applies.

Ciminelli now argues that no loss enhancement should apply, or, in the alternative, that the enhancement should be lower. Ciminelli is incorrect as a legal and factual matter. First, Ciminelli contends that the Government has not proven any loss. (Sentencing Letter of Louis Ciminelli, Nov. 12, 2018 (Dkt. No. 901) ("Ciminelli Sub.") 21-22.) Ciminelli assumes—incorrectly—that the Government must prove actual loss. In fact, "[l]oss for purposes of the fraud guideline . . . is defined as 'the greater of actual loss or intended loss.'" *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 103 (2d Cir. 2014) (quoting U.S.S.G. § 2B1.1 cmt. 3(A)). The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. 3(A)(i), (ii).

Here, the Government has proven that there was an intended loss. Indeed, conspiring to rig an RFP to prevent other companies from fairly competing only makes sense if the goal is to ensure that a better or lower price competitor cannot win the bidding, and a notable feature of the bid-rigging scheme here was to prevent evaluation based on price. As Kevin Schuler testified, LPCiminelli did not want to afford an opportunity for another company to compete by offering a lower price (*see* Tr. 1096), and the jury found beyond a reasonable doubt that the defendants exposed Fort Schuyler to a risk of economic harm (Tr. 2885-86). In short, the Government has proven that Ciminelli and his co-defendants intended pecuniary harm. As such, a loss enhancement applies, which may be measured in terms of gain. *See, e.g.*, *United States v. Thomas*, 101 F.3d 1392, 1996 WL 364553, at *3 (2d Cir. 1996) ("[W]hen loss or intended loss cannot be determined with precision, the Sentencing Guidelines support reasonable alternative estimates of loss, including the use of '[t]he offender's gain from committing the fraud.'" (quoting former fraud provision of the Sentencing Guidelines, Section 2F1.1 cmt. 8)).

Even if Ciminelli were correct in focusing on actual loss, however, he would still be subject to a loss enhancement. Mark Balling, formerly senior vice president of Lend Lease, a significant construction company in Western New York that was interested in the Buffalo Billion projects, testified that during the relevant time period, Lend Lease's typical fee for construction management at risk was 2% to 2.5% for projects under $100 million in size, and less for larger projects. (Tr. 1512.) Steven Bills, vice president of LeChase Construction Services, another construction company in Western New York interested in the Buffalo Billion projects, similarly testified that LeChase's typical construction management fee ranged from 2% for projects in excess of $200 million to 4-5% for projects in the range of $1 million to $5 million. (Tr. 1613.) By contrast, LPCiminelli charged a 3.5% fee on a $750 million project and COR charged an 8% fee on its $15 million and $90 million projects. Ciminelli responds to this testimony simply by asserting, without attribution or authority, that "[t]o use [Balling's and Bills'] testimony now to argue that it proves loss is seriously misguided." (Ciminelli Sub. 22.) There is no basis for the claim that this sworn testimony cannot establish loss. To the contrary, the testimony at trial clearly demonstrated, beyond a preponderance of the evidence, that significantly lower fees were available in the market.

Second, Ciminelli argues that, even if there was a loss to Fort Schuyler, it can be reasonably calculated by some theoretical expert, and therefore gain should not be used as an alternative means to measure loss. (Ciminelli Sub. 22.) Under the Sentencing Guidelines, however, "[a] district court is not required to calculate loss with absolute precision, but need only by a preponderance of the evidence make a reasonable estimate of the loss given the available information." *United States v. Binday*, 804 F.3d 558, 595 (2d Cir. 2015) (internal quotation marks and citations omitted). Moreover, courts may use gain as an alternative measure for loss so long as the actual or intended loss "*reasonably* cannot be determined." U.S.S.G § 2B1.1 cmt. 3(B) (emphasis added).

