# BRACEWELL

November 26, 2018

**VIA ECF**

Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:  United States v. Ciminelli, S2 16 Cr. 776 (VEC)

Dear Judge Caproni:

We write in response to the government's letter of November 19, 2018, which recommends "a substantial term of imprisonment" for Louis Ciminelli.

A.  Guidelines Calculation

The government's position on "loss" is seriously flawed. First, the government argues that it has proven "intended loss" because "conspiring to rig an RFP to prevent other companies from fairly competing only makes sense if the goal is to ensure that a better or lower price competitor cannot win the bidding, and a notable feature of the bid-rigging scheme here was to prevent evaluation based on price." G. letter 4. But that is plainly wrong. No witness testified that Fort Schuyler would have issued an RFP in which price was an evaluation criterion if the defendants had not "rigged the bid." To the contrary, all of the RFPs that Fort Schuyler issued as part of the Buffalo Billions program were "RFQs," in which the winner was selected on

**Paul Shechtman**
Partner

T: +1.212.508 6107    F: +1.800.404.3970
1251 Avenue of the Americas, 49th Floor, New York, New York 10020-1100
paul.shechtman@bracewell.com        bracewell.com

AUSTIN   CONNECTICUT   DALLAS   DUBAI   HOUSTON   LONDON   NEW YORK   SAN ANTONIO   SEATTLE   WASHINGTON, DC

# BRACEWELL

November 26, 2018
Page 2

qualifications, not price.[1] In every instance, compensation was to be negotiated after the "preferred developer" was selected and after the contours of the job were defined. Thus, to argue that Mr. Ciminelli intended to defraud Fort Schuyler by preventing a lower bid from being submitted is to create a narrative without support.

Second, the government contends that the testimony of Mr. Balling and Mr. Bills proves that there was a loss. At trial, however, the Court made clear that neither witness was in a position to testify about "what the development fee schedule should be for this case." (Tr. 1485); id. (the Court: "I have no idea how Mr. Balling has any idea what the development fee ought to have been in this case"). Yet that is precisely what the government seeks to use their testimony for now. "Sworn testimony can[] establish loss," see G. letter 4, but not sworn testimony that is off point.

Notably, both Balling and Bills testified about their typical fees for a "construction management project," but Riverbend was a design-build job, in which a contractor takes on more risk. See Schiff Hardin LLP, "Risk Allocation in Design-Build Construction Projects," Oct. 2003 ("a design-builder will remain liable to the owners for the failure of the completed structure to function adequately as a consequence of a design problem [unrelated to] the design-builder's negligent errors or omissions"); id. ("the design-build concept . . . allows the owner to shift the

---

[1] Fort Schuyler was not unique in this regard. It is standard practice in a design-build project to select based on qualifications, not price. See "Design-Build Done Right," Design Build Institute of America, Feb. 2014 (an owner "should use a process that (a) focuses heavily on qualifications of the design builder . . . rather than price and (b) rewards design building teams that have a demonstrated history of successful collaboration in design-build projects).

# BRACEWELL

November 26, 2018
Page 3

risk of delayed completion to the design-builders with greater certainty at an earlier stage of the project"). In construction, as in most walks of life, one who assumes more risk is compensated accordingly. See "Design-Build Goes Mainstream," National Real Estate Investor, April 2003 ("the added risk design-build firms assume by guaranteeing price is worth a couple extra percentage points").

Third, the government argues that there is no reasonable way to determine what another company would have charged "because the defendant's scheme worked." But that is unconvincing. Every day, construction companies bid on jobs based on contract documents and related materials. The government has chosen not to enlist an expert to make a "reasonable estimate" of a fair fee for the Riverbend job, which is all that the law requires. Nor has it taken the obvious step of asking Fort Schuyler to determine if the 3.5 percent that LPCiminelli charged was out of line with what it paid for other jobs. Suffice it to say, the notion that a fair fee for the Riverbend project cannot reasonably be calculated would be startling to any construction-industry professional.