Ciminelli's proposal for calculating loss is not reasonable and relies on a faulty premise: that the question of loss depends on what some putative other construction company *should* charge given the circumstances that Ciminelli now deems most significant. (Ciminelli Sub. 22.) In fact, as to actual loss, the question is what a competing company actually *would have* charged had there been a fair competition for these projects. There is no reasonable way to make that determination

because the defendants' scheme worked: they forestalled a real competition and therefore it is not reasonably possible to determine the lowest price Fort Schuyler would have obtained absent the fraudulent scheme. In short, the Court "need only make a reasonable estimate of loss," U.S.S.G § 2B1.1 cmt. 3(C), and the Guidelines impose no requirement to follow Ciminelli's flawed process for establishing loss.

Third, and finally, Ciminelli contends that, even if there was a loss and it cannot reasonably be calculated, the Court should not use gain as an alternate measure of loss because it overstates the loss, as any loss in this context must be less than the gain. (Ciminelli Sub. 23.) This argument misunderstands the law and purposes of Section 2B1.1(b) and its associated commentary. As noted above, the Court need only "make a reasonable estimate of the loss given the available information," *Binday*, 804 F.3d at 595, and when using the gain as an alternative measure for loss, there is no requirement that there be "a direct correlation" between the amount of the gain and the amount of loss, *United States v. Finazzo*, 682 F. App'x 6, 13 (2d Cir. 2017).

The question, therefore, is simply whether the gain provides a reasonable estimate of the loss for the purposes of imposing an appropriate enhancement under the Guidelines, and there is no doubt that gain provides such a reasonable alternative measurement in this case.[1] First, the scope and impact of this fraud was enormous: it went to the control over and fair use of hundreds of millions of taxpayer dollars, and adversely impacted not only Fort Schuyler's disposition of that money but also the public's faith in the fair and just administration of vast sums of taxpayer dollars and public investment in economic development. *See* U.S.S.G. § 2B1.1 cmt. 3(C)(vi) ("The estimate of loss shall be based on available information, taking into account . . . [m]ore general factors, such as the scope and duration of the offense and revenues generated by similar operations."). Second, where the defendants have defrauded the victim of its right to control its assets, the extent of the assets fraudulently taken control of provides a reasonable estimate of the victim's loss. *See United States v. Williams*, 736 F. App'x 267, 273 (2d Cir. 2018) ("[The defendant's] use of fraudulent means to deprive . . . victims of 'potentially valuable economic information' that might otherwise have led them not to pay off those debts, *Binday*, 804 F.3d at 570 (internal quotation marks omitted), rendered each payment part of the harm he inflicted by

---

[1] Ciminelli suggest that, even if the Court does use gain, the gain should be diminished by some amount to account for the fact that competitors would have charged some fee for the work. (Ciminelli Sub. 23-24.) But a competitor's putative fee does not lessen the gain to LPCiminelli, and, for the reasons set forth above, gain is the reasonable and appropriate measure for loss in this case.

Ciminelli also argues that the only "reasonably foreseeable pecuniary harm" that resulted from the offense was the fees that would have accrued based on an early estimate of the Riverbend project as a $60 to $80 million project. (Ciminelli Sub. 24.) Ciminelli provides no support for the notion that harm must be reasonably foreseeable at some particular early point in the course of a conspiracy as determined by the defendant, nor could he. The full scope of the value of project was foreseeable and indeed known to Ciminelli as the fraudulent scheme and criminal conspiracy developed and continued. The Government notes, however, that Ciminelli has not been held accountable for the loss associated with COR's projects in Syracuse.

depriving the victims of the right to control their finances, and therefore a reasonable estimate of the victims' loss.").

### III. DISCUSSION

As the Court is aware, the Sentencing Guidelines provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct, protect the public from further crimes of the defendant, and promote respect for the law. *Id.* at 50 & n.6.

The Government submits, consistent with the Probation Office's recommendation, that a substantial prison sentence, though one below the applicable Guidelines range, would be sufficient but not greater than necessary to comply with the purposes of sentencing in this case.

#### A. The Nature, Circumstances, and Seriousness of the Offense

The conduct at issue here was far-reaching and affected key institutions relied on by the citizens of New York. As Ciminelli acknowledges, "[w]e recognize that the 'Buffalo Billions case' has garnered state-wide notoriety and that corruption in New York State government is not to be taken lightly. New York's citizen deserve far better than they have received." (Ciminelli Sub. 25.)