Fourth, the government argues that gain does not have to bear any relationship to loss, even though gain is meant to be a proxy for loss in appropriate cases. G. letter 5. How could that be? See United States v. Mitrow, 2015 WL 5245281 *5 (S.D.N.Y.)(Engelmayer, J.)(rejecting gain as a proxy for loss where it "substantially overstated[d] any realistic measure of loss"). By multiplying 3.5 percent by the amount spent on the Riverbend project (an amount the government overstates), the government assumes, in effect, that a contractor would have done the job for free.

# BRACEWELL

November 26, 2018
Page 4

There is no free design-builder. The government's goal may be to get the biggest number possible, but that should not be the court's.[2]

In sum, the government has the burden of proving loss by a preponderance of the evidence, and it has not made any effort to do so here. See United States v. Schneider, 930 F.2d 555, 559 (7th Cir. 1991)(the defendants "may have placed [the victim] at risk, but the government has made no effort to quantify risk, liberal as the requirements are for such quantification").[3]

B.   Section 3553(a)

1.   The government writes that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." G. letter 6, citing Gall v. United States, 128 S.Ct. 586, 594 (2007). Of

---

[2]   The government cites Finazzo for the proposition that "there is no requirement that there be a 'direct correlation' between the amount of the gain and the amount of the loss." G. letter 5, citing 682 F. App'x. 6, 13 (2d Cir. 2017). But in Finazzo, the kickbacks that went to the defendant were "a reasonable estimate of the loss." Id. ("any profits that [Finazzo] would have gotten . . . would [otherwise] have accrued to the company[,] increasing its profitability"). That cannot be said here.

[3]   Almost as a throw-away, the government cites United States v. Williams, 736 F. App'x. 267, 273 (2d Cir. 2018) for the broad proposition that "where the defendants have defrauded the victim of its right to control its assets, the extent of the assets fraudulently taken control of provides a reasonable estimate of the victim's loss." G. letter 5. But that misreads the case. (In Williams, the defendants operated a debt collection agency, which apparently purchased aging debts -- some still legitimate, some not -- and then threatened the putative debtors and lied to them to obtain payment.) A hypothetical is instructive. Assume (i) A owed B a $100 debt and failed to pay it, and (ii) B obtained the money by threatening A at gunpoint. No one would doubt that B had stolen $100 from A, regardless of whether the debt was legitimate. That is what Williams teaches, and it is light years from this case. If the government's reading of Williams were correct, the loss in this case would be the full value of the Riverbend contract (more than $600 million), no matter how conscientiously LPCiminelli performed the work.

# BRACEWELL

November 26, 2018
Page 5

course, not everyone shares that enthusiasm.  See, e.g., United States v. Algahaim, 842 F.3d 796, 799 (2d Cir. 2018)(the Sentencing Commission's "approach, unknown to other sentencing systems, was one [it] was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider"); F. Bowman, "The Failure of the Federal Sentencing Guidelines," 105 Colum. L. Rev. 1315, 1328 (2005)("[a]t or near the root of virtually every serious criticism of the guidelines is the concern that they are too harsh").  One does not have to believe the Guidelines are regrettable to recognize that, too often, they are a "starting point" that starts the sentencing dialogue too high.

2. The government would diminish Mr. Ciminelli's enormous contributions to Buffalo by noting that "much of the funds donated to various institutions in Buffalo came to [him] while he was committing fraud to divert millions of dollars to his company and his own bank account." G. letter 7.  That is untrue.  Years before his company earned a dollar from the Riverbend project, Mr. Ciminelli was donating millions to Buffalo's cultural and educational institutions.  Just as importantly, he was giving his time and wise counsel to them.  Would that all of us were as civic-minded as he has been.

3. Finally, in its sentencing recommendation, the government, like the Probation Office, gives no weight to Mr. Ciminelli's health.  The government relegates it to a footnote.  G. letter 7 n.2.  The leading multiple myeloma specialist in the country puts Mr.

# BRACEWELL

November 26, 2018
Page 6

Ciminelli's life expectancy at eight years or less.  Letter of Dr. Joseph Mikhael.  Surely, that is a relevant fact for a sentencing judge to consider.[4]

                        Respectfully submitted,

                        /s/ Paul Shechtman

                        Paul Shechtman
                        Partner

PS:wr
Attachment

---

[4] Attached are a few letters from supporters that were received belatedly.  We apologize for their lateness.