Although the board members and employees of Fort Schuyler were cynically deceived by the defendants in an effort to take control over enormous amounts of taxpayer dollars, the victims in this case are broader still. Ciminelli and his co-defendants deprived honest competitors of the efforts and expense that those competitors spent on what was in truth a hopeless attempt to obtain State business, and, perhaps more importantly, took from those competitors a fair chance to compete for a share of the work and earnings funded by the citizens of New York. Ciminelli and his co-defendants further took from the citizens of New York their right and expectation to see that their money would be used to develop and benefit the State, and not as a tool to benefit businessmen and lobbyists with unethical access and influence in State government.

Moreover, Ciminelli's conduct went beyond his participation in a scheme to defraud. When faced with the real possibility of criminal liability, Ciminelli's response was to attempt to erase the evidence of his crime to obstruct the investigation and elude responsibility. Ciminelli's efforts to delete his criminal communications itself represents additional criminal conduct requiring appropriate punishment.

The defendant's conduct, and its impact on direct and indirect victims mandates a

substantial term of imprisonment.

### B. The Need to Deter Criminal Conduct

In this case, not only corrupt Government officials but also the business interests who choose to use their influence unlawfully have been brought to justice. This case represents an important opportunity to deter crimes committed by those in the private sector who believe that they can commit crimes of fraud and corruption with impunity. When sentencing Percoco, the Court stated, "I hope that this sentence will be heard in Albany." (Percoco Sentencing Tr. 75, Sept. 20, 2018.) When sentencing Kelly, the Court stated, "I hope the sentence will be heard in government affairs offices everywhere." (Kelly Sentencing Tr. 65, Oct. 16, 2018.) And when sentencing Ciminelli, the Court will send a message to be heard in boardrooms and executive suites everywhere.

### C. The Characteristics of the Defendant

Ciminelli's submission focuses substantially on the good works he has done for the City of Buffalo.[2] These are properly mitigating factors and, as noted above, the Government recommends a sentence below the applicable Guidelines range of 108 to 135 months' imprisonment.

However, it is worth noting that much of the funds donated to various institutions in Buffalo came to Ciminelli while he was committing fraud to divert millions of dollars to his company and his own bank account. Furthermore, while the various letters written in support of Ciminelli attest to a strong moral character, the facts proven at trial demonstrate that, when enough money was at stake, Ciminelli was all too willing to engage in fraud to get it. And finally, rather than accept responsibility for his conduct, Ciminelli took steps to erase the evidence of his guilt in effort to obstruct investigation into his offense.

### D. The Need to Avoid Unwarranted Sentence Disparities Among Defendants

Ciminelli was convicted at trial with three other individuals for their roles in defrauding Fort Schuyler, none of whom have been sentenced. The Government views Ciminelli as less culpable than Kaloyeros. Kaloyeros, unlike Ciminelli, was a State employee granted enormous discretion and trust by the Governor of New York. The evidence at trial also shows that Kaloyeros was more proactive than his co-defendants in perpetrating the fraud, as he was the individual drafting the RFPs and working to insert qualifications that would steer the awards to his co-conspirators. The Government views Ciminelli as similarly culpable to Aiello and Gerardi, who engaged in the same fraud on behalf of their company and who also engaged in obstructive conduct, although Aiello and Gerardi also engaged in a second, separate bribery scheme.

---

[2] Ciminelli also refers to the impact that imprisonment will have on his health. The Government has requested additional information on this topic from the Bureau of Prisons, and will furnish additional information to the Court as appropriate.

## IV.  CONCLUSION

For the foregoing reasons, the Government respectfully submits that the defendant should be sentenced to a below-Guidelines-range but substantial term of imprisonment.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:  \_\_\_\_/s/_____
Matthew Podolsky
David Zhou
Robert Boone
Janis Echenberg
Assistant United States Attorneys
(212) 637-1947/2438/2208/2597

cc:  Counsel for Louis Ciminelli (by ECF)